| Reed Zars | George E. Hays | Michelle Fein |
|---|---|---|
| Utah Bar No. 16351 | Attorney at Law | Utah Bar No. 18065 |
| Attorney at Law | P.O. Box 843 | 50 W Broadway, Suite 333 |
| 910 Kearney Street | Bellevue, WA 98009 | PMB 49891 |
| Laramie, WY 82070 | (415) 566-5414 | Salt Lake City, UT 84101 |
| (307) 760-6268 | georgehays@mindspring.com | (610) 761-7643 |
| reed@zarslaw.com | (Pro Hac Vice pending) | michelle@fein.law |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | | |
|---|---|---|
| Utah Physicians for a Healthy Environment, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No. _____ |
| Harley-Davidson of Salt Lake City, LLC. (d/b/a | ) | |
| Harley-Davidson of Salt Lake City and | ) | |
| South Valley Harley-Davidson Shop) and | ) | |
| Northern Utah Power Sports, LLC. (d/b/a | ) | |
| Golden Spike Harley-Davidson and Saddleback | ) | |
| Harley-Davidson), and Joseph L. Timmons, Jr., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**COMPLAINT**

**I.  STATEMENT OF THE CASE, JURISDICTION AND VENUE**

1.      This is a federal Clean Air Act and Noise Control Act citizen enforcement action

brought by Plaintiff Utah Physicians for a Healthy Environment, Inc. ("Physicians"), against

Defendants Harley Davidson of Salt Lake City, LLC (d/b/a Harley-Davidson of Salt Lake City

and South Valley Harley-Davidson Shop), Northern Utah Power Sports, LLC (d/b/a Golden

Spike Harley-Davidson and Saddleback Harley-Davidson), and Joseph L. Timmons, Jr.,

member, manager and responsible corporate officer of Harley Davidson of Salt Lake City, LLC

and Northern Utah Power Sports, LLC (collectively, "Defendants").  Physicians seek to enforce Defendants' significant, repeated, and ongoing violations of the Clean Air Act and Noise Control Act, which have been and continue to be at the expense of the health and well-being of Physicians' members and the public at large.   Defendants' violations include: the removal of air and noise emission control devices in motorcycles; the sale and installation of aftermarket parts that defeat air and noise emission control devices in motorcycles; and the ownership, operation, and sale of new and used motorcycles without all of their required air emission and noise controls present and functioning as designed.

2.      This complaint seeks declaratory and injunctive relief and the imposition of civil penalties (payable to the U.S. Treasury) under (1) the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q ("CAA"), (2) Utah's CAA state implementation plan at 40 C.F.R. § 52.2320(c)(59) ("Utah SIP"), (3) the federal Noise Control Act at 42 U.S.C. §§ 4901-4918 ("NCA"), and (4) the federal regulations implementing the NCA at 40 C.F.R. Part 205, Subparts A, D, and E.

3.      This court has subject matter jurisdiction over the claims set forth in this complaint pursuant to 42 U.S.C. § 7604(a) (citizen suit provision of the CAA), 42 U.S.C. § 4911(a)(1) (citizen suit provision of the NCA), and 28 U.S.C. § 1355(a) (recovery of penalties).  Jurisdiction additionally exists under 28 U.S.C. § 1331 because this action is brought to address Defendants' violations of federal law, including CAA § 7522 (motor vehicle tampering and defeat part prohibitions), Utah Admin. Code R307-201-2 in the Utah SIP at 40 C.F.R. § 52.2320(c)(59) (motor vehicle emissions systems requirements), and NCA §§ 4909(a)(1), 4909(a)(2)(B), and 4909(a)(3) (motorcycle noise control requirements including tampering, defeat part, and tampered vehicle use prohibitions).

4.      The relief requested is authorized pursuant to 28 U.S.C. §§ 2201 and 2202 (declaratory judgment), CAA § 7413 (Utah SIP civil penalties), CAA § 7524 (mobile source civil penalties), CAA § 7604 (CAA injunctive relief), NCA § 4910(a)(2) (civil penalties), and NCA § 4911(a) (injunctive relief).

5.      Pursuant to 28 U.S.C. § 1391(b) and (c), venue lies in the District of Utah because all three Defendants reside and do business in Utah, and the actions giving rise to the claims herein have taken place, and continue to take place, in Utah.  This matter is filed in the Central Division of the Utah Federal District Court because Physicians' main office is in Salt Lake County.

6.      To the extent required by CAA § 7604(b)(1)(A) and NCA § 4911(b)(1)(A), on April 5, 2022, Physicians notified in writing, by certified mail, the Administrator of the Environmental Protection Agency ("EPA"), the Governor of Utah, the Utah Department of Environmental Quality ("UDEQ"), and Defendants of the violations alleged in this Complaint and Physicians' intent to sue.  A true and accurate copy of Physicians' April 5, 2022 notice letter and attachments are incorporated herein as **Attachment 1**.

7.      More than sixty days have passed since Physicians' April 5, 2022 notice letter was postmarked and served via certified mail.  Defendants did not object to any of the factual or legal allegations in Physicians' notice letter, or provide any additional information showing Physicians' allegations were in error, as the notice letter encouraged.  *See* **Attachment 1**, at 17.

8.      Neither the State of Utah nor EPA has commenced or is diligently prosecuting a court action to require Defendants' compliance with the statutes and regulations cited herein. Defendants have repeatedly violated, and remain in violation of, the Clean Air Act, the Utah SIP,

and the Noise Control Act.

## II.  PARTIES

### A.      Plaintiff Utah Physicians for a Healthy Environment

9.      Plaintiff Utah Physicians for a Healthy Environment is one of the largest civic organizations of health care professionals in the Western U.S., with approximately 400 physician members and over 2,000 other members who are health care professionals, biologists, toxicologists, engineers, air quality specialists, and other concerned individuals.  Physicians are dedicated to protecting the health and well-being of Utah's citizens through action and the promotion of science-based education, to obtain measurable improvements to human health and the environment.

10.      Physicians are concerned about the significant contribution of motor vehicle exhaust, including that from motorcycles, to elevated levels of respirable particulate matter and ozone in the airshed of the Wasatch Front, and the negative impact that these pollutants have on the public's health.  These pollutants are associated with a wide array of acute and chronic diseases.

11.      Physicians are also concerned about the high levels of noise emitted by motorcycles with aftermarket exhaust systems that emit twice as much noise as they should. These motorcycles roar through the neighborhoods of Physicians' members, and throughout Utah's cities, towns, rural areas, and national parks.  Physicians are particularly concerned about the negative impact that loud and gratuitous noise has on the health of their members and the public.

-4-

12.     Physicians work on behalf of their members to protect and improve the health of Utah's airsheds and soundscapes that are being adversely affected by the excessive air and noise pollution from modified motorcycles.  Physicians allege that Defendants' illegal actions identified in paragraph 1 have caused excess air and noise emissions in Utah.  Physicians bring this action on behalf of its adversely affected members.

13.     The health, environmental, and aesthetic interests of Physicians and its members have been, are being, and, unless and until this Court grants the requested relief herein, will continue to be adversely affected by Defendants' alleged repeated and ongoing violations of the CAA and NCA.

14.     The ambient air in at least seven Utah counties along the Wasatch Front fails to meet the federal, health-based standard for particulate matter, which is less than 2.5 microns in size ("PM$_{2.5}$").  (A micron is one millionth of a meter, approximately 50 times smaller than the diameter of a human hair.)  The counties that do not meet the 24-hour, 35 micrograms per cubic meter PM$_{2.5}$ standard are shown in the map below, acquired from the UDEQ website at:

*https://deq.utah.gov/air-quality/area-designations-pm2-5-state-implementation-plan-development*.  (Approximate dealership locations added.)



15.     The ambient air in all or parts of at least seven Utah counties also fails to meet the federal, health-based ozone limit of 0.070 parts per million for the 8-hour standard.  *See* 40 C.F.R. § 81.345 (listing Utah counties in nonattainment for the 2015 8-Hour Ozone NAAQS). These counties are shown in the map below, acquired from the UDEQ website at:

*https://documents.deq.utah.gov/air-quality/planning/inventory/DAQ-2016-018761.pdf*.

(Approximate dealership locations added.)  EPA recently proposed redesignate these counties from "marginal" to the more serious "moderate" ozone nonattainment status that will require the state to revise its SIP to include additional ozone control requirements.  87 Fed. Reg. 21842, 21845 & 21849 (April 13, 2022).



16.     Utah's Division of Air Quality ("UDAQ") attributes a significant portion of the air pollution problem along the Wasatch Front to on-road motor vehicles.  *See* UDAQ, Utah's Air Quality, 2021 Annual Report, at 26 ("On-road mobile sources produce about 39% of the annual man-made pollution ($NO_x$, $PM_{2.5}$ exhaust, and VOC) along the Wasatch Front."), *available at* https://documents.deq.utah.gov/air-quality/planning/air-quality-policy/DAQ-2022-000342.pdf.

17.     Defendants' removal of original air and noise emission control devices in

motorcycles, their sale and installation of motorcycle aftermarket defeat parts, their sale of new

and used motorcycles with aftermarket defeat parts installed, and their ownership and use of such

tampered motorcycles all cause an increase in the emission of exhaust and noise from

motorcycles in Utah.  These increased exhaust emissions, including $PM_{2.5}$ and $NO_x$ (an ozone

precursor), and additional noise pose a particular hazard to public health in Utah.

18.    Physicians' members necessarily breathe the ambient air in Utah and the Wasatch

Front at home, at work, on roads and highways, and during outdoor pursuits and other activities.

The substantial increase in motorcycle emissions of $NO_x$ and hydrocarbons caused by

Defendants' sale and installation of aftermarket defeat parts contributes to and exacerbates the

Wasatch Front's unhealthy levels of $PM_{2.5}$ and ozone.  These pollutants enter the lungs of

Physicians' members and pose a significant risk to their health and well-being.  Motorcycle

exhaust contributes to and prolongs the poor air quality in Utah that has been linked to serious

diseases that range from short-term increased rates of heart attacks, strokes, and death to long-

term neurodegenerative diseases like Alzheimer's.

19.    Physicians' members suffer in many ways from elevated, unhealthful levels of

$PM_{2.5}$, including experiencing vision impairment, reduction of lung capacity, sinus irritation,

coughing spells, and foul smells.  UDAQ confirms that particulate matter "can cause nose and

throat irritation, lung damage, bronchitis, and early death."  UDAQ, Utah's Air Quality, 2021

Annual Report, at 5.  Motorcycles that expel increased emissions due to Defendants' activities

contribute to these adverse effects.

20.    Physicians' members also suffer in many ways from elevated, unhealthful levels

of ozone.  According to UDAQ, "Ozone affects the lungs and respiratory system in many ways.

Exposure can lead to increased school or work absences, visits to doctors and emergency rooms, and hospital admissions.  Research also indicates that ozone exposure can increase the risk of premature death from heart or lung disease."  UDAQ, "Frequently Asked Questions about Ozone and Your Health," available at *https://deq.utah.gov/air-quality/frequently-asked-questions-about-ozone-and-your-health.*  UDAQ specifically recognizes that ozone pollution "[c]an cause breathing problems, reduced lung function, asthma, irritated eyes, stuffy nose, and reduced resistance to colds and other infections.  It may also speed up aging of lung tissue."  UDAQ, Utah's Air Quality, 2021 Annual Report, at 5.  UDAQ explains that elevated ozone coincides with elevated levels of volatile organic compounds and nitrogen oxides and that "motor vehicles are the largest source of [nitrogen oxides] within the nonattainment area."  *Id.* at 36.

21.     Physicians' members suffer from a reduced enjoyment of life when high pollution levels in the Wasatch Front force them to avoid activities, such as traveling, walking, running, hiking, skiing, and biking.  Physicians' members are also harmed when they are unable to see with clarity the beautiful scenery that once was visible, due to high pollution levels.  Again, motorcycles that release increased emissions due to Defendants' violations contribute to these adverse effects.

22.     Physicians' members share the same soundscape or acoustic environment in which Defendants' dealerships are located and in which Defendants' customers operate their loud motorcycles.  The motorcycles using unlabeled, aftermarket exhaust systems sold by Defendants contribute to the degradation of the acoustic environment in which Physicians' members live, work and recreate.

23.     The noise from tampered motorcycles with unlabeled aftermarket exhaust systems

can easily be twice as loud as the noise from their stock counterparts.  Physicians are harmed by

the painfully loud and omnipresent noise from tampered motorcycles driven through the streets

of downtown Salt Lake City, through Logan, Ogden, Riverdale, and Sandy, along I-15, I-70, I-

80, and Utah's secondary highways.  The thundering noise from tampered motorcycles echoes

between the walls of Utah's favorite scenic byways, including but not limited to Emigration,

Little and Big Cottonwood, and Millcreek Canyons.  The additional noise from the aftermarket

exhaust parts and motorcycles with such parts that Defendants sold impairs Physicians'

members' enjoyment of those byways and many similar, once quieter acoustic environments.

24.     Excessive noise discharged by tampered motorcycles in the neighborhoods of

Physicians' members, along the Wasatch Front, and throughout Utah has injured, and continues

to injure, Physicians' members because it is physically painful.

25.     Excessive noise from tampered motorcycles in Utah diminishes Physicians'

members' enjoyment of their homes, gardens, recreational and social activities, meals, travels,

and conversations.

26.     Physicians' members are forced to avoid or curtail activities in Utah they would

otherwise enjoy, such as bicycling, running or hiking on or near roads and highways, due to the

excessive noise discharged from tampered motorcycles.

27.     Unlabeled motorcycle exhaust systems manufactured after 1985 harm Physicians'

members because they are presumptively louder than 80 dB.

28.     Physicians' members could bring this action in their individual capacity.  None

of the claims asserted or relief requested, however, requires that Physicians' members bring such

an action in their individual capacity.

**B.      Defendants**

29.      Defendant Harley Davidson of Salt Lake City, LLC, ("Harley SLC") is a Utah Corporation.  Harley SLC's address is 2928 S State Street, Salt Lake City, UT 84115.  Harley SLC's registered agent is Joseph L. Timmons, Jr.

30.      Harley SLC is owned by Joseph L. Timmons, Jr.

31.      Harley SLC does business as Harley-Davidson of Salt Lake City and South Valley Harley-Davidson Shop.

32.      Harley SLC owns two Harley-Davidson dealerships in Utah, one in Salt Lake City, the other in Sandy.  The Harley-Davidson of Salt Lake City dealership is located at 2928 S State Street, Salt Lake City, UT 84115.  The South Valley Harley-Davidson Shop is located at 8886 Sandy Pkwy, Sandy, UT 84070.

33.      Through its dealerships Harley SLC has repeatedly (1) removed Original Equipment Manufacturer ("OEM") catalytic converters in the exhaust system in new and used motorcycles, (2) installed aftermarket exhaust parts in new and used motorcycles that replaced OEM exhaust parts, (3) sold aftermarket exhaust parts alone and in new and used motorcycles, (4) owned and operated motorcycles without fully functioning emission control systems, (5) assembled and sold new motorcycles that do not comply with their applicable noise limit and exhaust labeling requirements, (6) removed noise control devices from new and used motorcycles, and (7) operated motorcycles from which noise control devices had been removed. All of these actions contribute to the harmful levels of air and noise pollution that harm Physicians' members and the public.

34.     Defendant Northern Utah Power Sports, LLC, ("Power Sports") is a Utah Corporation.  Power Sports' address is 2928 S State Street, Salt Lake City, UT 84115.  Power Sports' registered agent is Joseph L. Timmons, Jr.

35.     Power Sports is owned by Joseph L. Timmons, Jr.

36.     Power Sports does business as Golden Spike Harley-Davidson and Saddleback Harley-Davidson.

37.     Power Sports owns two Harley-Davidson dealerships in Utah, one in Riverdale, the other in Logan.  The Golden Spike Harley-Davidson dealership is located at 5152 1500 W, Riverdale, UT 84405.  The Saddleback Harley-Davidson Shop dealership is located at 445 Main St., Logan, UT 84321.

38.     Through its dealerships Power Sports has repeatedly (1) removed Original Equipment Manufacturer ("OEM") catalytic converters in the exhaust system in new and used motorcycles, (2) installed aftermarket exhaust parts in new and used motorcycles that replaced OEM exhaust parts, (3) sold aftermarket exhaust parts alone and in new and used motorcycles, (4) owned and operated motorcycles without fully functioning emission control systems, (5) assembled and sold new motorcycles that do not comply with their applicable noise limit and exhaust labeling requirements, (6) removed noise control devices from new and used motorcycles, and (7) operated motorcycles from which noise control devices had been removed. All of these actions contribute to the harmful levels of air and noise pollution that harm Physicians' members and the public.

39.     Defendant Joseph L. Timmons, Jr. owns Harley SLC and Power Sports.  Mr. Timmons is the CEO, manager, and 100 percent owner of Harley SLC and Power Sports.  Mr.

Timmons had the authority to prevent and correct the violations alleged in this complaint but did not exercise that authority.

### III.  LEGAL FRAMEWORK

**A.     Clean Air Act**

40.     Congress enacted the CAA "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).  To effect that purpose, Congress required motor vehicles to meet emission limits, which necessitated the use of emission control devices, including catalytic converters, to protect and enhance the nation's air.

(1)     CAA Mobile Source Emission Standards

41.     Pursuant to CAA § 7521(a), EPA promulgates air pollution emission standards for all new motor vehicles offered for sale in the United States to protect public health and welfare. As set forth at CAA § 7521(a)(1):

> The Administrator shall by regulation prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.

42.     In accordance with this directive, EPA has promulgated emission standards for motorcycles by model year, weight, and fuel type, including emission standards for on-road motorcycles at 40 C.F.R. §§ 86.401-2006 – 86.449.

43.     CAA § 7522(a)(1) and 40 C.F.R. § 86.407-78 prohibit manufacturers from selling new motorcycles in the United States unless the manufacturer demonstrates to EPA that each model year of its motorcycles meets its applicable emission standards promulgated pursuant to

CAA § 7521 and has been granted a certificate of conformity ("COC").  The COC, issued

pursuant to CAA § 7525(a), 40 C.F.R. § 86.417-78 and 86.437-78, confirms EPA's finding that

the motorcycle meets all applicable emission standards at the time of original sale, and will

continue to meet such standards during its useful life as long as it is not tampered.

(2)   <u>CAA Defeat Part Prohibitions</u>

44.     To ensure continuous compliance with CAA § 7521 emission standards, CAA

§ 7522(a)(3) prohibits the before- and aftermarket tampering of emission control systems on

EPA-certified vehicles.  The applicable provisions of CAA § 7522(a)(3)(B) are set forth below:

> (a) Enumerated prohibitions.  The following acts and the causing thereof are
> prohibited—
> . . .
>
> (3)(B) for any person to manufacture or sell, or offer to sell, or install, any part or
> component intended for use with, or as part of, any motor vehicle or motor
> vehicle engine, where a principal effect of the part or component is to bypass,
> defeat, or render inoperative any device or element of design installed on or in a
> motor vehicle or motor vehicle engine in compliance with regulations under this
> subchapter, and where the person knows or should know that such part or
> component is being offered for sale or installed for such use or put to such use[.]

45.     The term "motor vehicle" means any motor vehicle for which a COC has been

issued by EPA pursuant to CAA § 7525(a), indicating that it conforms to applicable EPA

requirements governing motor vehicle emissions.

46.     A motorcycle is a "motor vehicle" within the meaning of CAA § 7550(2), which

defines "motor vehicle" as "any self-propelled vehicle designed for transporting persons or

property on a street or highway."  *Id.*; *see also* 69 Fed. Reg. 2398, 2403 n.8 (Jan. 15, 2004).

47.     The defeat part prohibitions in CAA § 7522(a)(3)(B) are meant "to assure that vehicle emission control systems will function as intended during the time the vehicle is in use." H.R. Rep. No. 95-294, 297 (1977); 1977 U.S.C.C.A.N. 1077, 1376, 1977 WL 16034.

        (3)     <u>Utah SIP Tampering and Tampered Vehicle Ownership and Operation Prohibitions</u>

48.     By regulation, Utah prohibits any person from removing or making inoperable any federally required emission control system or device on any motor vehicle in Utah and requires any person owning or operating a motor vehicle registered in Utah to maintain all of the federally required emission control systems or devices in that vehicle at all times.  Utah Admin. Code R307-201-2 states:

> **R307-201-2. Automobile Emission Control Devices.**
>
> Any person owning or operating any motor vehicle or motor vehicle engine registered in the State of Utah on which is installed or incorporated a system or device for the control of crankcase emissions or exhaust emissions in compliance with the Federal motor vehicle rules, shall maintain the system or device in operable condition and shall use it at all times that the motor vehicle or motor vehicle engine is operated. No person shall remove or make inoperable within the State of Utah the system or device or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere.

49.     Utah Admin. Code R307-201-2 is a regulation that has been approved by EPA as part of Utah's SIP to implement the Clean Air Act and is therefore federally enforceable ("Utah SIP regulation R307-201-2").[1]  40 C.F.R. § 52.2320(c)(59), 71 Fed. Reg. 7679, 7680 (Feb. 14,

---

[1] R307-201-2 was subsequently renumbered after its inclusion in the Utah SIP and exists as a matter of state law as well, at Utah Admin. Code R307-201-4.  See: *https://adminrules.utah.gov/public/search/R307-201-4/Current%20Rules.*

2006), https://www.epa.gov/sips-ut/utah-sip-table-c-r307-201-emission-standards-general-emission-standards.

50.     The term "person" in the Utah SIP includes an "individual, trust, firm, estate, company, corporation, partnership, association, state, state or federal agency or entity, municipality, commission, or political subdivision of a state."  R307-101-2, 40 C.F.R. § 52.2320(c)(67), (83), 73 Fed. Reg. 51222, 51222 (Sept. 2, 2008); 81 Fed. Reg. 4959, 4960 (Jan. 1, 2016).

(4)     Penalties for Violations of the CAA and Utah SIP

51.     According to CAA § 7524(a), any person, other than a manufacturer or dealer, who violates CAA § 7522(a)(3)(B) by selling or installing a defeat part after November 1, 2015, is subject to a civil penalty of up to $5,179 per violation, if assessed on or after January 12, 2022. 40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

52.     According to Utah SIP regulation R307-201-2 and CAA §§ 7604(a) and 7413(b), any person who removes or makes inoperable any federally required emissions system or device in a motor vehicle in Utah after November 1, 2015, is subject to a civil penalty of up to $109,024 for each system or device removed or rendered inoperable.  40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

53.     According to Utah SIP regulation R307-201-2 and CAA §§ 7604(a) and 7413(b), any person who owns or operates a motor vehicle in Utah after November 1, 2015, and who fails to maintain all emission control systems and devices in that vehicle, and who fails to use all such systems and devices at all times the vehicle is operated, is subject to a civil penalty of up to

$109,024 for each day of such ownership or operation.  40 C.F.R. § 19.4; 87 Fed. Reg. 1676,

1678 (Jan. 12, 2022).

(5)     Citizen Enforcement of CAA and Utah SIP

54.     Pursuant to CAA § 7604(a), Physicians are entitled to bring suit against

Defendants to enforce emissions standards and to seek civil penalties for such violations.

55.     CAA § 7604(a) authorizes any person to commence a civil action against

any person "who is alleged to have violated (if there is evidence that the alleged violation has

been repeated) or to be in violation of (A) an emission standard or limitation under

this chapter . . ."

56.     CAA § 7604(f)(1) defines "emission standard or limitation under this Act" to

include, "a schedule or timetable of compliance, emission limitation, standard of performance or

emission standard."  CAA § 7604(f)(4) additionally defines "emission standard

or limitation under this Act" to include "any other standard, limitation, or schedule established

. . . under any applicable State implementation plan approved by the Administrator."

57.     CAA § 7602(k) defines the terms "emission limitation" and "emission

standard" as:

> a requirement established by the State or the Administrator which limits
> the quantity, rate, or concentration of emissions of air pollutants on a
> continuous basis, including any requirement relating to the operation or
> maintenance of a source to assure continuous emission reduction, and any
> design, equipment, work practice or operational standard promulgated
> under this chapter.

58.     CAA § 7602(l) defines the term "standard of performance" as:

> a requirement of continuous emission reduction, including any
> requirement relating to the operation or maintenance of a source to assure
> continuous emission reduction.

-17-

59.     Defendants' violations of Utah SIP regulation R307-201-2 are also enforceable by citizens because Utah SIP regulation R307-201-2 is an emission standard or limitation as defined by CAA § 7604(a).  Utah SIP regulation R307-201-2 has been promulgated as a federal rule, 40 C.F.R. § 52.2320(c)(59), and assures continuous emission reductions by requiring emission control systems and devices in motor vehicles in Utah to be maintained and operated "at all times."

60.     Defendants' violations of the Clean Air Act's defeat part prohibitions set forth at CAA § 7522(a)(3)(B) are enforceable by citizens because these provisions are emission standards or limitations as defined by CAA § 7604(a).  The defeat part prohibitions limit the quantity, rate, or concentration of emissions of air pollutants from motor vehicles on a continuous basis by prohibiting persons from selling or installing parts that bypass, defeat, or render inoperative any emission control device that reduces emissions on a continuous basis, and by requiring emission control devices to be operational in a vehicle at all times.  The defeat part prohibitions are also requirements relating to the operation or maintenance of vehicles to assure continuous emission reduction, and are design, equipment, work practice, and operational standards.

### B.     Noise Control Act

61.     The Noise Control Act, 42 U.S.C. §§ 4901-4918 ("NCA"), is founded on the Congressional finding "that inadequately controlled noise presents a growing danger to the health and welfare of the Nation's population, particularly in urban areas."  42 U.S.C. § 4901(a)(1).  As a consequence, Congress declared "that it is the policy of the United States to promote an environment for all Americans free from noise that jeopardizes their health or

welfare." 42 U.S.C. § 4901(b).  To achieve this goal, Congress authorized "the establishment of

Federal noise emission standards for products distributed in commerce" and also the provision of

"information to the public respecting the noise emission and noise reduction characteristics of

such products.  *Id.*

           (1)     NCA Noise Emission Standards

      62.     NCA § 4905 required the EPA to promulgate noise control standards for any

product identified as a major source of noise.

      63.     On May 28, 1975, EPA identified motorcycles as a major source of noise.  43

Fed. Reg. 10822, 10822 (March 15, 1978).  As a consequence, and pursuant to NCA § 4905(c),

EPA was required to issue regulations applicable to motorcycles that:

> set limits on noise emissions from such product and shall be a standard
> which in the Administrator's judgment, based on criteria published under
> section 4904 of this title, is requisite to protect the public health and
> welfare, taking into account the magnitude and conditions of use of such
> product (alone or in combination with other noise sources), the degree of
> noise reduction achievable through the application of the best available
> technology, and the cost of compliance.

      64.     EPA complied with this mandate, promulgating, for example, a noise limit for

street and off-road motorcycles of 83 decibels applicable to model years 1983-1985, and a noise

limit of 80 decibels applicable to model years 1986 and thereafter.  40 C.F.R. § 205.152.

      65.     The EPA regulations also include a rule that each manufacturer place a "readily

visible" permanent label on each motorcycle stating the vehicle meets EPA noise regulations and

identifying a model specific code that must match the same code reflected on a permanent,

"readily visible" label on the vehicle's exhaust system.  40 C.F.R. §§ 205.158, 205.168-1, &

205.169.

(2)     NCA Noise Control Device Tampering and Defeat Part Prohibitions

66.     To ensure initial and continuous compliance with these noise control

requirements, NCA § 4909(a) provides:

> Except as otherwise provided in subsection (b), the following acts or the causing thereof are prohibited:
>
> (1) In the case of a manufacturer, to distribute in commerce any new product manufactured after the effective date of a regulation prescribed under section 4905 of this title which is applicable to such product, except in conformity with such regulation. [Violations of the referenced noise emissions standards at 40 C.F.R. §§ 205.152 (motorcycles) and 205.166 (exhaust systems) are subject to a civil penalty of $41,219 for each new product each day.  42 U.S.C. § 4910(a)(2) & (b).]
>
> (2)(A) The removal or rendering inoperative by any person, other than for purposes of maintenance, repair, or replacement, of any device or element of design incorporated into any product in compliance with regulations under section 4905 of this title [40 C.F.R. § 205.152 and § 205.166], prior to its sale or delivery to the ultimate purchaser or while it is in use, or (B) the use of a product after such device or element of design has been removed or rendered inoperative by any person.
>
> (3) In the case of a manufacturer, to distribute in commerce any new product manufactured after the effective date of a regulation prescribed under section 4907(b) of this title (requiring information respecting noise) which is applicable to such product, except in conformity with such regulation. [Violations of the labeling requirements at 40 C.F.R. §§ 205.158 and 205.169 are subject to a civil penalty of $4,219 per violation per day pursuant to 42 U.S.C. § 4910(a)(2).]
>
> (4) The removal by any person of any notice affixed to a product or container pursuant to regulations prescribed under section 4907(b) of this title [labeling requirements at 40 C.F.R. §§ 205.158 and 205.169], prior to sale of the product to the ultimate purchaser.
>
> (5) The importation into the United States by any person of any new product in violation of a regulation prescribed under section 4908 of this title which is applicable to such product. [Subject to civil penalty per 42 U.S.C. § 4910(a)(2).]

67.     The following definitions, among others, are set forth at NCA § 4902:

(3) The term "product" means any manufactured article or goods or component thereof; . . .

(4) The term "ultimate purchaser" means the first person who in good faith purchases a product for purposes other than resale.

(5) The term "new product" means (A) a product the equitable or legal title of which has never been transferred to an ultimate purchaser, or (B) a product which is imported or offered for importation into the United States and which is manufactured after the effective date of a regulation under section 4905 or 4907 of this title which would have been applicable to such product had it been manufactured in the United States.

(6) The term "manufacturer" means any person engaged in the manufacturing or assembling of new products, or the importing of new products for resale, or who acts for, and is controlled by, any such person in connection with the distribution of such products.

(7) The term "commerce" means trade, traffic, commerce, or transportation—

> (A) between a place in a State and any place outside thereof, or
>
> (B) which affects trade, traffic, commerce, or transportation described in subparagraph (A).

(8) The term "distribute in commerce" means sell in, offer for sale in, or introduce or deliver for introduction into, commerce.

68.     In the motorcycle noise emission regulations at 40 C.F.R. § 205.151(a), the term "tampering" is defined as follows:

> **(26) *Tampering*** means the removal or rendering inoperative by any person, other than for purposes of maintenance, repair, or replacement, of any device or element of design incorporated into any product in compliance with regulations under section 6 [NCA § 4905], prior to its sale or delivery to the ultimate purchaser or while it is in use; or the use of a product after such device or element of design has been removed or rendered inoperative by any person.

69.     Owner's manuals for motorcycles manufactured by Harley-Davidson state the following acts are "presumed to constitute tampering" under the NCA:

1.     Replacing the muffler(s) and/or the entire exhaust system with parts not certified to be noise legal for street use.
2.     Removing or modifying the muffler internal baffles in any way.
3.     Replacing the air intake/cleaner assembly with one not certified to be noise legal for street use.
4.     Modifying the air intake/cleaner assembly in such a way as to make the vehicle no longer noise legal for street use.

### (3)  Citizen Enforcement of the NCA

70.    Pursuant to NCA § 4911(a)(1), citizens can sue any person alleged to be in violation of a "noise control requirement." According to NCA § 4911(f), "the term 'noise control requirement' means paragraph (1), (2), (3), (4), or (5) of section 4909(a)," set forth above.

71.    Pursuant to NCA § 4911(a), Physicians are entitled to bring suit against Defendants to enforce noise violations and to seek injunctive relief and civil penalties for such violations.

72.    The NCA provides for civil penalties against manufacturers, including assemblers, who assemble and distribute in commerce noncompliant new products. The NCA prescribes a penalty of up to $41,219 per day an assembler is in violation of NCA § 4909(a)(1) or (3) after November 2, 2015 and assessed on or after January 12, 2022. NCA § 4910(a)(2); 40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

## IV.  STATEMENT OF FACTS

73.    In each of the allegations set forth below, actions alleged to have been taken by the identified Defendant include actions that the Defendant caused to be taken.

74.     In each of the allegations set forth below, any action alleged to have been taken or not taken by the identified Defendant occurred in Utah between April 5, 2017, and the date of this Complaint.

75.     In each of the allegations set forth below, actions alleged to constitute the removal of any device or element of design in a motorcycle include the deletion, bypass, or rendering inoperative of such device or element of design.

76.     In each of the allegations set forth below, air and noise emission control devices alleged to have been removed include the removal of elements of design.

77.     Each of the allegations set forth below are alleged to have taken place in Utah and are applicable to motorcycles owned or operated in Utah.

78.     An "aftermarket defeat part," as used herein, includes but is not limited to an exhaust part, air intake, or an electronic reprogrammer or software "tune" that changes emission-related settings in the motorcycle's Engine Control Module ("ECM") where a principal effect of the part is to bypass, defeat, or render inoperative an emission control device in a motorcycle and where the person(s) who sold and/or installed such part knew or should have known the part was being sold and/or installed for that purpose.

*Defendants' Air Pollution Related Misconduct*

A.      **Defendants' Repeated Removal of Emission Control Systems or Devices in Motorcycles in Utah.**

      1.      **Defendant Harley SLC Has Repeatedly Removed Emission Control Systems or Devices from Motorcycles in Utah.**

79.     Over the last five years, Harley SLC repeatedly removed emission control systems or devices in motorcycles in Utah.  Harley SLC continues to remove emission control systems or devices in motorcycles in Utah.

80.     Harley SLC repeatedly removed catalytic converters and ECM electronic emission control settings in motorcycles in Utah.  Harley SLC continues to remove catalytic converters and ECM electronic emission control settings in motorcycles in Utah.

81.     More than one of the motorcycles from which Harley SLC removed emission control systems or devices in one or more of the ways described in this Section were registered in Utah.

82.     More than one of the motorcycles from which Harley SLC removed emission control systems or devices in one or more of the ways described in this Section were registered in Utah when owned and/or operated by Harley SLC.

83.     Harley SLC's removal of emission control systems or devices from motorcycles has caused such motorcycles to emit more pollution into the air of Utah than the motorcycles emitted before the removal of such systems or devices.  Harley SLC's removal of emission control systems or devices from motorcycles has caused such motorcycles to exceed their emission standards.

84.     Harley SLC's removal of emission control systems or devices from motorcycles diminished these motorcycles' ability to reduce the emission of pollutants on a continuous basis.

85.     Harley SLC did not replace the emission control systems or devices that it removed from motorcycles in Utah with other devices that were equally or more effective in reducing emissions.

86.     Motorcycles that Harley SLC tampered in one or more of the ways described in this Section have been operated on streets, roads and highways in Utah, and continue to be operated on such streets, roads and highways in Utah.

87.     Motorcycles that Harley SLC tampered in one or more of the ways described in this Section continue to emit more pollution into the air of Utah than they would be emitting absent such modifications.

88.     Harley SLC is not currently prevented by any enforceable injunction from removing emission control systems or devices from motorcycles in Utah.  Harley SLC has not restored the OEM emission control systems or devices to the motorcycles from which Harley SLC removed such systems or devices.

**2.     Defendant Power Sports Has Repeatedly Removed Emission Control Devices from Motorcycles in Utah.**

89.     Over the last five years, Power Sports repeatedly removed emission control systems or devices in motorcycles in Utah.  Power Sports continues to remove emission control systems or devices in motorcycles in Utah.

90.     Power Sports repeatedly removed catalytic converters and ECM electronic emission control settings in motorcycles in Utah.  Power Sports continues to remove catalytic converters and ECM electronic emission control settings in motorcycles in Utah.

91.     More than one of the motorcycles from which Power Sports removed emission control systems or devices in one or more of the ways described in this Section were registered in Utah.

92.     More than one of the motorcycles from which Power Sports removed emission control systems or devices in one or more of the ways described in this Section were registered in Utah when owned and/or operated by Power Sports.

93.     Power Sports' removal of emission control systems or devices from motorcycles has caused such motorcycles to emit more pollution into the air of Utah than the motorcycles emitted before the removal of such systems or devices.  Power Sports' removal of emission control systems or devices from motorcycles has caused such motorcycles to exceed their emission standards.

94.     Power Sports' removal of emission control systems or devices from motorcycles diminished these motorcycles' ability to reduce the emission of pollutants on a continuous basis.

95.     Power Sports did not replace the emission control systems or devices that it removed from motorcycles in Utah with other devices that were equally or more effective in reducing emissions.

96.     Motorcycles that Power Sports tampered in one or more of the ways described in this Section have been operated on streets, roads and highways in Utah, and continue to be operated on such streets, roads and highways in Utah.

97.     Motorcycles that Power Sports tampered in one or more of the ways described in this Section continue to emit more pollution into the air of Utah than they would be emitting absent such modifications.

98.     Power Sports is not currently prevented by any enforceable injunction from removing emission control systems or devices from motorcycles in Utah.  Power Sports has not restored the OEM emission control systems or devices to the motorcycles from which Power Sports removed such systems or devices.

B.     **Defendants' Repeated Sales and/or Installation of Aftermarket Defeat Parts**

    1.     **Harley SLC Repeatedly Sold and/or Installed Aftermarket Defeat Parts.**

99.     Over the last five years, Harley SLC has repeatedly sold aftermarket defeat parts that enable the removal of pollution control devices in street motorcycles.  These sales have been effected through the internet site https://www.shoputahharley.com and through its Utah dealerships.

100.     Over the last five years, Harley SLC has also repeatedly sold and/or installed aftermarket defeat parts in motorcycles.

101.     Over the last five years, Harley SLC has repeatedly sold multiple styles of aftermarket defeat parts for exhaust systems made by Vance & Hines and other companies for street motorcycles.

102.     Harley SLC has repeatedly sold and/or installed aftermarket "full" and "slip-on" exhaust parts that do not have catalytic converters.

103.     "Full" exhaust parts replace the motorcycle's entire OEM exhaust system, including mufflers, header pipes, combiner junctions and any OEM catalytic converters in that system.

104.     "Slip-on" exhaust parts replace any OEM catalytic converters located within the muffler assembly.

105.    A principal effect of the aftermarket full exhaust parts sold and/or installed by Harley SLC is to bypass, defeat, and/or render inoperative federally required catalytic converters to the extent they are located in the OEM muffler assembly, combiner junctions, or header pipes.

106.    An example of a full exhaust system sold and/or installed by Harley SLC is the Vance & Hines Pro Pipe, part number 17589, shown below.  Priced earlier this year at $849.99, the Pro Pipe system fits the Harley-Davidson Street Bob, touting "a massive 4½ inch stepped megaphone to provide the volume velocity for making power."  To deliver this result, the Pro Pipe replaces the Street Bob's two OEM muffler assemblies, both containing pollution reducing catalysts, with a single exhaust pipe without any catalyst.[2]

---

[2] Although the Street Bob is plainly a street bike by its very name, the Vance & Hines installation instructions for Pro Pipe part number 17589 state: "FOR CLOSED COURSE COMPETITION USE ONLY. NOT INTENDED FOR STREET USE."  This incongruous statement does not excuse Defendants (or Vance & Hines) from liability.  Rather, it shows they are fully aware they are marketing illegal products for street motorcycles.



107.    A principal effect of the slip-on aftermarket exhaust parts sold and/or installed by

Harley SLC is to bypass, defeat, and/or render inoperative federally required catalytic converters

to the extent they are located within the OEM muffler assembly.  An example of a slip-on

exhaust system sold and/or installed by Harley SLC is the Vance & Hines Twin Slash, part

number 46875, shown below.  Priced in 2021 at $349.99, the Twin Slash system fits many

Harley-Davidson Softail models.



108.     OEM catalytic converters in motorcycles are designed to reduce the emission of nitrogen oxides (NOx), hydrocarbons (HC), and carbon monoxide (CO).

109.     Removing an OEM catalytic converter in a motorcycle can cause the motorcycle's emissions of NOx, HC, and CO to: (a) increase and (b) exceed the motorcycle's emission standards for such pollutants.

110.    Harley SLC repeatedly sold and/or installed full and slip-on aftermarket exhaust parts that did not have a California Air Resources Board Executive Order (CARB EO)[3].

111.    Harley SLC repeatedly sold and/or installed full and slip-on aftermarket exhaust parts with instructions that explain how to remove all or part of the OEM exhaust system that includes a catalytic converter.

112.    Harley SLC repeatedly sold and/or installed ECM reprogammers that enabled the removal of catalytic converters in motorcycles.

113.    Harley SLC repeatedly sold full and slip-on aftermarket exhaust parts that, after they were installed in motorcycles, caused air pollution emissions from those motorcycles to increase.

114.    Harley SLC repeatedly sold and/or installed full and slip-on aftermarket exhaust parts in motorcycles in Utah, which motorcycles emitted more pollution into the air than they would have emitted with all OEM exhaust systems operational.

115.    Harley SLC knew or should have known that by selling and/or installing full and slip-on aftermarket exhaust parts with no catalytic converter, the parts would be used to bypass, defeat, or render inoperative one or more OEM catalytic converters.

116.    Harley SLC has no evidence from the manufacturer of the full and slip-on aftermarket exhaust parts, or from an environmental control agency, that the installation and use

---

[3] Only those aftermarket parts shown not to reduce the effectiveness of a vehicle's emission control systems bear a CARB EO number issued pursuant to Title 13, Division 3, Chapter 4, Article 2, Section 2222 of the California Code of Regulations.

of each of their aftermarket exhaust parts would not adversely affect the emissions performance of each motorcycle into which they are designed to be installed.

117.    Harley SLC continues to sell and/or install full and slip-on aftermarket exhaust parts.

118.    Harley SLC continues to sell and/or install full and slip-on aftermarket exhaust parts with no catalytic converter

119.    Aftermarket exhaust parts with no catalytic converter that Harley SLC sold and/or installed are currently in motorcycles in Utah and are causing those vehicles, when operating, to emit more pollutants into the air of the Wasatch Front, and Utah generally, than they would absent the sale, installation, and use of such parts.

120.    Harley SLC is not currently prevented by any enforceable injunction from selling and/or installing aftermarket exhaust parts with no catalytic converter in Utah.  Harley SLC has not retrieved the aftermarket exhaust parts that it sold and/or installed in Utah.

121.    Harley SLC has not restored to OEM standards the motorcycles in Utah in which Harley SLC's aftermarket full and slip-on exhaust parts were installed in Utah.

**2.    Defendant Power Sports Has Repeatedly Sold and/or Installed Aftermarket Defeat Parts.**

122.    Over the last five years, Power Sports has repeatedly sold aftermarket defeat parts that enable the removal of pollution control devices in street motorcycles.  These sales have been effected through the internet site https://www.shoputahharley.com and through its Utah dealerships.

123.    Over the last five years, Power Sports has also repeatedly sold and/or installed aftermarket defeat parts in motorcycles.

124.     Over the last five years, Power Sports has repeatedly sold multiple styles of aftermarket defeat parts for exhaust systems made by Vance & Hines and other companies for street motorcycles.

125.      Power Sports has repeatedly sold and/or installed aftermarket "full" and "slip-on" exhaust parts that do not have catalytic converters.

126.     "Full" exhaust parts replace the motorcycle's entire OEM exhaust system, including mufflers, header pipes, combiner junctions and any OEM catalytic converters in that system.

127.     "Slip-on" exhaust parts replace any OEM catalytic converters located within the muffler assembly.

128.     A principal effect of the aftermarket full exhaust parts sold and/or installed by Power Sports is to bypass, defeat, and/or render inoperative federally required catalytic converters to the extent they are located in the OEM muffler assembly, combiner junctions, or header pipes.

129.     An example of a full exhaust system sold and/or installed by Power Sports is the Vance & Hines Pro Pipe, part number 17589, shown below.  Priced earlier this year at $849.99, the Pro Pipe system fits the Harley-Davidson Street Bob, touting "a massive 4½ inch stepped megaphone to provide the volume velocity for making power."  To deliver this result, the Pro

Pipe replaces the Street Bob's two OEM muffler assemblies, both containing pollution reducing catalysts, with a single exhaust pipe without any catalyst.[4]



130.    A principal effect of the slip-on aftermarket exhaust parts sold and/or installed by Power Sports is to bypass, defeat, and/or render inoperative federally required catalytic converters to the extent they are located within the OEM muffler assembly.  An example of a

---

[4] Although the Street Bob is plainly a street bike by its very name, the Vance & Hines installation instructions for Pro Pipe part number 17589 state: "FOR CLOSED COURSE COMPETITION USE ONLY. NOT INTENDED FOR STREET USE."  This incongruous statement does not excuse Defendants (or Vance & Hines) from liability.  Rather, it shows they are fully aware they are marketing illegal products for street motorcycles.

slip-on exhaust system sold and/or installed by Power Sports is the Vance & Hines Twin Slash, part number 46875, shown below. Priced in 2021 at $349.99, the Twin Slash system fits many Harley-Davidson Softail models.



131.    OEM catalytic converters in motorcycles are designed to reduce the emission of nitrogen oxides (NOx), hydrocarbons (HC), and carbon monoxide (CO).

132.    Removing an OEM catalytic converter in a motorcycle can cause the motorcycle's emissions of NOx, HC, and CO to: (a) increase and (b) exceed the motorcycle's emission standards for such pollutants.

133.     Power Sports repeatedly sold and/or installed full and slip-on aftermarket exhaust parts that did not have a California Air Resources Board Executive Order (CARB EO)[5].

134.     Power Sports repeatedly sold and/or installed full and slip-on aftermarket exhaust parts with instructions that explain how to remove all or part of the OEM exhaust system that includes a catalytic converter.

135.     Power Sports repeatedly sold and/or installed full and slip-on aftermarket exhaust parts and ECM reprogammers that enabled the removal of catalytic converters in motorcycles.

136.     Power Sports repeatedly sold and/or installed ECM reprogammers that enabled the removal of catalytic converters in motorcycles.

137.     Power Sports repeatedly sold and/or installed full and slip-on aftermarket exhaust parts in motorcycles in Utah, which motorcycles emitted more pollution into the air than they would have emitted with all OEM exhaust systems operational.

138.     Power Sports knew or should have known that by selling and/or installing full and slip-on aftermarket exhaust parts with no catalytic converter, the parts would be used to bypass, defeat, or render inoperative one or more OEM catalytic converters.

139.     Power Sports has no evidence from the manufacturer of the full and slip-on aftermarket exhaust parts, or from an environmental control agency, that the installation and use of each of their aftermarket exhaust parts would not adversely affect the emissions performance of each motorcycle into which they are designed to be installed.

---

[5] Only those aftermarket parts shown not to reduce the effectiveness of a vehicle's emission control systems bear a CARB EO number issued pursuant to Title 13, Division 3, Chapter 4, Article 2, Section 2222 of the California Code of Regulations.

140.    Power Sports continues to sell and/or install full and slip-on aftermarket exhaust parts.

141.    Power Sports continues to sell and/or install full and slip-on aftermarket exhaust parts with no catalytic converter

142.    Aftermarket exhaust parts with no catalytic converter that Power Sports sold and/or installed are currently in motorcycles in Utah and are causing those vehicles, when operating, to emit more pollutants into the air of the Wasatch Front, and Utah generally, than they would absent the sale, installation, and use of such parts.

143.    Power Sports is not currently prevented by any enforceable injunction from selling and/or installing aftermarket exhaust parts with no catalytic converter in Utah.  Power Sports has not retrieved the aftermarket exhaust parts that it sold and/or installed in Utah.

144.    Power Sports has not restored to OEM standards the motorcycles in Utah into which Power Sports' aftermarket full and slip-on exhaust parts were installed in Utah.

**C.    Defendants Have Repeatedly Owned and/or Operated Motorcycles Without Operable Emission Control Devices or Systems.**

**1.    Defendant Harley SLC Has Owned and/or Operated Multiple Motorcycles Without Operable Emission Control Devices or Systems.**

145.    Over the last five years, Harley SLC has owned and/or operated multiple motorcycles registered in Utah.

146.     Over the last five years, Harley SLC has owned and/or operated multiple motorcycles registered in Utah in which one or more federally required emission control systems and devices were not maintained in operable condition.

147.    Over the last five years, Harley SLC has operated multiple motorcycles registered in Utah in which one or more federally required emission control systems and/or devices were not used at all times the motorcycles were operated.

148.    Over the last five years, Harley SLC has owned and/or operated multiple motorcycles registered in Utah in which one or more federally required catalytic converters and emissions-related ECM software settings were not maintained in OEM operable condition.

149.    Over the last five years, Harley SLC has owned and/or operated multiple motorcycles in which one or more federally required catalytic converters were not used at all times the motorcycles were operated.

150.    Harley SLC's operation of motorcycles in which one or more federally required catalytic converters were not used at all times caused the motorcycle's emissions of NOx, HC, and CO to: (a) increase and (b) exceed the motorcycle's emission standards for such pollutants.

151.    Harley SLC continues and/or is likely in the future to own and/or operate motorcycles without operable emission control devices or systems in Utah.

152.    Harley SLC is not currently prevented by any enforceable injunction from owning or operating motorcycles registered in Utah in which one or more federally required catalytic converters and emissions-related ECM software settings are not maintained and/or used in operable condition.

153.    Harley SLC has not restored the federally required catalytic converters and ECM settings to operable condition in the motorcycles described above.

2.     **Defendant Power Sports Has Repeatedly Owned and/or Operated Motorcycles Without Operable Emission Control Devices or Systems.**

154.    Over the last five years, Power Sports has owned and/or operated multiple motorcycles registered in Utah.

155.    Over the last five years, Power Sports has owned and/or operated multiple motorcycles registered in Utah in which one or more federally required emission control systems and devices were not maintained in operable condition.

156.    Over the last five years, Power Sports has operated multiple motorcycles registered in Utah in which one or more federally required emission control systems and/or devices were not used at all times the motorcycles were operated.

157.    Over the last five years, Power Sports has owned and/or operated multiple motorcycles registered in Utah in which one or more federally required catalytic converters and emissions-related ECM software settings were not maintained in OEM operable condition.

158.    Over the last five years, Harley SLC has owned and/or operated multiple motorcycles in which one or more federally required catalytic converters were not used at all times the motorcycles were operated.

159.    Power Sports' operation of motorcycles in which one or more federally required catalytic converters were not used at all times caused the motorcycle's emissions of NOx, HC, and CO to: (a) increase and (b) exceed the motorcycle's emission standards for such pollutants.

160.    Power Sports continues and/or is likely in the future to own and/or operate motorcycles without operable emission control devices or systems in Utah.

161.    Power Sports is not currently prevented by any enforceable injunction from owning or operating motorcycles registered in Utah in which one or more federally required

catalytic converters and emissions-related ECM software settings are not maintained and/or used in operable condition.

162.    Power Sports has not restored the federally required catalytic converters and ECM settings to operable condition in the motorcycles described above.

*Defendants' Noise Pollution Related Misconduct*

**D.    Defendants' Assembly and Sale of New Motorcycles in Utah that Exceed 80 dB and Have No Label on their Exhaust Systems.**

**1.    Defendant Harley SLC Has Assembled and Sold New Motorcycles in Utah that Exceed the 80 dB Noise Limit.**

163.    Over the last five years Harley SLC has assembled new Harley-Davidson motorcycles that exceed 80 decibels ("dB") under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

164.    Harley SLC has assembled, sold, and transferred equitable or legal title to the first purchaser of new Harley-Davidson motorcycles that exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

165.    Harley SLC has assembled, sold, and transferred equitable or legal title to, the first purchaser of new Harley-Davidson motorcycles with aftermarket exhaust systems that exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

166.     Harley SLC has assembled, sold, and transferred equitable or legal title to, the first purchaser of new Harley-Davidson motorcycles that are not covered by a COC.

167.     Harley SLC assembled, sold, and transferred equitable or legal title to the first purchaser of new Harley-Davidson motorcycles with aftermarket exhaust parts that allow the motorcycles to exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

168.    Harley SLC continues to sell to the first purchaser in Utah new Harley-Davidson motorcycles with aftermarket exhaust systems that exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

169.    The new Harley-Davidson motorcycles that Harley SLC sold over the last five years with aftermarket exhaust systems that exceed 80 dB continue to discharge excessive and harmful noise in Utah.

170.    With respect to each new Harley-Davidson motorcycle that Harley SLC sold over the last five years with an aftermarket exhaust system that exceeds 80 dB, the motorcycle was warranted to the ultimate purchaser and each subsequent purchaser that it was designed, built, and equipped so as to conform at the time of sale to the 80 dB noise limit, and that it was free from defects in materials and workmanship which would cause the motorcycle to fail to conform with the 80 dB noise limit for five years.

171.    Harley SLC is not currently prevented by any enforceable injunction from selling new motorcycles in Utah that do not meet the 80 dB noise limit.

172.    Harley SLC has not restored to NCA compliance the new Harley-Davidson motorcycles it has sold in Utah with aftermarket exhaust systems that exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

**2.      Defendant Power Sports Has Assembled and Sold New Motorcycles in Utah That Exceed the 80 dB Noise Limit.**

173.    Over the last five years Power Sports has assembled new Harley-Davidson motorcycles that exceed 80 decibels ("dB") under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

174.    Power Sports has assembled, sold, and transferred equitable or legal title to the first purchaser of new Harley-Davidson motorcycles that exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

175.    Power Sports has assembled, sold, and transferred equitable or legal title to, the first purchaser of new Harley-Davidson motorcycles with aftermarket exhaust systems that exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

176.    Power Sports has assembled, sold, and transferred equitable or legal title to, the first purchaser of new Harley-Davidson motorcycles that are not covered by a COC.

177.    Power Sports assembled, sold, and transferred equitable or legal title to the first purchaser of new Harley-Davidson motorcycles with aftermarket exhaust parts that allow the motorcycles to exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

178.    Power Sports continues to sell to the first purchaser in Utah new Harley-Davidson motorcycles with aftermarket exhaust systems that exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

179.    The new Harley-Davidson motorcycles that Power Sports sold over the last five years with aftermarket exhaust systems that exceed 80 dB continue to discharge excessive and harmful noise in Utah.

180.    With respect to each new Harley-Davidson motorcycle that Power Sports sold over the last five years with an aftermarket exhaust system that exceeds 80 dB, the motorcycle was warranted to the ultimate purchaser and each subsequent purchaser that it was designed, built, and equipped so as to conform at the time of sale to the 80 dB noise limit, and that it was

free from defects in materials and workmanship which would cause the motorcycle to fail to conform with the 80 dB noise limit for five years.

181.    Power Sports is not currently prevented by any enforceable injunction from selling new motorcycles in Utah that do not meet the 80 dB noise limit.

182.    Power Sports has not restored to NCA compliance the new Harley-Davidson motorcycles it has sold in Utah with aftermarket exhaust systems that exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

**E.    Defendants' Assembly and Sale of New Motorcycles in Utah with no Model Specific Code on the Exhaust System that Matches the Code on the Motorcycle's Noise Emission Control Information Label Affixed to the Frame.**

**1.    Defendant Harley SLC Has Assembled and Sold New Motorcycles with Exhaust Systems with No Noise Emission Control Label with Matching Model Specific Code.**

183.    Over the last five years Harley SLC has assembled, and continues to assemble, new Harley-Davidson motorcycles with exhaust systems that have no Motorcycle Exhaust System Emission Control Information label stating the exhaust systems meet EPA noise emission requirements.

184.    Harley SLC has assembled, and continues to assemble, new Harley-Davidson motorcycles with exhaust systems that have no Motorcycle Exhaust System Emission Control Information label identifying a model specific code that matches the model specific code on the motorcycle's Noise Emission Control Information label.

185.    Harley SLC has assembled, sold, and transferred equitable or legal title to, the first purchaser of new Harley-Davidson motorcycles with exhaust systems that have no label stating the exhaust systems meet EPA noise emission requirements.  Harley SLC has assembled,

sold, and transferred equitable or legal title to, the first purchaser of new Harley-Davidson motorcycles with exhaust systems that have no Motorcycle Exhaust System Emission Control Information label identifying a model specific code that matches the model specific code on the motorcycle's Noise Emission Control Information label.

186.    The motorcycles that Harley SLC has assembled and sold with exhaust systems that have no Motorcycle Exhaust System Emission Control Information label stating the exhaust systems meet EPA noise emission requirements presumptively exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.  The motorcycles that Harley SLC has assembled and sold with exhaust systems that have no Motorcycle Exhaust System Emission Control Information label identifying a model specific code that matches the model specific code on the motorcycle's Noise Emission Control Information label presumptively exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

187.    Over the last five years Harley SLC has not restored the new Harley-Davidson motorcycles it assembled and sold in Utah without a Motorcycle Exhaust System Emission Control Information label on their exhaust systems identifying a model specific code that matches the model specific code on the motorcycle's Noise Emission Control Information label.

188.    Harley SLC is not currently prevented by any enforceable injunction from assembling and selling new motorcycles in Utah with exhaust systems that have no Motorcycle Exhaust System Emission Control Information label identifying a model specific code that matches the model specific code on the motorcycle's Noise Emission Control Information label.

2.   **Defendant Power Sports Has Assembled and Sold New Motorcycles with Exhaust Systems with No Noise Emission Control Label with Matching Model Specific Code.**

189.   Over the last five years Power Sports has assembled, and continues to assemble, new Harley-Davidson motorcycles with exhaust systems that have no Motorcycle Exhaust System Emission Control Information label stating the exhaust systems meet EPA noise emission requirements.

190.   Power Sports has assembled, and continues to assemble, new Harley-Davidson motorcycles with exhaust systems that have no Motorcycle Exhaust System Emission Control Information label identifying a model specific code that matches the model specific code on the motorcycle's Noise Emission Control Information label.

191.   Power Sports has assembled, sold, and transferred equitable or legal title to, the first purchaser of new Harley-Davidson motorcycles with exhaust systems that have no label stating the exhaust systems meet EPA noise emission requirements.  Power Sports has assembled, sold, and transferred equitable or legal title to, the first purchaser of new Harley-Davidson motorcycles with exhaust systems that have no Motorcycle Exhaust System Emission Control Information label identifying a model specific code that matches the model specific code on the motorcycle's Noise Emission Control Information label.

192.   The motorcycles that Power Sports has assembled and sold with exhaust systems that have no Motorcycle Exhaust System Emission Control Information label stating the exhaust systems meet EPA noise emission requirements presumptively exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.  The motorcycles that Power Sports has assembled and sold with exhaust systems that have no Motorcycle Exhaust System Emission Control

Information label identifying a model specific code that matches the model specific code on the motorcycle's Noise Emission Control Information label presumptively exceed 80 dB under the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

193.    Over the last five years Power Sports has not restored the new Harley-Davidson motorcycles it assembled and sold in Utah without a Motorcycle Exhaust System Emission Control Information label on their exhaust systems identifying a model specific code that matches the model specific code on the motorcycle's Noise Emission Control Information label.

194.    Power Sports is not currently prevented by any enforceable injunction from assembling and selling new motorcycles in Utah with exhaust systems that have no Motorcycle Exhaust System Emission Control Information label identifying a model specific code that matches the model specific code on the motorcycle's Noise Emission Control Information label.

   F.    **Defendants' Use of Tampered Motorcycles.**

        1.    **Harley SLC Uses Tampered Motorcycles.**

195.    Harley SLC has used, and continues to use, new and used motorcycles after one or more noise control devices and/or elements of design, such as a labeled muffler, have been removed or rendered inoperative.

196.    Harley SLC has not restored to NCA compliance the motorcycles it uses in Utah after one or more noise control devices had been removed.

197.    Harley SLC's use of new and used motorcycles in Utah after one or more noise control devices have been removed causes excess noise.

2.      **Power Sports Uses Tampered Motorcycles.**

198.    Power Sports has used, and continues to use, new and used motorcycles after one or more noise control devices and/or elements of design, such as a labeled muffler, have been removed or rendered inoperative.

199.    Power Sports has not restored to NCA compliance the motorcycles it uses in Utah after one or more noise control devices had been removed.

200.    Power Sports' use of new and used motorcycles in Utah after one or more noise control devices have been removed causes excess noise.

G.   **Defendant Timmons Had the Authority to Stop and Correct Harley SLC's and Power Sports' Air and Noise Pollution Misconduct, But Did Not Exercise that Authority.**

201.    Defendant Timmons is the manager and sole member of Harley Davidson of Salt Lake City, LLC, and Northern Utah Power Sports, LLC.

202.    Mr. Timmons had the authority to prevent and correct Defendants Harley SLC and Power Sports' removal of emission control devices from motorcycles in Utah, but did not exercise that authority.

203.    Mr. Timmons had the authority to prevent and correct Defendants Harley SLC and Power Sports' sale of aftermarket defeat parts in Utah, but did not exercise that authority.

204.    Mr. Timmons had the authority to prevent and correct Defendants Harley SLC and Power Sports' installation of aftermarket defeat parts, but did not exercise that authority.

205.    Mr. Timmons had the authority to prevent and correct Defendants Harley SLC and Power Sports' ownership and operation of motorcycles in Utah in which all federally

required OEM air and noise emission control devices were not maintained and operational, but did not exercise that authority.

206.     Mr. Timmons had the authority to prevent and correct Defendants Harley SLC and Power Sports' assembly and sale of new motorcycles that exceed the 80 dB noise limit and failed to have the proper noise emission labels, but did not exercise that authority.

207.     Mr. Timmons had the authority to prevent and correct Defendants Harley SLC and Power Sports' use of motorcycles in Utah after one or more of their noise control devices or elements of design had been removed, but did not exercise that authority.

208.     Mr. Timmons had actual or constructive knowledge of Defendants Harley SLC and Power Sports' conduct described in Sections A through F in Part IV above.

## V.  CAUSES OF ACTION

209.     Physicians incorporates by reference and realleges the allegations contained in paragraphs 1 through 208 for all causes of action stated below.

### FIRST CAUSE OF ACTION

**Harley SLC repeatedly violated the Utah SIP by removing and/or making inoperable, emission control devices in motorcycles in Utah.**

210.     Utah SIP regulation R307-201-2 states:

Any person owning or operating any motor vehicle or motor vehicle engine registered in the State of Utah on which is installed or incorporated a system or device for the control of crankcase emissions or exhaust emissions in compliance with the Federal motor vehicle rules, shall maintain the system or device in operable condition and shall use it at all times that the motor vehicle or motor vehicle engine is operated. **No person shall remove or make inoperable within the State of Utah the system or device or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere.**

(Emphasis added.)

211.     Utah SIP regulation R307-201-2 was approved and promulgated as a federal rule in 2006 at 40 C.F.R. § 52.2320(c)(59)(i)(A), 71 Fed. Reg. 7679, 7682 (Feb. 14, 2006), *https://www.epa.gov/system/files/documents/2021-09/table-c-ut.pdf#R307-201*.

212.     Utah SIP regulation R307-201-2 has applied at all times relevant to the allegations in this Complaint.

213.     Utah SIP regulation R307-201-2 prohibits any person from removing, or making inoperable, any federally required exhaust emissions control system or device on any motorcycle in Utah.

214.     The term "person" in the Utah SIP includes an "individual, trust, firm, estate, company, corporation, partnership, association, state, state or federal agency or entity, municipality, commission, or political subdivision of a state."  R307-101-2, 40 C.F.R. § 52.2320(c)(67), (81), 73 Fed. Reg. 51222, 51225 (Sept. 2, 2008); 81 Fed. Reg. 4959, 4961 (Jan. 1, 2016).

215.     Harley SLC is a "person" within the meaning of Utah SIP regulation R307-101-2.

216.     Over the last five years, through its dealerships, Harley SLC repeatedly violated Utah SIP regulation R307-201-2 by removing, or making inoperable, federally required exhaust emission control systems and devices, including catalytic converters and ECM software settings, in motorcycles in Utah.  The purpose of such systems and devices was to reduce the emission of pollutants on a continuous basis.

217.     After Harley SLC removed exhaust emission control systems and devices from motorcycles in Utah, it did not install another system or device, or part thereof in all such

motorcycles which was equally or more effective in reducing emissions from the motorcycle to the atmosphere.

218.    Harley SLC continues to violate Utah SIP regulation R307-201-2 by removing, or making inoperable, federally required exhaust emission control systems or devices on motorcycles in Utah.  Each exhaust emissions control system or device removed or made inoperable by Harley SLC limited the emission of pollutants on a continuous basis.

219.    Each emission control device or system removed or made inoperable by Harley SLC represents a separate violation of Utah SIP regulation R307-201-2.

220.    Harley SLC is liable for civil penalty relief of up to $109,024 for each emissions control system or device removed or made inoperable in violation of the Utah SIP after November 1, 2015.  40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

221.    Pursuant to CAA § 7604(a), Harley SLC is also liable for injunctive and remedial relief for its Utah SIP regulation violations.

222.    Harley SLC continues to remove OEM emission control devices from motorcycles.  Harley SLC has not restored the OEM emission control devices it removed from motorcycles.

223.    Harley SLC's continued removal of OEM emission control devices from motorcycles and failure to restore to Utah SIP compliance the motorcycles in Utah from which it removed or made inoperable exhaust emission control systems and devices constitutes an ongoing violation of Utah SIP regulation R307-201-2.

224.    Harley SLC's failure to restore to Utah SIP regulation compliance the motorcycles in which it removed OEM emission control devices constitutes a continuing harm.

225.    The excess emissions from motorcycles in Utah caused by Harley SLC's illegal removal of OEM emission control devices continue to harm Physicians' members and the public. Harley SLC should be enjoined to take all necessary measures to end and remediate these illegal excess emissions causing ongoing harm because: (a) such excess emissions are injurious to human health and therefore are irreparable; (b) there is no adequate remedy at law to address these excess emissions because monetary damages cannot compensate for human and environmental injury; (c) the harm to the Physicians and the public from Harley SLC's illegal emissions is far greater than any harm to Harley SLC in stopping and remediating such emissions; and (d) to stop and remediate such emissions fulfills the public interest by protecting and enhancing the quality of Utah's air consistent with the purpose of the CAA.

### SECOND CAUSE OF ACTION

**Power Sports repeatedly violated the Utah SIP by removing
and/or making inoperable, emission control devices in motorcycles in Utah.**

226.    Utah SIP regulation R307-201-2 states:

Any person owning or operating any motor vehicle or motor vehicle engine registered in the State of Utah on which is installed or incorporated a system or device for the control of crankcase emissions or exhaust emissions in compliance with the Federal motor vehicle rules, shall maintain the system or device in operable condition and shall use it at all times that the motor vehicle or motor vehicle engine is operated. **No person shall remove or make inoperable within the State of Utah the system or device or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere.**

(Emphasis added.)

227.    Utah SIP regulation R307-201-2 was approved and promulgated as a federal rule in 2006 at 40 C.F.R. § 52.2320(c)(59)(i)(A), 71 Fed. Reg. 7679, 7682 (Feb. 14, 2006), *https://www.epa.gov/system/files/documents/2021-09/table-c-ut.pdf#R307-201*.

228.    Utah SIP regulation R307-201-2 has applied at all times relevant to the allegations in this Complaint.

229.    Utah SIP regulation R307-201-2 prohibits any person from removing, or making inoperable, any federally required exhaust emissions control system or device on any motorcycle in Utah.

230.    The term "person" in the Utah SIP includes an "individual, trust, firm, estate, company, corporation, partnership, association, state, state or federal agency or entity, municipality, commission, or political subdivision of a state."  R307-101-2, 40 C.F.R. § 52.2320(c)(67), (81), 73 Fed. Reg. 51222, 51225 (Sept. 2, 2008); 81 Fed. Reg. 4959, 4961 (Jan. 1, 2016).

231.    Power Sports is a "person" within the meaning of Utah SIP regulation R307-101-2.

232.    Over the last five years, through its dealerships, Power Sports repeatedly violated Utah SIP regulation R307-201-2 by removing, or making inoperable, federally required exhaust emission control systems and devices, including catalytic converters and ECM software settings, in motorcycles in Utah.  The purpose of such systems and devices was to reduce the emission of pollutants on a continuous basis.

233.    After Power Sports removed exhaust emission control systems and devices from motorcycles in Utah, it did not install another system or device, or part thereof in all such

motorcycles which was equally or more effective in reducing emissions from the motorcycle to the atmosphere.

234.    Power Sports continues to violate Utah SIP regulation R307-201-2 by removing, or making inoperable, federally required exhaust emission control systems or devices on motorcycles in Utah.  Each exhaust emissions control system or device removed or made inoperable by Power Sports limited the emission of pollutants on a continuous basis.

235.    Each emission control device or system removed or made inoperable by Power Sports represents a separate violation of Utah SIP regulation R307-201-2.

236.    Power Sports is liable for civil penalty relief of up to $109,024 for each emissions control system or device removed or made inoperable in violation of the Utah SIP after November 1, 2015.  40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

237.    Pursuant to CAA § 7604(a), Power Sports is also liable for injunctive and remedial relief for its Utah SIP regulation violations.

238.    Power Sports continues to remove OEM emission control devices from motorcycles.  Power Sports has not restored the OEM emission control devices it removed from motorcycles.

239.    Power Sports' continued removal of OEM emission control devices from motorcycles and failure to restore to Utah SIP compliance the motorcycles in Utah from which it removed or made inoperable exhaust emission control systems and devices constitutes an ongoing violation of Utah SIP regulation R307-201-2.

240.    Power Sports' failure to restore to Utah SIP regulation compliance the motorcycles in which it removed OEM emission control devices constitutes a continuing harm.

241.     The excess emissions from motorcycles in Utah caused by Power Sports' illegal removal of OEM emission control devices continue to harm Physicians' members and the public. Power Sports should be enjoined to take all necessary measures to end and remediate these illegal excess emissions causing ongoing harm because: (a) such excess emissions are injurious to human health and therefore are irreparable; (b) there is no adequate remedy at law to address these excess emissions because monetary damages cannot compensate for human and environmental injury; (c) the harm to the Physicians and the public from Power Sports' illegal emissions is far greater than any harm to Power Sports in stopping and remediating such emissions; and (d) to stop and remediate such emissions fulfills the public interest by protecting and enhancing the quality of Utah's air consistent with the purpose of the CAA.

### THIRD CAUSE OF ACTION

**Defendant Timmons is Liable for the Removal Violations of Defendants Harley SLC and Power Sports as a Responsible Corporate Officer**

242.     The term "person" in the Utah SIP includes an "individual."  R307-101-2.

243.     An officer of a corporation can be held personally liable for violations of federal laws created to protect public health if the officer had the authority to prevent or correct the violations and failed to exercise that authority, and the officer had actual or constructive knowledge of the facts giving rise to the violations.

244.     Corporate officers have a positive duty to seek out and remedy violations of law committed by the corporations they control, and, more importantly, a duty to implement measures that would have insured the violations did not occur in the first place.

245.      Defendant Timmons as an individual is a "person" within the meaning of Utah SIP regulation R307-101-2.

-54-

246.     Mr. Timmons is the manager and sole member of Harley Davidson of Salt Lake City, LLC and Northern Utah Power Sports, LLC.

247.     Mr. Timmons had the authority to prevent or correct the violations described in the First and Second causes of action above, but did not exercise that authority.

248.     Mr. Timmons had actual or constructive knowledge of the facts giving rise to the violations described in the First and Second causes of action above.

249.     Mr. Timmons is personally liable for each of the violations described in the First and Second causes of action above.

## FOURTH CAUSE OF ACTION

**Harley SLC has repeatedly violated CAA § 7522(a)(3)(B)
by selling and/or installing aftermarket defeat parts in Utah.**

250.     CAA § 7522(a)(3)(B) has applied at all times relevant to the allegations in this Complaint.

251.     Pursuant to CAA § 7522(a)(3)(B), "the following acts and the causing thereof are prohibited" –

> (3)(B) for any person to . . . sell . . . or install[] any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle . . . in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.

252.     CAA § 7602(e) defines the term "person" as including "an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any

agency, department, or instrumentality of the United States and any officer, agent, or employee thereof."

253.    Harley SLC is a "person" within the meaning of CAA § 7602(e).

254.    A motorcycle is a "motor vehicle" within the meaning of CAA § 7550(2); 69 Fed. Reg. 2398, 2403 (Jan. 15, 2004).

255.    Harley SLC has sold separate aftermarket defeat parts in Utah, including full and slip-on exhaust systems, through the website https://www.shoputahharley.com and in its dealerships in Salt Lake City and Sandy.

256.    Harley SLC has sold and/or installed aftermarket defeat parts in motorcycles in Utah, including full and slip-on exhaust systems.

257.    A principal effect of the aftermarket defeat parts or components sold and/or installed by Harley SLC is to bypass, defeat, or render inoperative devices and elements of design, including catalytic converters, installed in federally-certified motorcycles.

258.    Harley SLC knows or should know that the aftermarket defeat parts it has sold and/or installed will be or are being put to use to bypass, defeat, or render inoperative devices and elements of design, including catalytic converters.

259.    Over the last five years, Harley SLC repeatedly violated CAA § 7522(a)(3)(B) by selling and/or installing aftermarket defeat parts for and in motorcycles in Utah, including but not limited to the aftermarket defeat parts identified in **Attachment 1**, Exhibits A & B.

260.    Each aftermarket defeat part that Harley SLC sold in Utah represents a separate violation of CAA § 7522(a)(3)(B).

261.   Each aftermarket defeat part that Harley SLC installed in Utah represents a separate violation of CAA § 7522(a)(3)(B).

262.   Pursuant to CAA §§ 7524(a), 7604(a), and 7413(e), Harley SLC is liable for injunctive, remedial and civil penalty relief of up to $5,179 for each aftermarket defeat part that Harley SLC sold and/or installed in violation of CAA § 7522(a)(3)(B) after April 5, 2017 and assessed after January 12, 2022.  40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

263.   Pursuant to CAA §§ 7604(a), Harley SLC is also liable for injunctive and remedial relief for its CAA § 7522(a)(3)(B) defeat part sale and installation violations.

264.   Harley SLC continues to sell and install aftermarket defeat parts.  Harley SLC has not retrieved the aftermarket defeat parts that it sold and/or installed and has not restored the OEM emission control devices in motorcycles Harley SLC's aftermarket defeat parts defeated.

265.   Harley SLC's failure to retrieve the aftermarket defeat parts it sold and/or installed in Utah, and to restore to CAA compliance the motorcycles in which such parts were put to use, constitutes a continuing harm resulting from its CAA § 7522(a)(3)(B) defeat part sales violations.

266.   The excess emissions from motorcycles in Utah caused by Harley SLC's sale and installation of aftermarket defeat parts in motorcycles continue to harm Physicians' members. The excess emissions from motorcycles with such parts represent a continuing harm caused by Harley SLC's violations that Harley SLC is responsible to remediate.

267.    The excess emissions from motorcycles in Utah caused by Harley SLC's aftermarket defeat part sales and installations continue to harm Physicians' members and the public.  Harley SLC should be enjoined to take all necessary measures to end and remediate

these illegal excess emissions causing ongoing harm because: (a) such excess emissions are injurious to human health and therefore are irreparable; (b) there is no adequate remedy at law to address these excess emissions because monetary damages cannot compensate for human and environmental injury; (c) the harm to Physicians and the public from Harley SLC's illegal emissions is far greater than any harm to Harley SLC in stopping and remediating such emissions; and (d) to stop and remediate such emissions fulfills the public interest by protecting and enhancing the quality of Utah's air consistent with the purpose of the CAA.

### FIFTH CAUSE OF ACTION

**Power Sports has repeatedly violated CAA § 7522(a)(3)(B)**
**by selling and/or installing aftermarket defeat parts in Utah.**

268.    CAA § 7522(a)(3)(B) has applied at all times relevant to the allegations in this Complaint.

269.    Pursuant to CAA § 7522(a)(3)(B), "the following acts and the causing thereof are prohibited" –

> (3)(B) for any person to . . . sell . . . or install[] any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle . . . in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.

270.    CAA § 7602(e) defines the term "person" as including "an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof."

271.    Power Sports is a "person" within the meaning of CAA § 7602(e).

272.    A motorcycle is a "motor vehicle" within the meaning of CAA § 7550(2); 69 Fed. Reg. 2398, 2403 (Jan. 15, 2004).

273.    Power Sports has sold separate aftermarket defeat parts in Utah, including full and slip-on exhaust systems, through the website https://www.shoputahharley.com and in its dealerships in Salt Lake City and Sandy.

274.    Power Sports has sold and/or installed aftermarket defeat parts in motorcycles in Utah, including full and slip-on exhaust systems.

275.    A principal effect of the aftermarket defeat parts or components sold and/or installed by Power Sports is to bypass, defeat, or render inoperative devices and elements of design, including catalytic converters, installed in federally-certified motorcycles.

276.    Power Sports knows or should know that the aftermarket defeat parts it has sold and/or installed will be or are being put to use to bypass, defeat, or render inoperative devices and elements of design, including catalytic converters.

277.    Over the last five years, Power Sports repeatedly violated CAA § 7522(a)(3)(B) by selling and/or installing aftermarket defeat parts for and in motorcycles in Utah, including but not limited to the aftermarket defeat parts identified in **Attachment 1**, Exhibits A & B.

278.    Each aftermarket defeat part that Power Sports sold in Utah represents a separate violation of CAA § 7522(a)(3)(B).

279.    Each aftermarket defeat part that Power Sports installed in Utah represents a separate violation of CAA § 7522(a)(3)(B).

280.    Pursuant to CAA §§ 7524(a), 7604(a), and 7413(e), Power Sports is liable for injunctive, remedial and civil penalty relief of up to $5,179 for each aftermarket defeat part that Power Sports sold and/or installed in violation of CAA § 7522(a)(3)(B) after April 5, 2017 and assessed after January 12, 2022.  40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

281.    Pursuant to CAA §§ 7604(a), Power Sports is also liable for injunctive and remedial relief for its CAA § 7522(a)(3)(B) defeat part sale and installation violations.

282.    Power Sports continues to sell and install aftermarket defeat parts.  Power Sports has not retrieved the aftermarket defeat parts that it sold and/or installed and has not restored the OEM emission control devices in motorcycles Power Sports' aftermarket defeat parts defeated.

283.    Power Sports' failure to retrieve the aftermarket defeat parts it sold and/or installed in Utah, and to restore to CAA compliance the motorcycles in which such parts were put to use, constitutes a continuing harm resulting from its CAA § 7522(a)(3)(B) defeat part sales violations.

284.    The excess emissions from motorcycles in Utah caused by Power Sports' sale and installation of aftermarket defeat parts in motorcycles continue to harm Physicians' members.  The excess emissions from motorcycles with such parts represent a continuing harm caused by Power Sports' violations that Power Sports is responsible to remediate.

285.     The excess emissions from motorcycles in Utah caused by Power Sports' aftermarket defeat part sales and installations continue to harm Physicians' members and the public.  Power Sports should be enjoined to take all necessary measures to end and remediate these illegal excess emissions causing ongoing harm because: (a) such excess emissions are injurious to human health and therefore are irreparable; (b) there is no adequate remedy at law to

address these excess emissions because monetary damages cannot compensate for human and environmental injury; (c) the harm to Physicians and the public from Power Sports' illegal emissions is far greater than any harm to Power Sports in stopping and remediating such emissions; and (d) to stop and remediate such emissions fulfills the public interest by protecting and enhancing the quality of Utah's air consistent with the purpose of the CAA.

<strong>SIXTH CAUSE OF ACTION</strong>

<strong>As a responsible corporate officer, Defendant Timmons is liable for Harley SLC and Power Sports' sale and installation of aftermarket defeat devices</strong>

286.    CAA § 7602(e) defines the term "person" as including "an individual."

287.    An officer of a corporation can be held personally liable for violations of federal laws created to protect public health if the officer had the authority to prevent or correct the violations and failed to exercise that authority, and the officer had actual or constructive knowledge of the facts giving rise to the violations.

288.    Corporate officers have a positive duty to seek out and remedy violations of law committed by the corporations they control, and, more importantly, a duty to implement measures that would have ensured the violations did not occur in the first place.

289.    Defendant Timmons as an individual is a "person" within the meaning of CAA § 7602(e).

290.    Mr. Timmons is the manager and sole member of Harley Davidson of Salt Lake City, LLC and Northern Utah Power Sports, LLC.

291.    Mr. Timmons had the authority to prevent or correct the violations described in the Fourth and Fifth causes of action above, but did not exercise that authority.

-61-

292.    Mr. Timmons had actual or constructive knowledge of the facts giving rise to the

violations described in the Fourth and Fifth causes of action above.

293.    Mr. Timmons is personally liable for each of the violations described in the

Fourth and Fifth causes of action above.

### SEVENTH CAUSE OF ACTION

**Harley SLC has repeatedly violated Utah SIP regulation R307-201-2
by owning and operating motorcycles without all of their federally-required
emission control systems and devices in operable condition.**

294.    Utah SIP regulation R307-201-2 states:

> **Any person owning or operating any motor vehicle or motor vehicle
> engine registered in the State of Utah on which is installed or
> incorporated a system or device for the control of crankcase emissions
> or exhaust emissions in compliance with the Federal motor vehicle
> rules, shall maintain the system or device in operable condition and
> shall use it at all times that the motor vehicle or motor vehicle engine
> is operated.** No person shall remove or make inoperable within the State
> of Utah the system or device or any part thereof, except for the purpose of
> installing another system or device, or part thereof, which is equally or
> more effective in reducing emissions from the vehicle to the atmosphere.

(Emphasis added.)

295.    Utah SIP regulation R307-201-2 was approved and promulgated as a federal rule

in 2006 at 40 C.F.R. § 52.2320(c)(59)(i)(A), 71 Fed. Reg. 7679, 7682 (Feb. 14, 2006),

*https://www.epa.gov/system/files/documents/2021-09/table-c-ut.pdf#R307-201.*

296.    Utah SIP regulation R307-201-2 has applied at all times relevant to the allegations

in this Complaint.

297.    The term "person" in the Utah SIP includes an "individual, trust, firm, estate,

company, corporation, partnership, association, state, state or federal agency or entity,

municipality, commission, or political subdivision of a state."  R307-101-2, 40 C.F.R.

§ 52.2320(c)(67), (81), 73 Fed. Reg. 51222, 51225 (Sept. 2, 2008); 81 Fed. Reg. 4959, 4961 (Jan. 1, 2016).

298.    Harley SLC is a "person" within the meaning of Utah SIP Regulation R307-101-2.

299.    Over the last five years, Harley SLC has owned and operated motorcycles without maintaining their federally approved OEM emission control systems or devices in operable condition.

300.    Over the last five years, Harley SLC repeatedly violated Utah SIP regulation R307-201-2 by owning and/or operating motorcycles without maintaining their federally approved OEM emission control systems or devices in operable condition.

301.    Over the last five years, Harley SLC repeatedly violated Utah SIP regulation R307-201-2 by owning and/or operating motorcycles without using their federally approved OEM emission control systems or devices at all times the motorcycles were operated.

302.    Harley SLC is liable for civil penalty relief of up to $109,024 per day for each motorcycle it owned and/or operated with emission control systems it failed to maintain in inoperable condition in violation of the Utah SIP regulation after November 1, 2015.  40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

303.    Pursuant to CAA § 7604(a), Harley SLC is also liable for injunctive and remedial relief for its Utah SIP regulation violations.

304.    The excess emissions from motorcycles owned and/or operated by Harley SLC, with emission control systems that Harley SLC failed to maintain in operable condition,

continue to harm Physicians' members.  The excess emissions from such motorcycles represent a continuing harm caused by Harley SLC's violations that Harley SLC is responsible to remediate.

305.    The excess emissions from motorcycles in Utah owned and/or operated by Harley SLC with emission control systems that Harley SLC failed to maintain in operable condition continue to harm Physicians' members and the public.  Harley SLC should be enjoined to take all necessary measures to end and remediate these illegal excess emissions causing ongoing harm because: (a) such excess emissions are injurious to human health and therefore are irreparable; (b) there is no adequate remedy at law to address these excess emissions because monetary damages cannot compensate for human and environmental injury; (c) the harm to Physicians and the public from Harley SLC's illegal emissions is far greater than any harm to Harley SLC in stopping and remediating such emissions; and (d) to stop and remediate such emissions fulfills the public interest by protecting and enhancing the quality of Utah's air consistent with the purpose of the CAA.

## EIGHTH CAUSE OF ACTION

**Power Sports has repeatedly violated Utah SIP regulation R307-201-2
by owning and operating motorcycles without all of their federally required
emission control systems and devices in operable condition.**

306.    Utah SIP regulation R307-201-2 states:

> **Any person owning or operating any motor vehicle or motor vehicle engine registered in the State of Utah on which is installed or incorporated a system or device for the control of crankcase emissions or exhaust emissions in compliance with the Federal motor vehicle rules, shall maintain the system or device in operable condition and shall use it at all times that the motor vehicle or motor vehicle engine is operated**. No person shall remove or make inoperable within the State of Utah the system or device or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere.

(Emphasis added.)

307.    Utah SIP regulation R307-201-2 was approved and promulgated as a federal rule in 2006 at 40 C.F.R. § 52.2320(c)(59)(i)(A), 71 Fed. Reg. 7679, 7682 (Feb. 14, 2006), *https://www.epa.gov/system/files/documents/2021-09/table-c-ut.pdf#R307-201*.

308.    Utah SIP regulation R307-201-2 has applied at all times relevant to the allegations in this Complaint.

309.    The term "person" in the Utah SIP includes an "individual, trust, firm, estate, company, corporation, partnership, association, state, state or federal agency or entity, municipality, commission, or political subdivision of a state."  R307-101-2, 40 C.F.R. § 52.2320(c)(67), (81), 73 Fed. Reg. 51222, 51225 (Sept. 2, 2008); 81 Fed. Reg. 4959, 4961 (Jan. 1, 2016).

310.    Power Sports is a "person" within the meaning of Utah SIP Regulation R307-101-2.

311.    Over the last five years, Power Sports has owned and operated motorcycles without maintaining their federally approved OEM emission control systems or devices in operable condition.

312.    Over the last five years, Power Sports repeatedly violated Utah SIP regulation R307-201-2 by owning and/or operating motorcycles without maintaining their federally approved OEM emission control systems or devices in operable condition.

313.    Over the last five years, Power Sports repeatedly violated Utah SIP regulation R307-201-2 by owning and/or operating motorcycles without using their federally approved OEM emission control systems or devices at all times the motorcycles were operated.

314.    Power Sports is liable for civil penalty relief of up to $109,024 per day for each motorcycle it owned and/or operated with emission control systems it failed to maintain in inoperable condition in violation of the Utah SIP regulation after November 1, 2015.  40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

315.    Pursuant to CAA § 7604(a), Power Sports is also liable for injunctive and remedial relief for its Utah SIP regulation violations.

316.    The excess emissions from motorcycles owned and/or operated by Power Sports, with emission control systems that Power Sports failed to maintain in operable condition, continue to harm Physicians' members.  The excess emissions from such motorcycles represent a continuing harm caused by Power Sports' violations that Power Sports is responsible to remediate.

317.    The excess emissions from motorcycles in Utah owned and/or operated by Power Sports with emission control systems that Power Sports failed to maintain in operable condition continue to harm Physicians' members and the public.  Power Sports should be enjoined to take all necessary measures to end and remediate these illegal excess emissions causing ongoing harm because: (a) such excess emissions are injurious to human health and therefore are irreparable; (b) there is no adequate remedy at law to address these excess emissions because monetary damages cannot compensate for human and environmental injury; (c) the harm to Physicians and the public from Power Sports' illegal emissions is far greater than any harm to Power Sports in stopping and remediating such emissions; and (d) to stop and remediate such emissions fulfills the public interest by protecting and enhancing the quality of Utah's air consistent with the purpose of the CAA.

## NINTH CAUSE OF ACTION

**As a responsible corporate officer, Defendant Timmons is liable for Harley SLC and Power Sports' owning and operating motorcycles without all of their federally required emission control systems and devices in operable condition.**

318.    The term "person" in the Utah SIP includes an "individual."  R307-101-2.

319.    An officer of a corporation can be held personally liable for violations of federal laws created to protect public health if the officer had the authority to prevent or correct the violations and failed to exercise that authority, and the officer had actual or constructive knowledge of the facts giving rise to the violations.

320.     Corporate officers have a positive duty to seek out and remedy violations of law committed by the corporations they control, and, more importantly, a duty to implement measures that would have ensured the violations did not occur in the first place.

321.    Defendant Timmons as an individual is a "person" within the meaning of Utah SIP regulation R307-101-2.

322.    Mr. Timmons is the manager and sole member of Harley Davidson of Salt Lake City, LLC and Northern Utah Power Sports, LLC.

323.     Mr. Timmons had the authority to prevent or correct the violations described in the Tenth and Eleventh causes of action above, but did not exercise that authority.

324.    Mr. Timmons had actual or constructive knowledge of the facts giving rise to the violations described in the Tenth and Eleventh causes of action above.

325.    Mr. Timmons is personally liable for each of the violations described in the Seventh and Eighth causes of action above.

**TENTH CAUSE OF ACTION**

**Harley SLC is in violation of NCA § 4909(a)(1) by selling new motorcycles
that do not comply with the NCA's 80 dB noise limit.**

326.   42 U.S.C. § 4909(a)(1) provides:

> Except as otherwise provided in subsection (b), the following acts or the
> causing thereof are prohibited:

> (1) In the case of a manufacturer, to distribute in commerce any new
> product manufactured after the effective date of a regulation prescribed
> under section 4905 of this title which is applicable to such product, except
> in conformity with such regulation.

327.   NCA § 4909(a)(1) is a noise control requirement within the meaning of NCA

§ 4911(f) and therefore is enforceable by citizens.

328.   NCA § 4902(6) defines "manufacturer" as including "any person engaged in the

manufacturing or assembling of new products . . . ."

329.   NCA § 4902(8) defines the term "distribute in commerce" to include to "sell in . .

. commerce."

330.   NCA § 4902(5)(A) defines the term "new product" as "a product the equitable or

legal title of which has never been transferred to an ultimate purchaser."

331.   NCA § 4902(4) defines the term "ultimate purchaser" as "the first person who in

good faith purchases a product for purposes other than resale."

332.   Pursuant to 40 C.F.R. § 205.152(a)(1)(i)(B), prescribed under 42 U.S.C. § 4905,

manufacturers of new street motorcycles are, and have been since 1986, prohibited from selling

new street motorcycles that emit noise greater than 80 decibels when tested pursuant to 40 C.F.R.

Part 205, Appendix I-1.

333.    Pursuant to NCA § 4905(d)(1), Harley SLC was required to warrant to the ultimate purchaser and each subsequent purchaser that each new motorcycle was designed, built, and equipped so as to conform to the 80 dB noise limit.

334.    Harley SLC is a manufacturer within the meaning of NCA § 4902(6) because it assembles new motorcycles.

335.    Harley SLC sells to the ultimate purchaser new motorcycles that emit noise greater than 80 decibels when tested pursuant to 40 C.F.R. Part 205, Appendix I-1.

336.    Harley SLC is in violation of NCA § 4909(a)(1) by selling new motorcycles to ultimate purchasers that do not conform to the 80 dB noise limit at 40 C.F.R.
§ 205.152(a)(1)(i)(B).

337.    Harley SLC is in violation of NCA § 4909(a)(1) by selling new motorcycles, over the last five years to ultimate purchasers in Utah, that do not conform to the 80 dB noise limit at 40 C.F.R. § 205.152(a)(1)(i)(B) and that continue to discharge excessive and harmful noise in Utah.

338.    Harley SLC is in violation of NCA § 4909(a)(1) by failing to restore to NCA compliance the new motorcycles it sold over the last five years to ultimate purchasers in Utah that do not conform to the 80 dB noise limit at 40 C.F.R. § 205.152(a)(1)(i)(B) and that continue to discharge excessive and harmful noise in Utah.

339.    With respect to each new motorcycle that Harley SLC sold over the last five years with an aftermarket exhaust system that exceeds 80 dB, Harley SLC warranted to the ultimate purchaser, and each subsequent purchaser, that the motorcycle was designed, built and equipped so as to conform at the time of sale to the 80 dB noise limit, and that it is free from defects in

materials and workmanship which would cause the motorcycle to fail to conform with the 80 dB noise limit for five years.

340.     Harley SLC is in violation of NCA § 4909(a)(1) by failing to restore to NCA compliance, consistent with its warranty pursuant to NCA § 4905(d), the new motorcycles it sold over the last five years to ultimate purchasers in Utah that do not conform to the 80 dB noise limit at 40 C.F.R. § 205.152(a)(1)(i)(B) and that continue to discharge excessive and harmful noise in Utah.

341.     The excess noise from motorcycles in Utah that Harley SLC sold in violation of NCA § 4909(a)(1) continues to harm Physicians' members. The excess noise from such motorcycles represents a continuing harm caused by Harley SLC's violations that Harley SLC is responsible to remediate.

342.     Harley SLC's violations of NCA § 4909(a)(1) by selling new motorcycles to ultimate purchasers that do not conform to the 80 dB noise limit at 40 C.F.R. § 205.152(a)(1)(i)(B) are subject to a civil penalty of $41,219 for each new motorcycle sold.  42 U.S.C. § 4910(a)(2) & (b); 40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

343.     Harley SLC's violations of NCA § 4909(a)(1) by selling new motorcycles to ultimate purchasers that do not conform to the 80 dB noise limit at 40 C.F.R. § 205.152(a)(1)(i)(B) are also subject to injunctive relief.  42 U.S.C. §§ 4910(c), 4911(a).

344.     The excess noise from motorcycles in Utah caused by Harley SLC's sale of new motorcycles that exceed the noise 80 dB noise limit continue to harm Physicians' members and the public.  Harley SLC should be enjoined to take all necessary measures to end and remediate these illegal noise emissions causing ongoing harm because: (a) such excess noise is injurious to

human health and therefore is irreparable; (b) there is no adequate remedy at law to address the

excess noise because monetary damages cannot compensate for human and environmental

injury; (c) the harm to Physicians and the public from Harley SLC's illegal emissions is far

greater than any harm to Harley SLC in stopping and remediating such emissions; and (d) to stop

and remediate such emissions fulfills the public interest by protecting and enhancing the quality

of Utah's soundscape is consistent with the purpose of the NCA.

## ELEVENTH CAUSE OF ACTION

### Power Sports is in violation of NCA § 4909(a)(1) by selling new motorcycles that do not comply with the NCA's 80 dB noise limit.

345.    42 U.S.C. § 4909(a)(1) provides:

> Except as otherwise provided in subsection (b), the following acts or the causing thereof are prohibited:

> (1) In the case of a manufacturer, to distribute in commerce any new product manufactured after the effective date of a regulation prescribed under section 4905 of this title which is applicable to such product, except in conformity with such regulation.

346.    NCA § 4909(a)(1) is a noise control requirement within the meaning of NCA

§ 4911(f) and therefore is enforceable by citizens.

347.    NCA § 4902(6) defines "manufacturer" as including "any person engaged in the

manufacturing or assembling of new products . . . ."

348.    NCA § 4902(8) defines the term "distribute in commerce" to include to "sell in . .

. commerce."

349.    NCA § 4902(5)(A) defines the term "new product" as "a product the equitable or

legal title of which has never been transferred to an ultimate purchaser."

350.    NCA § 4902(4) defines the term "ultimate purchaser" as "the first person who in good faith purchases a product for purposes other than resale."

351.    Pursuant to 40 C.F.R. § 205.152(a)(1)(i)(B), prescribed under 42 U.S.C. § 4905, manufacturers of new street motorcycles are, and have been since 1986, prohibited from selling new street motorcycles that emit noise greater than 80 decibels when tested pursuant to 40 C.F.R. Part 205, Appendix I-1.

352.    Pursuant to NCA § 4905(d)(1), Power Sports was required to warrant to the ultimate purchaser and each subsequent purchaser that each new motorcycle was designed, built, and equipped so as to conform to the 80 dB noise limit.

353.    Power Sports is a manufacturer within the meaning of NCA § 4902(6) because it assembles new motorcycles.

354.    Power Sports sells to the ultimate purchaser new motorcycles that emit noise greater than 80 decibels when tested pursuant to 40 C.F.R. Part 205, Appendix I-1.

355.    Power Sports is in violation of NCA § 4909(a)(1) by selling new motorcycles to ultimate purchasers that do not conform to the 80 dB noise limit at 40 C.F.R. § 205.152(a)(1)(i)(B).

356.    Power Sports is in violation of NCA § 4909(a)(1) by selling new motorcycles, over the last five years to ultimate purchasers in Utah, that do not conform to the 80 dB noise limit at 40 C.F.R. § 205.152(a)(1)(i)(B) and that continue to discharge excessive and harmful noise in Utah.

357.    Power Sports is in violation of NCA § 4909(a)(1) by failing to restore to NCA compliance the new motorcycles it sold over the last five years to ultimate purchasers in Utah

that do not conform to the 80 dB noise limit at 40 C.F.R. § 205.152(a)(1)(i)(B) and that continue to discharge excessive and harmful noise in Utah.

358.    With respect to each new motorcycle that Power Sports sold over the last five years with an aftermarket exhaust system that exceeds 80 dB, Power Sports warranted to the ultimate purchaser, and each subsequent purchaser, that the motorcycle was designed, built and equipped so as to conform at the time of sale to the 80 dB noise limit, and that it is free from defects in materials and workmanship which would cause the motorcycle to fail to conform with the 80 dB noise limit for five years.

359.    Power Sports is in violation of NCA § 4909(a)(1) by failing to restore to NCA compliance, consistent with its warranty pursuant to NCA § 4905(d), the new motorcycles it sold over the last five years to ultimate purchasers in Utah that do not conform to the 80 dB noise limit at 40 C.F.R. § 205.152(a)(1)(i)(B) and that continue to discharge excessive and harmful noise in Utah.

360.    The excess noise from motorcycles in Utah that Power Sports sold in violation of NCA § 4909(a)(1) continues to harm Physicians' members. The excess noise from such motorcycles represents a continuing harm caused by Power Sports' violations that Power Sports is responsible to remediate.

361.    Power Sports' violations of NCA § 4909(a)(1) by selling new motorcycles to ultimate purchasers that do not conform to the 80 dB noise limit at 40 C.F.R. § 205.152(a)(1)(i)(B) are subject to a civil penalty of $41,219 for each new motorcycle sold.  42 U.S.C. § 4910(a)(2) & (b); 40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

362.     Power Sports' violations of NCA § 4909(a)(1) by selling new motorcycles to ultimate purchasers that do not conform to the 80 dB noise limit at 40 C.F.R. § 205.152(a)(1)(i)(B) are also subject to injunctive relief.  42 U.S.C. §§ 4910(c), 4911(a).

363.     The excess noise from motorcycles in Utah caused by Power Sports' sale of new motorcycles that exceed the noise 80 dB noise limit continue to harm Physicians' members and the public.  Power Sports should be enjoined to take all necessary measures to end and remediate these illegal noise emissions causing ongoing harm because: (a) such excess noise is injurious to human health and therefore is irreparable; (b) there is no adequate remedy at law to address the excess noise because monetary damages cannot compensate for human and environmental injury; (c) the harm to Physicians and the public from Power Sports' illegal emissions is far greater than any harm to Power Sports in stopping and remediating such emissions; and (d) to stop and remediate such emissions fulfills the public interest by protecting and enhancing the quality of Utah's soundscape is consistent with the purpose of the NCA.

## TWELFTH CAUSE OF ACTION

**As a responsible corporate officer, Defendant Timmons is liable for
Harley SLC and Power Sports' selling new motorcycles
that do not comply with the NCA's 80 dB noise limit.**

364.     NCA § 4902(2) defines a "person" to include "an individual."

365.     An officer of a corporation can be held personally liable for violations of federal laws created to protect public health if the officer had the authority to prevent or correct the violations and failed to exercise that authority, and the officer had actual or constructive knowledge of the facts giving rise to the violations.

-74-

366.     Corporate officers have a positive duty to seek out and remedy violations of law committed by the corporations they control, and, more importantly, a duty to implement measures that would have ensured the violations did not occur in the first place.

367.     Defendant Timmons as an individual is a "person" within the meaning of NCA § 4902(2).

368.     Mr. Timmons is the manager and sole member of Harley Davidson of Salt Lake City, LLC and Northern Utah Power Sports, LLC.

369.     Mr. Timmons had the authority to prevent or correct the violations described in the Thirteenth and Fourteenth causes of action above, but did not exercise that authority.

370.     Mr. Timmons had actual or constructive knowledge of the facts giving rise to the violations described in the Thirteenth and Fourteenth causes of action above.

371.     Mr. Timmons is personally liable for each of the violations described in the Tenth and Eleventh causes of action above.

### THIRTEENTH CAUSE OF ACTION

**Harley SLC is in violation of NCA § 4909(a)(3) by assembling and selling new motorcycles that do not comply with the NCA's noise labeling requirements.**

372.     42 U.S.C. § 4909(a)(3) provides,

> Except as otherwise provided in subsection (b), the following acts or the causing thereof are prohibited:  . . .

> (3) In the case of a manufacturer, to distribute in commerce any new product manufactured after the effective date of a regulation prescribed under section 4907(b) of this title (requiring information respecting noise) which is applicable to such product, except in conformity with such regulation.

373.    NCA § 4909(a)(3) is a noise control requirement within the meaning of NCA 42 U.S.C. § 4911(f) and therefore is enforceable by citizens.

374.    NCA § 4902(6) defines the term "manufacturer" as including "any person engaged in the manufacturing or assembling of new products . . . ."

375.    NCA § 4902(8) defines the term "distribute in commerce" to include to "sell in . . . commerce."

376.    NCA § 4902(5)(A) defines the term "new product" as "a product the equitable or legal title of which has never been transferred to an ultimate purchaser."

377.    NCA § 4902(4) defines the term "ultimate purchaser" as "the first person who in good faith purchases a product for purposes other than resale."

378.    Pursuant to 40 C.F.R. §§ 205.158, 205.168-1, and 205.169, prescribed under 42 U.S.C. § 4907(b), manufacturers of street motorcycles are, and have been since 1986, prohibited from selling new street motorcycles unless a readily visible permanent Motorcycle Exhaust System Noise Emission Control Information label is affixed to each exhaust system that contains a model-specific code that matches the code on a readily visible permanent Motorcycle Noise Emission Control Information label on the frame of the motorcycle.

379.    Harley SLC has assembled and sold new motorcycles to the ultimate purchaser in Utah with exhaust systems that do not have a "readily visible" permanent Motorcycle Exhaust System Noise Emission Control Information label containing a model-specific code that matches the model specific code on a readily visible permanent Motorcycle Noise Emission Control Information label on the frame of the motorcycle.

380.     As a manufacturer, Harley SLC is violating NCA § 4909(a)(3) by assembling and selling new motorcycles to ultimate purchasers that do not conform to the labeling requirements at 40 C.F.R. §§ 205.158 (motorcycles) and 205.169 (exhaust systems).

381.     Harley SLC has not restored to OEM status the motorcycles it assembled and sold in Utah in violation of NCA § 4909(a)(3).  Harley SLC's failure to restore to NCA labeling compliance the motorcycles in which such parts were installed, constitutes an ongoing violation of NCA § 4909(a)(3).

382.     The noise from new motorcycles with unlabeled exhaust systems sold by Harley SLC is virtually assured to be greater than 80 dB applying the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

383.     The absence of a compliant Motorcycle Noise Emission Control Information label on the exhaust systems of new motorcycles that Harley SLC assembles and sells in violation of NCA § 4909(a)(3), and the presumptive noise in excess of 80 dB that results from this practice, continues to harm Physicians' members.  The absence of a compliant Motorcycle Noise Emission Control Information label on and the excess noise from such exhaust systems in new motorcycles represent a continuing harm caused by Harley SLC's violations that Harley SLC is responsible to remediate.

384.     Harley SLC's violations of NCA § 4909(a)(3), by assembling and selling new motorcycles to ultimate purchasers that do not conform to the labeling requirements at 40 C.F.R. §§ 205.158 (motorcycles) and 205.169 (exhaust systems), are subject to a civil penalty of $41,219 for each new motorcycle sold.  42 U.S.C. § 4910(a)(2) & (b); 40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

385.    Harley SLC's violations of NCA § 4909(a)(3), by assembling and selling new motorcycles to ultimate purchasers that do not conform to the labeling requirements at 40 C.F.R. §§ 205.158 (motorcycles) and 205.169 (exhaust systems), are also subject to injunctive relief and remediation.  42 U.S.C. §§ 4910(c), 4911(a).

386.    The excess noise from motorcycles in Utah caused by Harley SLC's assembly and sale of new motorcycles in non-compliance with the noise labeling requirement, and presumptively exceed the 80 dB noise limit, continue to harm Physicians' members and the public.  Harley SLC should be enjoined to take all necessary measures to end and remediate these illegal noise emissions causing ongoing harm because: (a) such excess noise is injurious to human health and therefore is irreparable; (b) there is no adequate remedy at law to address the excess noise because monetary damages cannot compensate for human and environmental injury; (c) the harm to Physicians and the public from Harley SLC's illegal emissions is far greater than any harm to Harley SLC in stopping and remediating such emissions; and (d) to stop and remediate such emissions fulfills the public interest by protecting and enhancing the quality of Utah's soundscape is consistent with the purpose of the NCA.

## FOURTEENTH CAUSE OF ACTION

**Power Sports is in violation of NCA § 4909(a)(3) by assembling and selling new motorcycles that do not comply with the NCA's noise labeling requirements.**

387.    42 U.S.C. § 4909(a)(3) provides,

> Except as otherwise provided in subsection (b), the following acts or the causing thereof are prohibited:  . . .
>
> (3) In the case of a manufacturer, to distribute in commerce any new product manufactured after the effective date of a regulation prescribed under section 4907(b) of this title (requiring information respecting noise)

which is applicable to such product, except in conformity with such regulation.

388.   NCA § 4909(a)(3) is a noise control requirement within the meaning of NCA 42 U.S.C. § 4911(f) and therefore is enforceable by citizens.

389.   NCA § 4902(6) defines the term "manufacturer" as including "any person engaged in the manufacturing or assembling of new products . . . ."

390.   NCA § 4902(8) defines the term "distribute in commerce" to include to "sell in . . . commerce."

391.   NCA § 4902(5)(A) defines the term "new product" as "a product the equitable or legal title of which has never been transferred to an ultimate purchaser."

392.   NCA § 4902(4) defines the term "ultimate purchaser" as "the first person who in good faith purchases a product for purposes other than resale."

393.   Pursuant to 40 C.F.R. §§ 205.158, 205.168-1, and 205.169, prescribed under 42 U.S.C. § 4907(b), manufacturers of street motorcycles are, and have been since 1986, prohibited from selling new street motorcycles unless a readily visible permanent Motorcycle Exhaust System Noise Emission Control Information label is affixed to each exhaust system that contains a model-specific code that matches the code on a readily visible permanent Motorcycle Noise Emission Control Information label on the frame of the motorcycle.

394.   Power Sports has assembled and sold new motorcycles to the ultimate purchaser in Utah with exhaust systems that do not have a "readily visible" permanent Motorcycle Exhaust System Noise Emission Control Information label containing a model-specific code that matches the model specific code on a readily visible permanent Motorcycle Noise Emission Control Information label on the frame of the motorcycle.

395.   As a manufacturer, Power Sports is violating NCA § 4909(a)(3) by assembling and selling new motorcycles to ultimate purchasers that do not conform to the labeling requirements at 40 C.F.R. §§ 205.158 (motorcycles) and 205.169 (exhaust systems).

396.   Power Sports has not restored to OEM status the motorcycles it assembled and sold in Utah in violation of NCA § 4909(a)(3).  Power Sports' failure to restore to NCA labeling compliance the motorcycles in which such parts were installed, constitutes an ongoing violation of NCA § 4909(a)(3).

397.   The noise from new motorcycles with unlabeled exhaust systems assembled and sold by Power Sports is virtually assured to be greater than 80 dB applying the testing criteria in 40 C.F.R. Part 205, Appendix I-1.

398.   The absence of a compliant Motorcycle Noise Emission Control Information label on the exhaust systems of new motorcycles that Power Sports assembles and sells in violation of NCA § 4909(a)(3), and the presumptive noise in excess of 80 dB that results from this practice, continues to harm Physicians' members.  The absence of a compliant Motorcycle Noise Emission Control Information label on and the excess noise from such exhaust systems in new motorcycles represent a continuing harm caused by Power Sports' violations that Power Sports is responsible to remediate.

399.   Power Sports' violations of NCA § 4909(a)(3), by assembling and selling new motorcycles to ultimate purchasers that do not conform to the labeling requirements at 40 C.F.R. §§ 205.158 (motorcycles) and 205.169 (exhaust systems), are subject to a civil penalty of $41,219 for each new motorcycle sold.  42 U.S.C. § 4910(a)(2) & (b); 40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

400.    Power Sports' violations of NCA § 4909(a)(3), by assembling and selling new motorcycles to ultimate purchasers that do not conform to the labeling requirements at 40 C.F.R. §§ 205.158 (motorcycles) and 205.169 (exhaust systems), are also subject to injunctive relief and remediation.  42 U.S.C. §§ 4910(c), 4911(a).

401.    The excess noise from motorcycles in Utah caused by Power Sports' assembly and sale of new motorcycles in non-compliance with the noise labeling requirement, and presumptively exceed the 80 dB noise limit, continue to harm Physicians' members and the public.  Power Sports should be enjoined to take all necessary measures to end and remediate these illegal noise emissions causing ongoing harm because: (a) such excess noise is injurious to human health and therefore is irreparable; (b) there is no adequate remedy at law to address the excess noise because monetary damages cannot compensate for human and environmental injury; (c) the harm to Physicians and the public from Power Sports' illegal emissions is far greater than any harm to Power Sports in stopping and remediating such emissions; and (d) to stop and remediate such emissions fulfills the public interest by protecting and enhancing the quality of Utah's soundscape is consistent with the purpose of the NCA.

## FIFTEENTH CAUSE OF ACTION

**As a responsible corporate officer, Defendant Timmons is liable for
Harley SLC and Power Sports' assembling and selling new motorcycles
that do not comply with the NCA's noise labeling requirements.**

402.    NCA § 4902(2) defines a "person" to include "an individual."

403.    An officer of a corporation can be held personally liable for violations of federal laws created to protect public health if the officer had the authority to prevent or correct the

violations and failed to exercise that authority, and the officer had actual or constructive knowledge of the facts giving rise to the violations.

404.     Corporate officers have a positive duty to seek out and remedy violations of law committed by the corporations they control, and, more importantly, a duty to implement measures that would have ensured the violations did not occur in the first place.

405.     Defendant Timmons as an individual is a "person" within the meaning of NCA § 4902(2).

406.     Mr. Timmons is the manager and sole member of Harley Davidson of Salt Lake City, LLC and Northern Utah Power Sports, LLC.

407.     Mr. Timmons had the authority to prevent or correct the violations described in the Sixteenth and Seventeenth causes of action above, but did not exercise that authority.

408.     Mr. Timmons had actual or constructive knowledge of the facts giving rise to the violations described in the Sixteenth and Seventeenth causes of action above.

409.     Mr. Timmons is personally liable for each of the violations described in the Thirteenth and Fourteenth causes of action above.

## SIXTEENTH CAUSE OF ACTION

**Harley SLC is in violation of NCA § 4909(a)(2)(B) by using new and used motorcycles after one or more noise control devices have been removed from such motorcycles.**

410.     NCA § 4909(a)(2) provides:

Except as otherwise provided in subsection (b), the following acts or the causing thereof are prohibited: . . .

(2)(A) The removal or rendering inoperative by any person, other than for purposes of maintenance, repair, or replacement, of any device or element of design incorporated into any product in compliance with regulations under section 4905 of this title [40 C.F.R. § 205.152 and § 205.166], prior

to its sale or delivery to the ultimate purchaser or while it is in use, or (B) the use of a product after such device or element of design has been removed or rendered inoperative by any person.

411.    NCA § 4909(a)(2) is a noise control requirement within the meaning of NCA § 4911(f) and therefore is enforceable by citizens.

412.     Motorcycle noise control devices and/or elements of design include but are not limited to the motorcycle's OEM mufflers, entire exhaust system, and the air intake/cleaner assembly.

413.    Harley SLC is in violation of NCA § 4909(a)(2) because it uses new and used motorcycles after one or more noise control devices and/or elements of design have been removed or rendered inoperative.

414.    Harley SLC has not restored to NCA compliance the motorcycles it has used in Utah after one or more noise control devices had been removed in violation of NCA § 4909(a)(2)(B).  Harley SLC's failure to restore to NCA compliance the new and used motorcycles it has used in which such devices were removed constitutes an ongoing violation of NCA § 4909(a)(2)(B).

415.    Harley SLC's use of new and used motorcycles in Utah after one or more noise control devices have been removed in violation of NCA § 4909(a)(2)(B) causes excess noise that Harley SLC is responsible to remediate.

416.    Harley SLC's violations of NCA 42 U.S.C. § 4909(a)(2)(B), by using new and used motorcycles after one or more noise control devices have been removed, are subject to injunctive relief and remediation.  42 U.S.C. §§ 4910(c), 4911(a).

417.   The excess noise from motorcycles in Utah caused by Harley SLC's use of motorcycles after one or more noise control devices have been removed, which presumptively exceeds the 80 dB noise limit, continues to harm Physicians' members and the public.  Harley SLC should be enjoined to take all necessary measures to end and remediate these illegal noise emissions causing ongoing harm because: (a) such excess noise is injurious to human health and therefore is irreparable; (b) there is no adequate remedy at law to address the excess noise because monetary damages cannot compensate for human and environmental injury; (c) the harm to Physicians and the public from Harley SLC's illegal emissions is far greater than any harm to Harley SLC in stopping and remediating such emissions; and (d) to stop and remediate such emissions fulfills the public interest by protecting and enhancing the quality of Utah's soundscape is consistent with the purpose of the NCA.

## SEVENTEENTH CAUSE OF ACTION

**Power Sports is in violation of NCA § 4909(a)(2)(B) by using new and used motorcycles after one or more noise control devices have been removed from such motorcycles.**

418.   NCA § 4909(a)(2) provides:

Except as otherwise provided in subsection (b), the following acts or the causing thereof are prohibited: . . .

(2)(A) The removal or rendering inoperative by any person, other than for purposes of maintenance, repair, or replacement, of any device or element of design incorporated into any product in compliance with regulations under section 4905 of this title [40 C.F.R. § 205.152 and § 205.166], prior to its sale or delivery to the ultimate purchaser or while it is in use, or (B) the use of a product after such device or element of design has been removed or rendered inoperative by any person.

419.   NCA § 4909(a)(2) is a noise control requirement within the meaning of NCA § 4911(f) and therefore is enforceable by citizens.

420.    Motorcycle noise control devices and/or elements of design include but are not limited to the motorcycle's OEM mufflers, entire exhaust system, and the air intake/cleaner assembly.

421.    Power Sports is in violation of NCA § 4909(a)(2) because it uses new and used motorcycles after one or more noise control devices and/or elements of design have been removed or rendered inoperative.

422.    Power Sports has not restored to NCA compliance the motorcycles it has used in Utah after one or more noise control devices had been removed in violation of NCA § 4909(a)(2)(B).  Power Sports' failure to restore to NCA compliance the new and used motorcycles it has used in which such devices were removed constitutes an ongoing violation of NCA § 4909(a)(2)(B).

423.    Power Sports' use of new and used motorcycles in Utah after one or more noise control devices have been removed in violation of NCA § 4909(a)(2)(B) causes excess noise that Power Sports is responsible to remediate.

424.    Power Sports' violations of NCA 42 U.S.C. § 4909(a)(2)(B), by using new and used motorcycles after one or more noise control devices have been removed, are subject to injunctive relief and remediation.  42 U.S.C. §§ 4910(c), 4911(a).

425.    The excess noise from motorcycles in Utah caused by Power Sports' use of motorcycles after one or more noise control devices have been removed, which presumptively exceeds the 80 dB noise limit, continues to harm Physicians' members and the public.  Power Sports should be enjoined to take all necessary measures to end and remediate these illegal noise emissions causing ongoing harm because: (a) such excess noise is injurious to human health and

therefore is irreparable; (b) there is no adequate remedy at law to address the excess noise because monetary damages cannot compensate for human and environmental injury; (c) the harm to Physicians and the public from Power Sports' illegal emissions is far greater than any harm to Power Sports in stopping and remediating such emissions; and (d) to stop and remediate such emissions fulfills the public interest by protecting and enhancing the quality of Utah's soundscape is consistent with the purpose of the NCA.

## EIGHTEENTH CAUSE OF ACTION

**As a responsible corporate officer, Defendant Timmons is liable for
Harley SLC and Power Sports' use of new and used motorcycles
after one or more noise control devices have been removed.**

426.   NCA § 4902(2) defines a "person" to include "an individual."

427.   An officer of a corporation can be held personally liable for violations of federal laws created to protect public health if the officer had the authority to prevent or correct the violations and failed to exercise that authority, and the officer had actual or constructive knowledge of the facts giving rise to the violations.

428.    Corporate officers have a positive duty to seek out and remedy violations of law committed by the corporations they control, and, more importantly, a duty to implement measures that would have ensured the violations did not occur in the first place.

429.   Defendant Timmons as an individual is a "person" within the meaning of NCA § 4902(2).

430.   Mr. Timmons is the manager and sole member of Harley Davidson of Salt Lake City, LLC and Northern Utah Power Sports, LLC.

431.   Mr. Timmons had the authority to prevent or correct the violations described in the Nineteenth and Twentieth causes of action above, but did not exercise that authority.

432.   Mr. Timmons had actual or constructive knowledge of the facts giving rise to the violations described in the Nineteenth and Twentieth causes of action above.

433.   Mr. Timmons is personally liable for each of the violations described in the Sixteenth and Seventeenth causes of action above.

## VI.  REQUESTS FOR RELIEF

WHEREFORE, Physicians respectfully requests that this Court grant the following relief to correct Defendants' significant and ongoing violations of law:

A.   DECLARE that Defendants, as specifically alleged in the First, Second, and Third Causes of Action, have violated and continue to violate Utah SIP regulation R307-201-2 by removing or making inoperable federally required exhaust emission control systems and devices in motorcycles in Utah.

B.   DECLARE that Defendants, as specifically alleged in the Fourth, Fifth, and Sixth Causes of Action, have violated and continue to violate CAA § 7522(a)(3)(B) by selling and/or installing aftermarket defeat parts alone and in used motorcycles in Utah.

C.   DECLARE that Defendants, as specifically alleged in the Seventh, Eighth, and Ninth Causes of Action, have violated and continue to violate Utah SIP regulation R307-201-2 by owning and operating motorcycles without all of their federally required emission control systems and devices in operable condition.

D.   DECLARE that Defendants, as specifically alleged in the Tenth, Eleventh and Twelfth Causes of Action, are in violation of NCA § 4909(a)(1) by assembling and selling new

motorcycles that do not comply with the NCA's 80 dB noise limit.

E.      DECLARE that Defendants, as specifically alleged in the Thirteenth, Fourteen, and Fifteenth Causes of Action, are in violation of NCA § 4909(a)(3) by assembling and selling new motorcycles that do not comply with the NCA's noise labeling requirements.

F.      DECLARE that Defendants, as specifically alleged in the Sixteenth, Seventeenth, and Eighteenth Causes of Action, are in violation of NCA § 4909(a)(2) by using new and used motorcycles after one or more noise control devices have been removed.

G.      ISSUE A PERMANENT INJUNCTION enjoining Defendants from:

        1.      Removing or rendering inoperative any OEM emission control device in any federally regulated motorcycle in Utah;

        2.      Selling or installing any aftermarket defeat part in Utah, including but not limited to selling and installing aftermarket exhaust parts that remove catalytic converters, as well as unapproved reprogrammers and software "tunes" that remove emissions-related settings in the motorcycle's ECM;

        3.      Selling new and used motorcycles that do not comply with the NCA's 80 dB noise limit and labeling requirements;

        4.      Owning and operating motorcycles without all of their federally required OEM emission control systems functioning and operational; and

        5.      Using motorcycles that are not in compliance with the NCA.

H.      ISSUE A PERMANENT INJUNCTION requiring Defendants to:

        6.      Take all necessary measures to remediate their illegal sales of air pollution control defeat parts, including but not limited to providing a financial incentive of sufficient size

to all Utah consumers of such parts, sold alone and as part of new and used motorcycles, to effect the retrieval of at least 90 percent of such parts sold over the last five years, and to pay for the full restoration of each applicable motorcycle's air emission control devices to their original condition;

7.     Take all necessary measures to remediate their illegal assembly and sales of new motorcycles that did not meet the 80 dB noise limit and labeling requirements, including but not limited to providing a financial incentive of sufficient size to all Utah purchasers of such motorcycles to effect the retrieval and no-fee restoration of at least 90 percent of such motorcycles sold over the last five years;

8.     Finance supplemental relief designed to reduce air pollution in the nonattainment areas of Utah, and noise pollution from loud roads and highways, to compensate for the excess, illegal pollution caused by Defendants' CAA and NCA violations; and

9.     Require the regular, certified submission to the Court and Physicians all facts and reports necessary to ensure complete and continuing compliance with the requirements above, along with the opportunity for periodic inspections.

I.     ORDER each Defendant to pay to the U.S. Treasury a civil penalty of up to $109,024 per day for removing or making inoperable federally required exhaust emission control systems and devices in motor vehicles in Utah in violation of Utah SIP regulation R307-201-2 after November 1, 2015.  42 U.S.C. §§ 7604(a) & 7413(b); 40 C.F.R. § 19.4; 81 Fed. Reg. 43092, 43095 (July 1, 2016); 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

J.     ORDER each Defendant to pay to the U.S. Treasury a civil penalty of up to $109,024 per day for each motorcycle with emission control systems it failed to maintain in

inoperable condition in violation of the Utah SIP after November 1, 2015.  42 U.S.C. §§ 7604(a)

& 7413(b); 40 C.F.R. § 19.4; 81 Fed. Reg. 43092, 43095 (July 1, 2016); 87 Fed. Reg. 1676, 1678

(January 12, 2022).

       K.      ORDER each Defendant to pay to the U.S. Treasury a civil penalty of up to

$5,179 for each violation of CAA § 7522(a)(3)(B) occurring on or after November 1, 2015.  42

U.S.C. § 7524(a).  Pursuant to CAA § 7524(a), each aftermarket defeat part sold or installed in

violation of CAA § 7522(a)(3)(B) constitutes a separate offense. CAA § 7604(a) & (g)(1)

provide that penalties are directed to finance EPA air compliance and enforcement activities;

       L.      ORDER each Defendant to pay up to $100,000 for beneficial mitigation projects,

as provided for by CAA § 7604(g)(2), consistent with the purposes of the Clean Air Act;

       M.      ORDER each Defendant to pay to the U.S. Treasury a civil penalty of up to

$41,219 per day for each new motorcycle sold in violation of NCA § 4909(a)(1) and (3) and not

restored.  42 U.S.C. § 4910(a)(2); 40 C.F.R. § 19.4; 87 Fed. Reg. 1676, 1678 (Jan. 12, 2022).

       N.      ORDER Defendants to pay Physicians their costs of litigation, including but not

limited to reasonable attorney and expert witness fees, as authorized in CAA § 7604(d) and NCA

§ 4911(d); and

O.     GRANT such other relief as the Court deems necessary and proper.

Dated this 18th day of July, 2022.

| s/ Reed Zars | s/ George Hays | s/ Michelle Fein |
|---|---|---|
| Reed Zars | George E. Hays | Michelle Fein |
| Utah Bar No. 16351 | Attorney at Law | Utah Bar No. 18065 |
| Attorney at Law | P.O. Box 843 | 50 W Broadway, Suite 333 |
| 910 Kearney Street | Bellevue, WA 98009 | PMB 49891 |
| Laramie, WY 82070 | (415) 566-5414 | Salt Lake City, UT 84101 |
| (307) 760-6268 | georgehays@mindspring.com | (610) 761-7643 |
| reed@zarslaw.com | (Pro Hac Vice pending) | michelle@fein.law |

*Attorneys for Plaintiff*

## ATTACHMENT

**Attachment 1:**  Physicians' April 5, 2022 Notice Letter, with Exhibits A & B.