THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> HARLEY-DAVIDSON OF SALT LAKE CITY, LLC d/b/a Harley-Davidson Shop; NORTHERN UTAH POWER SPORTS, LLC d/b/a Golden Spike Harley-Davidson and Saddleback Harley-Davidson; and JOSEPH L. TIMMONS, JR., <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER DENYING [49] PLAINTIFF'S EXPEDITED MOTION FOR PRELIMINARY INJUNCTION, GRANTING [79] PLAINTIFF'S PARTIAL MOTION TO EXCLUDE THE EXPERT TESTIMONY OF CHRISTIAN LINDHJEM, GRANTING IN PART AND DENYING IN PART [82] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART [83] DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHAEL ST. DENIS, DENYING [93] PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:22-cv-00473-DBB-DAO <br><br> District Judge David Barlow |

In this case, Plaintiff Utah Physicians for a Healthy Environment ("UPHE") alleges that Defendants Harley Davidson of Salt Lake City, LLC, Northern Utah Power Sports, LLC, and Mr. Joseph L. Timmons, Jr. (collectively "Defendants") committed various air- and noise-related violations.[1] Before the court are five fully-briefed motions: two motions to exclude expert testimony[2]; cross-motions for summary judgment[3]; and UPHE's motion for a preliminary

---

[1] *See* Compl. ¶¶ 210–433, ECF No. 2.
[2] Pl.'s Partial Mot. to Exclude the Expert Test. of Christian Lindhjem ("Pl.'s Mot. to Exclude"), ECF No. 79; Defs.' Mot. to Exclude Expert Test. of Michael St. Denis ("Defs.' Mot. to Exclude"), ECF No. 83.
[3] Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. 82; Pl.'s Mot. for Summ. J. (Pl.'s Mot."), ECF No. 93.

injunction.[4] For the following reasons, the court: grants UPHE's motion to exclude expert testimony; grants in part and denies in part Defendants' motion to exclude expert testimony; grants in part and denies in part Defendants' motion for summary judgment; denies UPHE's motion for summary judgment; and denies UPHE's motion for a preliminary injunction.

## BACKGROUND

### I.  Motorcycle Emissions and Noise Control

The Clean Air Act ("CAA") imposes separate regulatory schemes for stationary sources and mobile sources.[5] With regard to mobile sources, the EPA sets "standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which . . . cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."[6] Combustion motorcycles emit several chemicals that "contribute to the formation of ground-level ozone" and secondary particle formation.[7] While EPA imposes emissions standards for new motorcycles,[8] it does not require any specific device or system to be installed on new motorcycles to enable them to meet its emissions standards.[9] Finally, the CAA requires that new motor vehicles be tested to ensure compliance with emission standards; if the vehicle conforms to federal emission standards, the EPA issues a certificate of conformity ("COC").[10]

---

[4] Pl.'s Expedited Mot. for Preliminary Injunction ("PL.'s Mot. for PI"), ECF No. 49.
[5] *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1235 (10th Cir. 2021); *see also* 42 U.S.C. §§ 7408–7412; *id.* §§ 7521–22.
[6] 42 U.S.C. § 7521(a)(1).
[7] U.S. EPA, Final Regulatory Support Document: Control of Emissions from Highway Motorcycles 1-1 (2003), ECF No. 94-11.
[8] *See* 40 C.F.R. § 86.410-90; *id.* § 86.410-2006.
[9] *Id.* § 86.408-78(a).
[10] 42 U.S.C. § 7525(a)(1).

A few different technologies can aid in motorcycles meeting their emission standards,[11] though a catalytic converter is the principal method.[12] A catalytic converter generally consists "of an insulated chamber containing ceramic pellets or a ceramic honeycomb structure coated with a thin layer of metals" that "act as catalysts to reduce the" pollutants in the engine exhaust.[13] As such, a catalytic converter is typically located in the exhaust pipe or mufflers of a motorcycle.[14] A tuner is another device that impacts a motorcycle's exhaust emissions. In essence, a tuner is software that permits modification of the operation of the engine control unit by altering engine fuel and air intake, among other things.

The Noise Control Act ("NCA") requires that the EPA publish regulations limiting noise emissions from certain products that are a major source of noise.[15] The EPA has set noise emission standards for motorcycles.[16] As with the requirements under the CAA, the NCA and its implementing regulations do not require a specific part or device to be installed on new motorcycles, but rather, impose a standard of performance, which differs depending on the year and type of motorcycle.[17] A muffler is a typical part used to limit noise emissions.[18]

---

[11] *See* Control of Emissions from Highway Motorcycles, *supra* note 7, at 3-6, 3-8; *see generally* Emission Control System, Encyclopedia Britannica, https://www.britannica.com/technology/emission-control-system [https://perma.cc/XD9G-FX3T] (last visited Mar. 25, 2024).
[12] *See* Control of Emissions from Highway Motorcycles, *supra* note 7, 3-6, 3-8; Emission Control System, *supra* note 11.
[13] Emission Control System, *supra* note 11
[14] *See* Decl. of Troy Spratt in Support of Defs.' Opp'n to Pl.'s Mot. for Summ. J. ("Spratt Decl.") ¶ 7, ECF No. 104-3; Third Decl. of Dr. Michael St. Denis Decl. ("3rd St. Denis Decl.") ¶ 3, ECF No. 70-2.
[15] 42 U.S.C. § 4905(a), (c).
[16] *See* 40 C.F.R. § 205.152 (motorcycles); *id.* § 205.166 (motorcycle exhaust systems).
[17] *See id.* §§ 205.152, 205.166.
[18] *See* Muffler, Encyclopedia Brittanica, https://www.britannica.com/technology/muffler-engine-part [https://perma.cc/VK6R-MFEC] (last visited Mar. 29, 2024).

## II.   The Present Case

Mr. Timmons is the majority owner in both Harley Davidson of Salt Lake City and Northern Utah Power Sports.[19] Each of these entities owns and operates two Harley-Davidson dealerships in Utah.[20] The four dealerships sell new and used Harley-Davidson motorcycles and sell and install aftermarket parts from other manufacturers.[21]

UPHE describes itself as a civic organization of healthcare professionals and members of the public dedicated to addressing public health issues in Utah that are caused by environmental harms.[22] UPHE accomplishes its goals through educational efforts and through litigation.[23]

It is well-documented that much of the Wasatch front has elevated levels of $PM_{2.5}$ (particulate matter smaller than 2.5 microns) and ozone.[24] Vehicle exhaust contributes to both ozone and $PM_{2.5}$.[25] Several of UPHE's members allege aesthetic, recreational, and physical injuries related to air pollution along the Wasatch front.[26] In addition, several of UPHE's members allege aesthetic and recreational injuries related to loud motorcycles, including Harley-Davidsons.[27]

UPHE commenced this case in July 2022, alleging claims under Utah regulations, the CAA, and the NCA against Salt Lake Harley Davidson and Northern Utah Power Sports, and

---

[19] Decl. of Joseph L. Timmons, Jr. in Support of Defendants' Mot. for Summ. J. ("Timmons Decl.") ¶ 2, ECF No. 82-2.

[20] *Id.* ¶¶ 3–4.

[21] *Id.* ¶¶ 7, 10.

[22] Decl. of Jonny Vasic ("Vasic Decl.") ¶¶ 4–5, ECF No. 94-1.

[23] *Id.*

[24] *See* Utah Dep't of Air Quality, Utah's Air Quality: 2022 Annual Report, at 20 Fig. 6, 25 Fig. 10, ECF No. 94-5.

[25] *Id.* at 16, 22; Control of Emissions from Highway Motorcycles, *supra* note 7, 1-1.

[26] *E.g.*, Decl. of Bob Macfarlane (1st Macfarlane Decl.") ¶ 14, ECF No. 94-2; Decl. of Kirtly Parker Jones ("Jones Decl.") ¶¶ 18, 19, ECF No. 94-3; Vasic Decl. ¶¶ 1, 15.

[27] *E.g.*, Vasic Decl. ¶ 14; 1st Macfarlane Decl. ¶¶ 6, 11; Second Decl. of Bob Macfarlane ("2nd Macfarlane Decl.") ¶¶ 2, 3, ECF No. 94-3; Jones Decl. ¶¶ 3, 6, 7 8.

against Mr. Timmons under the responsible corporate officer doctrine.[28] In general, UPHE's claims concern the removal or replacement of devices meant to ensure a motor vehicle's compliance with the CAA or NCA, and the use of motor vehicles without such a device.[29]

In response to Defendants' interrogatories seeking production of all claimed violations,[30] UPHE produced spreadsheets detailing Defendants' sales of motorcycles with and installation of defeat devices.[31] These spreadsheets are based on Defendants' invoices.[32] UPHE identifies numerous unique events, many of which are the subject of multiple claimed violations.[33] For instance, one document identifies a transaction involving the sale of a new motorcycle with aftermarket mufflers and an aftermarket tuner.[34] UPHE identifies this sale as a violation of: Utah regulations for removing a catalytic converter; the CAA for installing a defeat device (the muffler); the CAA for selling a defeat device (the muffler); the CAA for installing a defeat device (the tuner); the CAA for selling a defeat device (the tuner); the NCA for removing the original muffler; and the NCA for using or causing the use of the motorcycle without the original muffler.[35]

UPHE initially listed the following violations in its claims spreadsheets: 468 catalytic converters removed; 468 aftermarket exhaust parts installed without catalytic converters; 155 tuners installed; 468 aftermarket exhaust parts sold without catalytic converters; 758 non-

---

[28] *See* Compl. ¶¶ 210–433.
[29] *See id.*
[30] *See* Defs.' Second Set of Written Discovery Requests to Plaintiff, ECF No. 82-6.
[31] *See* Summary Table of Harley Dealerships SIP, CAA and NCA Violations (July 5, 2023) and Tables of Violations (Rows 1 through 9 in Summary Table) ("UPHE Claims Spreadsheet"), ECF No. 94-18.
[32] *See* Pl.'s Mot. 26; Defendants' Invoices, ECF No. 115.
[33] *See* UPHE Claims Spreadsheet.
[34] *See* Defs.' Invoices, Bates No. 8658.
[35] *See* UPHE Claims Spreadsheet, Row 1 at p. 19; *id.* Row 2 at p. 19; *id.* Row 3 at p. 7; *id.* Row 4 at p. 20; *id.* Row 6 at p. 7; *id.* Row 8 at p. 81; *id.* Row 9 at p. 54.

compliant aftermarket exhaust parts sold over-the-counter; 155 tuners sold; 117 motorcycles operated without functioning emissions control devices; over 1,618 mufflers removed; and over 808 motorcycles operated without a muffler.[36]

In response to Defendants' motion for summary judgment, UPHE has since revised the spreadsheets to withdraw a number of claimed violations.[37] Its updated claimed violations are as follows: 440 catalytic converters removed; 440 aftermarket exhaust parts installed without catalytic converters; 137 tuners installed; 440 aftermarket exhaust parts sold without catalytic converters; 758 non-compliant aftermarket exhaust parts sold over-the-counter; 140 tuners sold; 112 motorcycles operated without functioning emissions control devices.[38] In addition, UPHE purchased a motorcycle to test for air and noise emissions.[39] UPHE's expert declares that the test motorcycle was in violation of both the CAA and the NCA.[40]

UPHE moved for a preliminary injunction to prevent Defendants from selling motorcycles that violate the CAA or the NCA.[41] In support of its motion for preliminary injunction, UPHE submitted evidence from an inspection at one of the dealerships owned by Harley-Davidson of Salt Lake City.[42] According to UPHE, that inspection revealed 10 used motorcycles that were CAA non-compliant and 14 used motorcycles that were NCA non-compliant.[43] These motorcycles were not listed on UPHE's claims spreadsheets, and UPHE did

---

[36] See UPHE Claims Spreadsheet.
[37] See UPHE Responses to Defs.' Defenses to UPHE Violations Spreadsheets, Summary Tables and Rows 1 through 7 ("Updated UPHE Claims Spreadsheet"), ECF No. 107-1.
[38] Updated UPHE Claims Spreadsheet.
[39] See Expert Report of Dr. Michael St. Denis ("St. Denis Report") ¶ 15, ECF No. 83-1.
[40] Id. ¶¶ 7, 10, 14.
[41] See Pl.'s Expedited Mot. for Preliminary Injunction, ECF No. 49.
[42] See Decl. of Dr. Michael St. Denis ("1st St. Denis Decl.") ¶ 3, ECF No. 49-1.
[43] See id.; Pl.'s Mot. for PI 2.

not supplement its claims spreadsheets to incorporate the motorcycles at issue in its motion for preliminary injunction.[44]

The parties each moved for summary judgment and moved to exclude the other's expert witness.[45] The parties finished briefing their motions on February 9, 2024.[46]

## MOTIONS TO EXCLUDE EXPERT TESTIMONY

### STANDARD

Federal Rule of Evidence 702 reads:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[47]

---

[44] *See* Defs.' Sur-Reply to Pl.'s Mot. for Preliminary Injunction ("Defs.' Sur-Reply to PI"), ECF No. 99; Pl.'s Resp. to Defs.' Sur-Reply to PI, ECF No. 100.

[45] *See* Pl.'s Mot.; Defs.' Mot; Pl.'s Mot. to Exclude; Defs.' Mot. to Exclude.

[46] *See* Defs.' Opp'n to Pl.'s Expedited Mot. for Preliminary Injunction ("Defs.' PI Opp'n"), ECF No. 69; Pl.'s Reply in Support of its Mot. for Preliminary Injunction (Pl.'s PI Reply"), ECF No. 70; Defs.' Sur-Reply to PI; Pl.'s Resp. to Defs.' Sur-Reply to PI; Defs.' Mem. in Opp'n to Pl.'s Partial Mot. to Exclude the Expert Test. of Christian Lindhjem ("Defs.' Opp'n to Mot. to Exclude"), ECF No. 103; Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Opp'n"), ECF No. 104; Pl. UPHE's Resp. to Defs.' Mot. to Exclude Expert Test. of Michael St. Denis ("Pl.'s Resp. to Mot. to Exclude"), ECF No. 105; Pl.'s Resp. to Defs.' Mot. for Summ. J. ("Pl.'s Resp."), ECF No. 106; Defs.' Reply Mem. in Support of Mot. to Exclude Expert Test. of Michael St. Denis ("Defs.' Reply to Mot. to Exclude"), ECF No. 111; Pl.'s Reply in Support of its Partial Mot. to Exclude Expert Test of Christian Lindhjem ("Pl.'s Reply to Mot. to Exclude"), ECF No. 112; Pl.'s Reply in Support of its Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 113; Defs.' Reply Mem. in Support of Mot. for Summ. J. ("Defs.' Reply"), ECF No. 114.

[47] Fed. R. Evid. 702.

Rule 702 imposes a "gatekeeping function" on district courts to ensure that expert opinions are both relevant and reliable.[48] It requires courts to first determine whether an expert is sufficiently qualified, and second to determine whether the expert opinion is "both relevant and reliable, in that it will assist the trier of fact."[49]

**DISCUSSION**

**I.      UPHE's Motion to Exclude Testimony from Mr. Christian Lindhjem**

Defendants retained Mr. Lindhjem to provide three opinions.[50] UPHE challenges only one of these. In part, Mr. Lindhjem opines:

> [EPA] enforcement of anti-tampering regulations by aftermarket part sales and installers has generally been limited to installation of parts that were clearly described and marketed to defeat the emissions control devices on vehicles. EPA concludes that if the seller and installer had a "reasonable basis" for believing that the aftermarket part did not adversely effect emissions, then EPA would not pursue legal action against the installer. . . . *In my experience, it would not be unreasonable for dealerships like those in this case to rely upon compliance representations by aftermarket parts manufacturers.*[51]

UPHE argues both that Mr. Lindhjem cannot offer an expert opinion on a legal question and that he is not qualified to offer this opinion.[52]

The court first considers Mr. Lindhjem's qualifications. Mr. Lindhjem holds bachelor's degrees in chemical engineering and chemistry, a master's degree in chemical engineering, and a Ph.D. in chemical engineering.[53] He has experience in engineering projects related to mobile

---

[48] *Roe v. v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022); *see also Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 US. 137, 141–42 (1999).
[49] *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013) (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)).
[50] Expert Report of Christian E. Lindhjem ("Lindhjem Report") 2, ECF No. 81.
[51] *Id.* at 2 (emphasis added).
[52] Pl.'s Mot. to Exclude 1–3.
[53] Christian Lindhjem, PhD – Curriculum Vitae 1, ECF No. 81, Attach. 1.

source emissions.[54] However, his CV is silent as to any "knowledge, skill, experience, training, or education" that could possibly be relevant to rendering an opinion as to whether a dealership can rely on the representations of manufacturers.

In arguing that Mr. Lindhjem is qualified, Defendants argue that "[t]he relevant field of this opinion is the EPA's enforcement of mobile source emissions regulations" and that Mr. Lindhjem has extensive experience in that field.[55] But that argument misconstrues both Mr. Lindhjem's proffered opinion and the proper scope of expert testimony. EPA's enforcement priorities cannot serve as a basis for an opinion that dealerships can reasonably rely on the representations of manufacturers. And in any event, Rule 702 limits expert testimony to "scientific, technical, or other specialized knowledge . . . ." and it requires that such knowledge be helpful to the trier of fact in understanding the evidence or determining a fact in issue.[56] Additionally, Mr. Lindhjem bases this opinion solely on an EPA policy memorandum released in 2020.[57] It would not materially assist the trier of fact in understanding the evidence or determining a fact in issue to have Mr. Lindhjem tell them what he thinks the EPA memo says.[58]

---

[54] *Id.* at 1–3.

[55] Defs.' Opp'n to Mot. to Exclude 3.

[56] Fed. R. Evid. 702.

[57] Lindhjem Report 2 (citing Susan Parker Bodine, U.S. EPA, <u>EPA Tampering Policy: The EPA Enforcement Policy on Vehicle and Engine Tampering and Aftermarket Defeat Devices under the Clean Air Act</u> (Nov. 23, 2020), https://www.epa.gov/enforcement/epa-tampering-policy-epa-enforcement-policy-vehicle-and-engine-tampering-and [https://perma.cc/LZ7W-SBF4]).

[58] *Cf. Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) ("There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having specialized understanding of the subject involved in the dispute." (quoting Fed. R. Evid. 702 advisory committee's notes to 1972 amendment)); *U.S. v. Rodriguez-Felix*, 450 F.3d 1117, 1124 (10th Cir. 2006) ("[The following are] non-exclusive factors to determine whether the testimony will asset the trier of fact: (1) whether the testimony is relevant; (2) whether it is within the juror's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness's credibility.").

And finally, nothing suggests that Mr. Lindhjem's opinion on this point is sufficiently reliable. Mr. Lindhjem merely summarizes the EPA policy memorandum and concludes that it is not unreasonable for dealerships to rely on manufacturers' representations.[59] There are no reliable "principles and methods" in Mr. Lindhjem's opinion.[60]

Therefore, the opinion is excluded. Defendants have not shown that Mr. Lindhjem is qualified to offer his first opinion, that the opinion is reliable, or that the opinion would materially assist the trier of fact.[61]

## II.   Defendants' Motion to Exclude Testimony from Dr. St. Denis

Dr. St. Denis offers four sets of opinions relevant to this case.[62] Only the first two are at issue. Relevant to the first two opinions is that Dr. St. Denis was hired to perform testing on a motorcycle sold by Defendants with aftermarket parts installed.[63] He sent the test motorcycle to the SGS Environmental Testing Center ("SGS") for air emissions testing.[64] He opines that the testing "showed a doubling of emissions of nitrogen oxides plus hydrocarbons . . . from the Test Motorcycle compared to its originally certified level of emissions" and that this level was consistent with the removal of a catalytic converter.[65] Next, following completion of the testing at SGS, Dr. St. Denis sent the test motorcycle to the Transportation Research Center ("TRC") for noise emissions testing.[66] He opines that the test motorcycle "emits noise at 94.5 dB(A)" which

---

[59] *See* Lindhjem Report 2–3.
[60] *Cf.* Fed. R. Evid. 702(b)–(d).
[61] In its briefing on summary judgment, UPHE also objects to Mr. Lindhjem's testimony on the grounds that it is unsworn. *See* Pl.'s Resp. 6. The court need not reach this issue.
[62] *See* St. Denis Report ¶¶ 5–14.
[63] *Id.* ¶ 15.
[64] *Id.* ¶ 28.
[65] *Id.* ¶¶ 7, 39–42.
[66] *Id.* ¶ 43.

is "more than twice as loud as the federal 80dB(A) limit" and "is consistent with the expected elevated noise from the aftermarket . . . muffler" that was installed.[67]

First, Defendants argue that Dr. St. Denis lacks the qualifications to opine on noise emissions.[68] As explained below, UPHE lacks standing to pursue its NCA claims. Therefore, because Dr. St. Denis's noise opinion is only relevant for those claims, the court finds that it need not address this argument.

Second, Defendants argue that Dr. St. Denis's air emissions opinion is unreliable because during SGS's testing there were high background levels of hydrocarbons.[69] According to Defendants, this means that Dr. St. Denis's opinion was not based on sufficient facts or data, as required by Rule 702(b).[70] UPHE counters that the background hydrocarbon concentrations were too high because the exhaust system on the test motorcycle was leaking.[71] It suggests that while the testing could not have been used by EPA to certify the motorcycle, the testing remains valid for comparison purposes.[72]

It appears that this issue is more appropriately addressed under Rule 702(d). In other words, the issue is whether the SGS testing and Dr. St. Denis's report reflects a reliable application of reliable principles and methods.[73] UPHE has not made a sufficient showing. Both Dr. St. Denis and SGS admitted that the test results were invalid for EPA purposes given that

---

[67] *Id.* ¶¶ 10, 51–53.
[68] Defs.' Mot. to Exclude 6–7.
[69] *Id.* at 9.
[70] *Id.* at 9–10.
[71] Pl.'s Resp. to Mot. to Exclude 6.
[72] *Id.*
[73] *See* Fed. R. Evid. 702(d).

background levels of hydrocarbons exceeded 5 parts per million.[74] While it may be the case that performing an emissions test that fails to conform to EPA protocols would not render the test result scientifically invalid, UPHE has not attempted to explain how high background levels of hydrocarbons would affect a test result, nor has it explained why the testing would be valid for comparison purposes. And indeed, it seems likely that a high background level of hydrocarbons would skew a test result focused in part on hydrocarbon emissions. On this record, it is impossible for the court to conclude that it is more likely than not that Dr. St. Denis's opinion reflects a reliable application of reliable principles and methods.

Accordingly, the court excludes Dr. St. Denis's air emissions opinions from its consideration of the motions for summary judgment, though it does not exclude the remainder of his opinions.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

### STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[75] "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."[76] Where the moving party does not bear the ultimate burden of proof on an issue at

---

[74] *See* SGS Emails 1, ECF No. 83-5 ("HC background was above the acceptable limit, which technically results in a voided test. . . . Obviously SGS is stating that this cannot be viewed as a Cert quality test, but the data can be used for development/comparison purposes."); Dep. of Michael St. Denis ("St. Denis Dep.") 34:5–34:6, 34:22–35:7, ECF No. 83-3.

[75] Fed. R. Civ. P. 56(a).

[76] *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).

trial, the party may simply point out to the court the lack of evidence to support the nonmoving party's case.[77] The burden then shifts to the nonmoving party to demonstrate that there is a genuine dispute of material fact for trial.[78] But when the moving party bears the ultimate burden of proof at trial, the party must make a showing such that "no reasonable trier of fact could find other than for the moving party."[79]

Further, "[c]ross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[80] Therefore the court must review each motion separately and must draw all reasonable inferences in the non-moving party's favor.[81] In other words, if after such a review there remain disputes of material fact, summary judgment as to either side will be inappropriate.[82] However, if the facts underlying both motions "are not in dispute and the parties only disagree about" the relevant law, "summary disposition is appropriate."[83]

**DISCUSSION**

## I.      Article III Standing

Defendants argue that UPHE lacks Article III standing to bring CAA claims based on sales to customers outside of Utah and to bring any claims under the NCA.[84] Plaintiff affirmatively argues that it has standing to pursue all its claimed violations.[85]

---

[77] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).
[78] *Id.* at 324.
[79] *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).
[80] *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 438 F.3d 1025, 1030 (10th Cir. 2007) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).
[81] *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906–07 (10th Cir. 2016).
[82] *Christian Heritage Acad.*, 438 F.3d at 1030.
[83] *Id.*
[84] Defs.' Mot. 11–12; *id.* 27–29.
[85] Pl.'s Mot. 6–24.

In order to have standing, an organization must demonstrate: (1) that "its members would otherwise have standing to sue in their own right"; (2) that "the interests it seeks to protect are germane to the organization's purpose"; and (3) that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[86] The first and second elements are constitutionally required, while the third is prudential.[87] A member of an organization has standing to sue in their own right if they meet the three standing elements: (1) an injury in fact that is both concrete and particularized, and actual or imminent; (2) causation between the conduct complained of and the injury; and (3) likelihood that the injury will be redressed by a favorable decision.[88] And importantly, plaintiffs must demonstrate standing for each alleged violation, not simply each alleged claim.[89]

---

[86] *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Diesel Power Gear*, 21 F.4th at 1241.
[87] *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–57 (1996).
[88] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).
[89] *Diesel Power Gear*, 21 F.4th at 1248.

### A.   CAA

The majority of the standing elements are not at issue for UPHE's CAA claims. Defendants argue only that UPHE lacks standing to bring its CAA claim based on Defendants' sales to customers living outside Utah.[90] This presents a question as to the causation element of UPHE's individual members' standing. Generally, the causation element is satisfied if the injury is "fairly traceable" to the alleged wrongful conduct.[91] In *Utah Physicians for a Healthy Environment v. Diesel Power Gear*, the Tenth Circuit held that "too-distant" air pollution was not "fairly traceable" to the alleged wrongful conduct.[92] The Tenth Circuit observed, as is directly relevant here: "If the vehicle was driven, however little, in the Salt Lake City area, UPHE has established that its members' injuries from excessive pollution can be fairly traced to the CAA violation; so standing can be predicated on pollution from that vehicle."[93]

Here, Defendants point out that some of the sales on which Plaintiffs base their claims are either sales to customers outside of Utah or are silent as to customer location.[94] Defendants identify 87 transactions involving non-Utah residents: 17 instances in which they sold and installed an aftermarket exhaust part, 14 instances in which they sold and installed a tuner, 55 instances in which they sold aftermarket parts and performed no installation; and one instance in which they sold a "tampered" motorcycle.[95] They then identify 78 transactions where the record

---

[90] Def.'s Mot. 11–12.
[91] *Lujan*, 504 U.S. at 560.
[92] 21 F.4th at 1246–49.
[93] *Id.* at 1248.
[94] Out-of-State Sales Spreadsheet, ECF No. 82-12; *see also* Defs.' Mot. 7–9 (summarizing the spreadsheet).
[95] Defs.' Mot. 7–9, 12; Out-of-State Sales Spreadsheet.

is silent as to customer location: 32 aftermarket parts sold and installed, 12 tuners sold and installed, and 34 parts sold on their own.[96]

UPHE has agreed to drop claims based on the 55 parts that were shipped to non-Utah residents where Defendants did not perform installation.[97] Accordingly, those claims are dismissed.[98] UPHE, however, points to deposition testimony that suggests that Defendants test ride motorcycles in Utah before selling them and after installing aftermarket parts before returning the motorcycle to the customer.[99] So for the remaining 32 events in which an out-of-state customer was involved, there exists a dispute of material fact as to whether UPHE's injuries can be fairly traced to Defendants' alleged CAA violations, since any test ride would take place in the airshed in which UPHE's members reside.

Next, UPHE's only argument regarding those transactions for which the record is silent as to customer location is that "Defendants' failure to preserve customer locations should not be rewarded through the application of an irrational presumption that all of the parts were shipped out-of-state."[100] But it is UPHE's burden to prove each element of standing at each stage of its case. And here, for the claimed violations that involve solely the sale of parts, UPHE has failed to carry its burden in resisting summary judgment by pointing to facts that would suggest that those parts were used in or around Salt Lake City. Accordingly, those violations are

---

[96] Defs.' Mot. 12.

[97] *See* Pl.'s Resp. 22.

[98] *See* Out-of-State Sales Spreadsheet (identifying the following Bates numbers as being an out-of-state sale on which Defendants performed no installation: 1871, 1956, 1977, 1980, 1990, 2028, 2057, 2064, 2073, 2077, 2081, 2087, 2100, 2101, 2101, 2106, 2113, 2115, 5379, 5629, 6805, 6806, 6811, 6812, 6816, 6840, 6925, 6929, 6964, 6973, 7241, 7252, 7255, 7261, 7272, 7296, 7306, 7345, 7370, 7376, 7403, 7432, 7438, 7461, 7483, 7547, 7578, 7586, 7588, 7618, 7621, 7621, 7639, 7663, and 7680).

[99] *See* Dep. of Mike Udy ("Udy Dep.") 11:1–11:3, ECF No. 107-3; *id.* at 15:8.

[100] Pl.'s Resp. 14.

dismissed.[101] There is no "presumption" that the parts were sold out-of-state, only application of the summary judgment standard to the standing elements. However, as above, for all claimed violations involving installation, there is a genuine dispute of fact as to whether Defendants operated the motorcycle around Salt Lake City while performing a test drive.

**B.  NCA**

Defendants make two challenges to UPHE's standing to bring its NCA claims: (1) that noise pollution is not germane to UPHE's organizational purpose; and (2) that UPHE's members' injuries are not fairly traceable to Defendants' alleged wrongful conduct because there is no record evidence that Defendants sold any of the motorcycles or parts that have affected or will affect UPHE's members.[102]

**1.  Germane to UPHE's Purpose**

Courts look to the asserted mission and activities of organizations when evaluating whether the interests the organization seeks to protect through litigation are germane to its purpose.[103]

Defendants argue that noise is not germane to UPHE's purpose because it is not listed as one of UPHE's "priority issues" on its website.[104] But whether or not UPHE lists noise pollution as a priority issue on its website is not dispositive. While UPHE has not presented its articles of incorporation or any public founding document required by Utah law,[105] it has presented a

---

[101] For the 34 transactions involving only the sale of a part to a customer for which no location is provided, Defendants cite only their Out-of-State Sales Spreadsheet. *See* Defs.' Mot. 8. That spreadsheet, however, does not identify any transactions for which customer location is unavailable.

[102] Defs.' Mot. 27–29.

[103] *See Hunt*, 432 U.S. at 344, 336–37; *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 286 (1986).

[104] Defs.' Mot. 28.

[105] *Cf.* Utah Code § 16-6a-202(1).

declaration from its Executive Director, Mr. Jonny Vasic, along with excerpts from its website. UPHE's general purpose is to protect "the health and well-being of the residents of Utah by promoting science-based education and interventions that result in progressive, measurable improvements to the environment."[106] And Mr. Vasic declares that "UPHE is also concerned about the health impacts of noise," pointing to an article posted on UPHE's website in 2020 about noise's effects on health.[107] Mr. Vasic also declares that this action was brought pursuant to a vote of its Board of Directors.[108] Defendants argue on reply that UPHE improperly attempts to treat all health issues as within its purview.[109] But it is plain from Mr. Vasic's declaration and UPHE's website that UPHE is concerned only with public health issues caused by environmental harms—not all health issues. And Defendants do not dispute that noise is an environmental health issue. The foregoing is sufficient to conclude that noise pollution is germane to UPHE's organizational purpose.

### 2.   Fairly Traceable

The injuries of UPHE's members must be "'fairly traceable to the challenged action[s]' of the Defendants."[110] Causation for purposes of Article III requires at least proof "of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact," though it "demands something less than the concept of proximate cause."[111] Additionally, "standing is not

---

[106] *See Mission & Goals*, Utah Physicians for a Healthy Environment, https://www.uphe.org/about/mission-goals/ [https://perma.cc/JTJ2-4S73] (June 27, 2024); *see also* Compl. ¶ 9.
[107] Vasic Decl. ¶ 9.
[108] *Id.* ¶ 11.
[109] Defs.' Reply 12.
[110] *Diesel Power Gear*, 21 F.4th at 1242 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)).
[111] *Id.* (quoting *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005)).

dispensed in gross; rather, Plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."[112]

UPHE has submitted declarations from three of its members, each of which detail their exposure to loud motorcycles, including Harley-Davidson motorcycles.[113] But the declarations simply describe the noise from "a motorcycle," "loud motorcycles," "a significant number of motorcycles, often recognizable as Harley-Davidsons," and "loud Harley-Davidson motorcycles."[114] UPHE argues that it "does not have to prove the noise *from Defendants' motorcycles* harm UPHE members, only that the noise from Defendants' motorcycles *contributes to the kinds of injuries* suffered by UPHE members."[115] UPHE also suggests that, in any event, it has standing to pursue a claim regarding the "test motorcycle" one of its members purchased from Defendants.[116]

As discussed above, in *Diesel Power Gear*, the Tenth Circuit held that "UPHE has standing to challenge Defendants' violations that contributed to the unhealthy air in the Wasatch Front."[117] In reaching its holding, the Tenth Circuit considered numerous other cases which found standing under the Clean Air Act and the Clean Water Act involving defendants "that emit the injurious pollutant in the geographic vicinity of where the person is injured."[118] Where an injurious pollutant is discharged into the air or water, and a plaintiff interacts with that body of air or water and suffers injuries consistent with that pollutant, the plaintiff's injuries are fairly

---

[112] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *see also Diesel Power Gear*, 21 F.4th at 1248.
[113] *See* sources cited *supra* note 27.
[114] Vasic Decl. ¶¶ 12–14; 1st Macfarlane Decl. ¶¶ 6–7, 11–12; 2nd Macfarelande Decl. ¶¶ 2–3; Jones Decl. ¶¶ 3–8.
[115] Pl. Reply 24 (emphasis in original).
[116] *See id.* at 22–23.
[117] 21 F. 4th at 1246.
[118] *Id.* at 1245 (compiling cases).

traceable to the discharge.[119] Once emitted, such pollution does not immediately dissipate and can contribute to a plaintiff's injuries over time. In other words, it is logical to infer that even smaller polluters contribute to a plaintiff's injuries where that plaintiff is in the same airshed or watershed.[120] For that reason, those "who reside in that area can fairly trace injuries they suffer from the polluted air to any contributor of prohibited emissions in the area."[121]

But UPHE has not presented any evidence that noise should be treated similarly from a technical perspective. There is no record evidence that the noise emitted from the motorcycles accumulates in a "noiseshed" or otherwise impacts those that are not in the immediate presence of the noise when it is emitted. Because UPHE identified nothing in the record that supports this basis for standing, the court is "[d]eprived of this inference" much as it would be with a "too-distant" polluter.[122] And UPHE has not pointed to any caselaw involving noise adopting the analysis it urges. Thus, UPHE has not shown that Defendants caused UPHE's members' injuries based solely on general geographic proximity.

Of course, UPHE has presented a number of declarations from its members that suggest that UPHE's members have been injured by loud motorcycles, including Harley-Davidson motorcycles.[123] For instance, Mr. Macfarlane declares that he lives in Emigration Canyon and that "a significant percentage of the Harley-Davidson motorcycles that are driven in Emigration Canyon have aftermarket exhausts" and produce a painfully loud noise.[124] Thus, UPHE's members have sufficient evidence of an Article III injury to survive summary judgment. But

---

[119] *See id.* 1242–46.
[120] *Id.* at 1242–47.
[121] *Id.* at 1246.
[122] *Cf. id.* at 1246.
[123] *See* Vasic Decl. ¶ 14; 1st Macfarlane Decl. ¶¶ 6, 11; 2nd Macfarlane Decl. ¶¶ 2, 3; Jones Decl. ¶¶ 3, 6, 7, 8.
[124] 1st Macfarlane Decl. ¶¶ 2, 11.

UPHE has not presented sufficient evidence linking the injury to Defendants' challenged conduct. Nothing in the record suggests that the same motorcycles that have injured UPHE's members in the past were sold by or modified by Defendants. UPHE essentially seeks an assumption that because Defendants sell, install, and remove parts which affect motorcycles' noise level that its members have been exposed to the same. But UPHE and the record are silent on the evidentiary basis for the assumption. To be sure, there is evidence that UPHE's members are exposed to loud motorcycles sold or modified by unknown persons and that Defendants sell and install motorcycles and parts that are loud. What is missing is the bridge between the two: that the specific violations UPHE is pursuing in this case involve motorcycles or parts to which its members have been exposed. Because standing is "not dispensed in gross,"[125] but instead on a violation-by-violation basis,[126] UPHE has not shown standing for its specific claims on this record.

That leaves the motorcycle UPHE purchased for testing purposes. Dr. St. Denis reports that it was purchased from Defendants, shipped to Ohio, and tested there.[127] An unidentified person also drove it on Emigration Canyon Road in the presence of Dr. St. Denis so that he could record its noise level.[128] But UPHE does not identify any member who was exposed to the noise.

---

[125] *TransUnion*, 594 U.S. at 431.
[126] *Diesel Power Gear*, 21 F.4th at 1248.
[127] St. Denis Report ¶¶ 22, 28–29.
[128] *Id.* ¶¶ 56-60.

Thus, UPHE has failed to carry its burden in resisting summary judgment, since it has not shown that its members' injuries can be fairly traced to any, let alone each, of the alleged NCA violations.[129] Accordingly, the court does not reach the merits of those claims.

## II.   Air-Related Claims Against Dealerships

UPHE asserts two sets of air-related claims against the dealerships: four claims based on Utah Administrative Code R307-201-2, a provision of Utah's CAA State Implementation Plan ("SIP")[130]; and another two claims based on the CAA's anti-tampering provision.[131]

42 U.S.C. § 7522(a) reads:

The following acts and the causing thereof are prohibited—

. . .

(3)(A) for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter prior to its sale or delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser; or

(B) for any person to manufacture or sell, or offer to sell or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.[132]

Similarly, Utah Administrative Code R307-201-2 reads:

---

[129] *See Lujan*, 504 U.S. at 561 ("[E]ach [standing] element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").
[130] *See* Compl. ¶¶ 210–41, 294–317 (claims 1, 2, 7, and 8).
[131] *Id.* ¶¶ 250–85 (claims 4 and 5).
[132] 42 U.S.C. § 7522(a)(3).

> Any person owning or operating any motor vehicle or motor vehicle engine registered in the State of Utah on which is installed or incorporated a system or device for the control of crankcase emissions or exhaust emissions in compliance with the Federal motor vehicle rules, shall maintain the system or device in operable condition and shall use it at all times that the motor vehicle or motor vehicle engine is operated. No person shall remove or make inoperable within the State of Utah the system or device or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally more effective in reducing emissions from the vehicle to the atmosphere.[133]

Before the court addresses arguments specific to each provision, it addresses Defendants' argument that neither provision covers pass-through sales.

## A.  Pass-Through Sales

Defendants argue that UPHE has abandoned any claims based on as-is, or pass-through sales—sales of a used motorcycle that already has a defeat part installed on it—and that in any event, pass-through sales are not covered by 42 U.S.C. § 7522(a)(3)(B).[134]

First, Defendants' argument that claims based upon pass-through sales are not legally cognizable under the CAA is foreclosed. In *Diesel Power Gear* the Tenth Circuit expressly rejected such an argument.[135] The Tenth Circuit reasoned that Section 7522(a)(3)(B) "does not explicitly provide for as-is sales. Nor does anything in the CAA provide a rationale for such an exception."[136] *Diesel Power Gear* is binding, so this court cannot, as Defendants suggest, "revisit" it.[137]

---

[133] Utah Amin. Code R307-201-2 (1998).

[134] Defs.' Mot. 23–27.

[135] *Diesel Power Gear*, 21 F.4th at 1253–54.

[136] *Id.* at 1254.

[137] In a two-sentence footnote, Defendants also summarily state that R307-201-2 does not cover pass-through sales where an emissions control device has already been removed because Defendants "cannot fail to maintain something that is not present." Defs.' Mot. 18, 27 n.7. No analysis is provided, just the conclusory assertion. For purposes of summary judgment, the court finds Defendants have waived this issue by failing to adequately brief it. *See Butler v. Cardiff Healthcare, Inc.*, No. 2:17-cv-01114, 2019 WL 3752574, at *8 (D. Utah Aug. 8, 2019) (collecting cases); *see also GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1206 (10th Cir. 2022) ("To preserve an issue for appeal, a party must 'alert[] the district court to the issue and seek[] a ruling'—'[a] party does not preserve an issue merely by

Next, the court turns to whether UPHE has any such claims before the court or whether such claims have been abandoned. UPHE argues that at least the violations at issue in its motion for preliminary injunction were pass-through sales of used motorcycles already containing defeat parts.[138] Defendants make no reply to this argument. However, in their motion and in the briefing on UPHE's motion for preliminary injunction, Defendants argued that UPHE had abandoned any claims to the extent they were based on violations not listed in UPHE's spreadsheets.[139] Defendants' argument is essentially that UPHE may not pursue any violations not listed by UPHE in response to Defendants' interrogatory because it failed to update its response.[140]

Rules 26 and 33 of the Federal Rules of Civil Procedure govern this issue. Specifically, Rule 33(a)(2) permits interrogatories to "relate to any matter that may be inquired into under Rule 26(b)."[141] Rule 26(b) permits discovery on "any nonprivileged matter that is relevant to any claim or defense[.]"[142] And Rule 33 makes clear that "[a]n interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact[.]"[143] But the Rules themselves are silent as to whether an answer to a contention interrogatory binds a party to pursue a particular theory of the case. However, the Advisory

---

. . . presenting [it] to the district court in a "vague and ambiguous" manner,' or 'by making a "fleeting contention" before the district court.'" (quoting *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1142 (109th Cir. 2009)) (alterations in original)).

[138] Pl.'s Resp. 35.

[139] Def.'s Mot. 23; Defs.' Sur-Reply to PI 2–4.

[140] *See* Defs.' Sur-Reply to PI 3–4; *see also* Defs.' Second Set of Written Discovery Requests to Pl. 6, ECF No. 99-1 ("INTERROGATORY NO. 7: For each of Defendants' violations of air and noise emissions limitations that You allege in this case, identify the specific statutory section, specific administrative rule, regulation or policy, and/or the specific Utah State Implementation Plan provision that is applicable, the basis for the alleged violation, the number of motorcycles, motorcycle parts, sales, and/or installations involved, the date of each violation, and the motorcycle (by VIN number) and/or motorcycle part (by name, description, part number, and manufacturer) forming the basis of each alleged violation.").

[141] Fed. R. Civ. P. 33(a)(2).

[142] Fed. R. Civ. P. 26(b)(1).

[143] Fed. R. Civ. P. 33(a)(2).

Committee Notes to the 1970 Amendments make clear that "[t]he general rule governing the use of answers to interrogatories is that under ordinary circumstances they do not limit proof."[144] Indeed, "[a]lthough in exceptional circumstances reliance on an answer may cause such prejudice that the court will hold the answering party bound to his answer, the interrogating party will ordinarily not be entitled to rely on the unchanging character of the answers he receives and cannot base prejudice on such reliance."[145] The court gives persuasive weight to the Advisory Committee Notes.[146]

In addition, as UPHE points out,[147] while Rule 26(e) requires parties who have responded to an interrogatory to supplement its response, that duty is only triggered "if the additional or corrective information had not otherwise been made known to the other parties during the discovery process or in writing."[148] And as Defendants were made aware that UPHE intended to pursue claims based on violations not identified in its response to Defendants' interrogatory,[149] exclusion of such evidence under Rule 37(c)(1)[150] is unwarranted.

In sum, Defendants may be held liable for pass-through sales under the CAA.

---

[144] Fed. R. Civ. P. 33 advisory committee's notes to 1970 amendment.

[145] *Id.*; *see also* 8B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2167 (3d ed., June 2024 update) (discussing the effect of the 1970 amendments); *id.* § 2181 (discussing the effect of answers to interrogatories).

[146] *See, e.g.*, *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1188 (10th Cir. 2009) (citing *United States v. Vonn*, 535 U.S. 55, 64 n.6 (2002); *Schiavone v. Fortune*, 477 U.S. 21, 31 (1986); *Miss. Publ'g Corp. v. Murphee*, 326 U.S. 438, 444 (1946)).

[147] *See* Pl.'s Resp. to Defs.' Sur-Reply to PI 2–3.

[148] Fed. R. Civ. P. 26(e)(1)(A).

[149] *See* Pl.'s Resp. to Defs.' Sur-Reply to PI 3 (listing documents which provided notice).

[150] *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

### B.  Utah Administrative Code R307-201-2

UPHE alleged four claims based on Utah Administrative Code R307-201-2 against the dealerships.[151] The CAA requires that states submit a SIP to EPA.[152] A SIP is primarily concerned with regulation of stationary sources, as opposed to mobile sources.[153] However, states may voluntarily include anti-tampering provisions in their SIP submission to the EPA, and the EPA may approve of such provisions.[154] "An approved SIP 'has the force and effect of federal law,'" and a SIP violation carries with it its own set of penalties.[155]

The court first addresses Defendants' argument that R307-201-2 is preempted by the CAA, and then addresses arguments related to the elements of both sentences of the provision.[156]

### 1.  Preemption

Defendants argue that R307-201-2 is unenforceable because it is preempted. Defendants cite only to caselaw suggesting that "when a statute and a regulation are in conflict, the statute 'renders the regulation which is in conflict with it void and unenforceable.'"[157] No doubt this is true, but it does not help answer the question raised by Defendants. The case cited by Defendants dealt with a situation in which a *federal* regulation conflicted with a *federal* statute.[158] In other words, it was an Article I issue of whether a regulation was statutorily authorized. But the

---

[151] *See* Compl. ¶¶ 210–41, 294–317 (claims 1, 2, 7, and 8). A revised rule has been adopted by Utah, *see* Utah Administrative Code R307-201-4. Since the parties discuss only the old version of the rule, *see, e.g.*, *id.*; Defs.' Mot. 15; Pl.'s Mot. 27, and since the EPA has not approved of the revised rule, *see* 40 C.F.R. § 52.2320(c); *id.* § 52.2320(c)(59), the court will apply the EPA-approved rule. *See Diesel Power Gear*, 21 F.4th at 1238 n.6.
[152] *See Diesel Power Gear*, 21 F.4th at 1235 (citing 42 U.S.C. § 7410).
[153] *Id.* at 1235–37.
[154] *See id.* at 1237.
[155] *Id.* at 1237–38 (quoting *Espinoza v. Roswell Tower, Inc.*, 32 F.3d 491, 492 (10th Cir. 1994)).
[156] Defs.' Mot. 15–19; Pl.'s Mot. 28–29.
[157] *See* Defs.' Mot. 15 (quoting *Enfield v. Kleppe*, 566 F.2s 1139, 1142 (10th Cir. 1977) (citing *Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1156 (10th Cir. 2019))).
[158] *See Cherokee Nation*, 936 F.3d at 1155–56.

question Defendants have raised here is whether a *state* regulation is preempted by *federal* law.[159]

The Supremacy Clause of the U.S. Constitution states that federal law "shall be the supreme Law of the Land."[160] This of course means that state law may be preempted by federal law. There are two general types of preemption: express preemption and implied preemption.[161] Implied preemption can be further divided into conflict preemption and field preemption.[162]

First, Defendants argue that R307-201-2 is preempted by 42 U.S.C. § 7522 because the latter requires scienter, while the former does not.[163] Here, Defendants assert that the CAA expressly preempts some state law related to mobile source emissions, and then suggest that the SIP conflicts with the CAA.[164] The CAA expressly preempts only certain laws aimed at new motor vehicles. 42 U.S.C. § 7543 reads: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."[165] Indeed, the same statute also states: "Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles."[166] In other words, the CAA expressly disclaims any preemptive

---

[159] Defendants do not challenge EPA's approval of R307-201-2 as part of Utah's SIP.
[160] U.S. Const. art. VI cl.2.
[161] *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 884 (2000).
[162] *See id.*; *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987).
[163] Defs.' Mot. 15–19.
[164] *Id.* 13–15.
[165] 42 U.S.C. § 7543(a); *see also In re Volkswagen*, 959 F.3d at 1217–18 (holding the CAA expressly preempts Utah's SIP to the extent it applies to new vehicles).
[166] 42 U.S.C. § 7543(d).

intent relevant to post-sale motor vehicles.[167] And the provision of Utah's SIP at issue is limited to post-sale motor vehicles.[168]

Having found no express preemption relevant to R307-201-2, the court turns to whether that provision is impliedly preempted by the CAA. Defendants apparently rely only on conflict preemption.[169] "[C]onflict preemption exists where 'compliance with both state and federal law is impossible,' or where 'the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."'"[170] Here, 42 U.S.C. § 7522(a)(3)(A) prohibits the after-sale removal or rendering inoperative of any device intended to reduce emissions if done "knowingly."[171] R307-201-2, by contrast, prohibits essentially the same conduct, but does not include a scienter element.[172] Defendants argue that this places the SIP "at odds" with the CAA.[173] But that is not the relevant test. Nowhere do Defendants suggest that it is *impossible* for them to comply with both state and federal law, nor do they suggest that R307-201-2 is an obstacle to the accomplishment of the purposes and objectives of Congress. Further, that the CAA itself expressly disclaims preemptive intent with regard to post-sale motor

---

[167] *Diesel Power Gear*, 21 F.4th at 1237.
[168] Utah Admin. Code § R307-201-2 (1998) (requiring registration in the State of Utah).
[169] *See* Defs.' Mot. 15–16.
[170] *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015).
[171] 42 U.S.C. § 7522(a)(3)(A).
[172] *See* Utah Admin. Code § R307-201-2 (1998) ("No person shall remove or make inoperable within the State of Utah the system or device or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere.").
[173] Defs.' Mot. 15.

vehicles[174] counsels against any finding of implied preemption, especially, where, as here, there is no other indication of preemptive intent.[175]   Accordingly, this argument is without merit.[176]

Second, Defendants suggest that R307-201-2 is preempted by the CAA because a violation of the SIP can lead to greater penalties than violation of the CAA's anti-tampering provision.[177] Thus, Defendants seem to imply that R307-201-2 cannot be enforced because it is field preempted or conflict preempted.[178] Field preemption exists where Congress has occupied the field of regulation so extensively that courts infer a Congressional intent to preempt all state regulation.[179] Defendants apparently take issue with the penalties the *CAA itself* sets for both violation of a SIP and violation of the anti-tampering provision.[180] The CAA cannot preempt itself. And while Defendants do not cite it or apparently challenge it, the court observes that even

---

[174] 42 U.S.C. § 7543(d).

[175] *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 ("[N]either an express pre-emption provision nor a saving clause 'bar[s] the ordinary working of conflict pre-emption principles.'" (quoting *Geier*, 529 U.S. at 869 (second alteration in original))).

[176] Defendants also, in a Notice of Supplemental Authority, raise Utah Code § 19-2-104(4), which reads: "A rule adopted under this chapter shall be consistent with provisions of federal laws, if any, relating to control of motor vehicles or motor vehicle emissions." *See* Notice of Supplemental Authority, ECF No. 116. Defendants argue that this statute "provides further support for Defendants' argument that the Utah SIP cannot be interpreted in a way that is inconsistent with the corresponding provisions in the Clean Air Act." *Id.* at 2. The court declines to consider this argument. First, the purpose of supplemental authority "is to advise the court of 'new authorities' a party has learned of after oral argument, not to interject a long available but previously unmentioned issue for decision." *Niemi v. Lassofer*, 728 F.3d 1252, 1262 (10th Cir. 2013) (applying Fed. R. App. P. 28(j)); *see also Kane County (II), Utah v. United States*, No. 2:10-cv-1073, 2020 WL 5016890, at *1–2 (D. Utah Aug. 24, 2020) (finding Tenth Circuit caselaw interpreting Rule 28(j) to be persuasive, since it is nearly identical to local rules permitting the filing of supplemental authority). This belated argument has long been available and may not be raised as if it were supplemental authority. Second, even if the court were to consider Defendants supplemental authority, the court would not be persuaded that it alters the analysis. To accept Defendants' suggestion that R307-201-2's elimination of the CAA's scienter requirement runs afoul of the statue, the court would have to interpret the phrase "shall be consistent with" as "shall be identical to." Instead, the court interprets the statute as merely codifying, as a matter of Utah law, the traditional conflict preemption analysis. In other words, a Utah regulation is not inconsistent with the CAA simply because it sets a higher bar than does the CAA, where it is entirely possible to comply with both Utah and federal law and where Utah law does not stand as an obstacle to Congress' purpose.

[177] Defs.' Mot. 16–17.

[178] *Id.* at 16.

[179] *See Arizona v. United States*, 567 U.S. 387, 401 (2012).

[180] *See* Defs.' Mot. 16; *see also* 42 U.S.C. § 7524(a) (penalties for anti-tampering); *id.* § 7413(d) (penalties for violation of SIP).

Utah's statute imposing penalties on violations of the SIP[181] would not be field preempted, as there is no indication in the CAA that Congress intended to fully occupy the field of penalties related to air quality violations.

And third, Defendants argue that "UPHE's SIP claims also must be dismissed to the extent they are directed at new vehicles."[182] UPHE does not challenge the merits of this argument, but instead argues that the court lacks jurisdiction to consider it under 42 U.S.C. § 7607.[183] 42 U.S.C. § 7607(b)(1) provides that "[a] petition for review of the [EPA's] action in approving or promulgating any [SIP] under section 7410 of this title . . . or any other final action of the Administrator under this chapter . . . which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit."[184] And the next subsection reads: "Action of the [EPA] with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement."[185] So if Defendants were challenging EPA's approval of the SIP provision at issue, UPHE would be correct that such proceedings would not be proper in this case. But that is not Defendants' argument.

Defendants do not challenge EPA's approval of Utah's SIP. Instead, they argue that R307-201-2 does not apply to new vehicles, in part because the CAA would preempt such regulation by states.[186] Indeed, the CAA expressly preempts state regulation of emissions for

---

[181] Utah Code § 19-1-303(1)(a)(i), (4); *id.* § 19-2-115(2)(a).
[182] Defs.' Mot. 19.
[183] Pl.' Resp. 30.
[184] 42 U.S.C. § 7607(b)(1).
[185] *Id.* § 7607(b)(2).
[186] *See* Defs.' Mot. 19.

new vehicles.[187] And the SIP provision at issue does not by its terms apply to new vehicles, especially when construed in light of the CAA. Nothing about the court's interpretation of the regulation calls into question EPA's approval of Utah's SIP. Therefore, Defendants are correct that UPHE may not premise its SIP claims on pre-sale motorcycles.[188]

In sum, to the extent that Defendants argue that R307-201-2 cannot be enforced at all, their arguments are meritless; that the regulation does not include a scienter element and that there are differing penalties is immaterial. However, the regulation would be preempted to the extent that it purports to apply to pre-sale motor vehicles. The court turns to application of the summary judgment standard to each portion of R307-201-2.

### 2.    Maintenance and Use of Emissions Control Device

UPHE's seventh and eighth claims are based upon the first sentence in R307-201-2, which reads:

> [1] Any person [2] owning or operating [3] any motor vehicle or motor vehicle engine [4] registered in the State of Utah [5] on which is installed or incorporated a system or device for the control of crankcase emissions or exhaust emissions in compliance with the Federal motor vehicle rules, shall [6] maintain the system or device in operable condition and shall use it at all times that the motor vehicle or motor vehicle engine is operated.[189]

UPHE argues that "Defendants' sales and repair records show that they have operated at least [112] new and used motorcycles between April 2017 and October 2022 without their federally required catalytic converters."[190] Defendants move for summary judgment on the basis that motorcycles are not motor vehicles and that dealers are not owners or operators; otherwise,

---

[187] *See* 42 U.S.C. § 7543(a).
[188] *Cf.* UPHE Claims Spreadsheet (identifying that claims 1 through 3 include violations stemming from the removal of catalytic converters from new and used motorcycles).
[189] Utah Admin. Code R307-201-2 (1998).
[190] Pl.'s Mot. 29.

Defendants make no argument that UPHE has insufficient evidence on any of the elements of their claim.[191] There is no genuine dispute of material fact as to the first element of the regulation. The court turns to the remaining elements.

### i.   Owners or Operators

Defendants argue that UPHE's claims based on the first sentence of R307-201-2 should be dismissed because dealers are not "owners."[192] However, UPHE does not argue that Defendants were "owners" within the meaning of the regulation. Accordingly, the court need not address Defendants' argument. Instead, UPHE suggests that Defendants "operated" motorcycles by test driving a motorcycle after performing installation or repairs.[193] For this fact, UPHE points to deposition testimony from Mr. Udy.[194] And while Defendants assert on reply that "they do not 'operate' motorcycles as 'operate' is used in the SIP,"[195] Defendants do not explain how "operate" is used in R307-201-2. Therefore, the plain meaning of "operate" controls,[196] and it clearly covers the occasional test drive. Mr. Udy's testimony refers only to testing of new motorcycles and of used motorcycles receiving a muffler replacement.[197] Nor does it suggest with sufficient certainty that such tests were performed on each and every motorcycle at issue in this case. Thus, there is a genuine dispute of material fact as to whether each of the 112 motorcycles at issue were operated.

---

[191] Defs.' Mot. 17–19. *But see* Defs.' Reply 17–18 ("UPHE has not established that Defendants, who are dealers, in fact operated motorcycles registered in Utah with inoperable emissions control devices. There are no facts that speak to the registration of motorcycles and no legal or factual support that Defendants operated motorcycles.").

[192] Defs.' Mot. 18.

[193] *See* Pl.'s Mot. 25–26, 29; Pl.'s Resp. 25–26.

[194] Udy Dep. 11:1–11:3; *id.* at 15:8.

[195] Defs. Reply 18.

[196] *See* Operate, Merriam-Webster, https://www.merriam-webster.com/dictionary/operate [https://perma.cc/6HYC-HVYW] (last visited Mar. 26, 2024) (noting that when used as a transitive verb, operate means "to cause to function"); *see also* Utah Code § 41-1a-102(49) (defining "operate" for purposes of the Utah Motor Vehicle Act).

[197] Udy Dep. 11:1–11:3; *id.* at 15:8.

### ii.    Motor Vehicles

Defendants argue that the SIP does not cover motorcycles because the title refers only to "*Automobile* Emission Control Devices," and because Utah does not require the inspection and testing of motorcycle emissions.[198] Where a statutory term is ambiguous, a title may be a proper source of resolving the ambiguity; however, the title of a statute does not override the plain text.[199] The text at issue here refers to "any motor vehicle or motor vehicle engine."[200] Thus, for Defendants' argument to have merit, the term "motor vehicle" must be ambiguous. And it is not. The ordinary meaning of the term "motor vehicle" encompasses cars, trucks, and motorcycles. Indeed, Merriam-Webster defines "motor vehicle" as "an automotive vehicle not operated on rails" especially "one with rubber tires for use on highways."[201] Similarly, Oxford English Dictionary defines "motor vehicle" as "[a] road vehicle powered by an engine (usually an internal combustion engine)."[202] And the CAA—which is persuasive since R307-201-2 is plainly based upon the CAA's anti-tampering provisions—defines "motor vehicle" as "any self-propelled vehicle designed for transporting persons or property on a street or highway."[203] The text of R307-201-2 thus plainly encompasses motorcycles.

The court pauses to point out that Defendants reliance on the title of R307-201-2 would fail even if "motor vehicle" were ambiguous. While Defendants do not develop their argument, it

---

[198] Defs.' Mot. 17 (citing Utah Admin. Code § R307-201-2 (1998)) (emphasis added); *id.* at 12–14.
[199] *Dubin v. United States*, 599 U.S. 110, 120 (2023); *see also Bhd. of R.R Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519, 528–29 (1947).
[200] Utah Admin. Code § R307-201-2 (1998).
[201] Motor Vehicle, Merriam-Webster, https://www.merriam-webster.com/dictionary/motor%20vehicle [https://perma.cc/8SM2-Y2T6] (last visited Feb. 14, 2024).
[202] Motor Vehicle, Oxford English Dictionary, https://www.oed.com/dictionary/motor-vehicle_n [https://perma.cc/4GAB-ZYGS] (last visited Feb. 14, 2024).
[203] 42 U.S.C. § 7550(2).

appears to be that the term "automobile" does not encompass motorcycles.[204] That, however, is simply not the case. The ordinary understanding of the meaning "automobile" encompasses all passenger vehicles designed for road use. And indeed, dictionary definitions confirm this understanding.[205] Defendants' argument is without merit.

Finally, that Utah does not require emissions testing for motorcycles is immaterial. Although a bit unclear, it appears that Defendants' argument is a policy argument made to demonstrate why it might be logical for Utah to exclude motorcycles from its anti-tampering provision.[206] But that has no bearing on the court's interpretation of R307-201-2. The provision is unambiguous, and whether the policy is logical is not for the court to decide.

### iii.   Registration

Next, the court turns to the fourth element of the provision. By its plain text, the first sentence of R307-201-2 applies only to those motor vehicles that are registered in the State of Utah. UPHE makes no showing on this point in its own motion for summary judgment.[207] However, on reply, UPHE argues that it can be presumed that the identified motorcycles were registered in Utah because Defendants provided evidence of their owners' Utah addresses.[208]

---

[204] Defendants make only the following conclusory statement: "The first flaw is that R307-201-2 expressly applies to 'Automobile Emission Control Devices.' While this is in the title and not the body of the text, it is no coincidence." Defs.' Mot. 17.

[205] *See* Automobile, Merriam-Webster, https://www.merriam-webster.com/dictionary/automobile [https://perma.cc/9J6Y-U7PU] (last visited Mar. 26, 2024) ("[A] *usually* four-wheeled automotive vehicle designed for passenger transportation." (emphasis added)); Automobile, Oxford English Dictionary, https://www.oed.com/dictionary/automobile_adj?tl=true [https://perma.cc/RND5-9HKE] (last visited Mar. 26, 2024) ("Noun . . . 2. Chiefly *North American*. A road vehicle powered by a motor (usually an internal combustion engine), esp. one designed to carry a driver and a small number of passengers; a car.").

[206] *See* Defs.' Mot. 17–18 ("Utah's SIP excludes motorcycles from the Inspection and Maintenance Program. As such, it makes sense that vehicles Utah's SIP does not require to be inspected or emissions tested to demonstrate attainment or maintenance of an air quality standard, would also not be included in a related SIP provision applicable to emission control devices.").

[207] *Cf.* Pl.'s Mot. 25–29.

[208] Pl.'s Reply 11.

This evidence is not sufficient to carry UPHE's burden; a reasonable jury would not be compelled to find in UPHE's favor on this element, even assuming UPHE had not raised it for the first time on reply.

And while Defendants argue that R307-201-2 categorically cannot apply to them to the extent that they are dealers who "do not register the motorcycles,"[209] Defendants make no argument in their motion that UPHE's claims fail for lack of proof on this element.[210] Rule 56(c) requires that Defendants either cite evidence in the record or show that "an adverse party cannot produce admissible evidence to support the fact."[211] In other words, where the moving party does not bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[212] But because Defendants did not do so, UPHE was under no obligation to resist summary judgment on this ground by coming forward with evidence on this element. Accordingly, the court finds that neither party carried their initial burden under Rule 56, and that summary judgment is improper on this element.

### iv.   Maintenance and Use of Emissions Control Device

Finally, because the evidence surrounding the fifth and sixth elements largely overlaps, the court considers them together. The 112 violations claimed by UPHE relate solely to instances in which Defendants purportedly operated motorcycles while checking for leaks in motorcycles on which they had installed new parts.[213] But simply operating a motorcycle after installing a

---

[209] Defs.' Mot. 18.
[210] *Cf. id.* 19.
[211] Fed. R. Civ. P. 56(c)(1).
[212] *Celotex*, 477 U.S. at 325.
[213] *See* Pl.'s Reply 10 ("Each of the 112 motorcycles identified in Row 7 are also identified in Row 1 as motorcycles from which Defendants removed their catalytic converters via installations of hollow aftermarket exhaust parts.");

new part is not enough to trigger liability under the first sentence of R307-201-2. UPHE must show that the parts installed by Defendants caused the vehicle's emissions control system to be inoperable such that it failed to comply with federal emissions standards.[214] And UPHE has not made such a showing. There is nothing in the record to suggest that the parts at issue in these 112 claimed violations rendered the emissions control system inoperable, nor is there any evidence in the record to suggest whether the motorcycles at issue continued to meet federal emission standards after such parts were installed. Indeed, in its own motion, UPHE does not point to any evidence of either fact; it simply states that "[t]hese violations are summarized" in its claims spreadsheet. That is not sufficient. On reply, UPHE suggests Defendants failed to maintain the emissions control device by installing "hollow aftermarket exhaust parts."[215] But UPHE fails to show that the majority of the parts at issue were indeed hollow.[216] Accordingly, the court cannot grant summary judgment to UPHE, as it has not provided evidence that would compel a jury to find in its favor.

---

*compare* UPHE Claims Spreadsheet, Row 7 (identifying the following Bates numbers as claimed violations: 1620, 2567, 2571, 6140, 8234, 2612, 5935, 5958, 6001, 6138, 6575, 8.92, 8445, 8530, 1159, 1172, 1207, 1305, 2332, 2388, 2411, 2423, 2431, 2482, 2500, 2504, 2507, 2541, 2545, 2547, 2559, 2624, 2634, 2642, 2900, 2907, 2949, 2969, 2971, 2982, 3004, 5817, 5846, 5877, 5920, 5926, 5933, 5946, 5998, 6045, 6057, 6095, 6516, 6540, 6562, 6618, 6659, 6666, 7090, 7136, 7911, 7953, 8054, 8239, 8342, 8416, 8453, 8459, 8462, 8464, 8481, 8507, 8539, 6041, 1161, 1672, 1684, 2307, 2604, 2607, 2911, 2929, 2937, 2947, 2993, 3008, 5668, 5899, 8996, 6068, 6091, 6093, 6115, 6134, 6495, 6497, 6520, 6524, 6537, 6548, 6630, 6641, 6655, 6657, 6689, 7040, 7128, 7140, 7909, 8044, 8100, 8116, 8170, 8216, 8278, 8322, 8403) *with* Defs.' Invoices. The court notes that while UPHE's spreadsheet lists the first five violations as applying to a "new" motorcycle, the invoices under the listed Bates numbers for those violations do not suggest that the repairs were performed on a pre-sale motorcycle. *See* Defs. Invoices, Bates Nos. 1620, 2567, 2571, 6140, 8234.

[214] Recall that no specific emissions control system is required under federal regulations. *See* sources cited *supra* notes 8–9. Accordingly, if a new part were installed that met federal emissions standards, there could be no liability under R307-201-2. Similarly, if the court were to read the sixth element as mandating that the original emissions control system be maintained and used at all times, it would negate the second sentence of R307-201-2, which provides an exception for installing a system that is at least equally as effective.

[215] Pl.'s Reply 10.

[216] *Cf. infra* note 372 and accompanying text.

However, the court similarly cannot grant summary judgment to Defendants. Again, Defendants made no argument in their motion that pointed out UPHE's lack of evidence on these elements. Accordingly, UPHE was under no obligation to come forward with such evidence in order to resist summary judgment, and the court cannot grant Defendants summary judgment either.

Therefore, the court denies both parties' motions for summary judgment on UPHE's seventh and eighth claims; neither party has carried their initial burden under Rule 56. There is no dispute of material fact on the first and third elements identified above; however, there are genuine disputes of material fact on the remaining elements. Finally, UPHE's updated spreadsheets retain five claimed violations for new motorcycles[217]; if these claims are based on pre-sale conduct by Defendants, then R307-201-2 is inapplicable as a matter of law.[218]

### 3.    Anti-Tampering

UPHE's first and second claims are based upon the second sentence in R307-201-2, which reads:

> No person shall remove or make inoperable within the State of Utah the system or device [used for the control of crankcase emissions or exhaust emissions in compliance with the Federal motor vehicle rules] or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally more effective in reducing emissions from the vehicle to the atmosphere."[219]

UPHE argues that "Defendants have removed [440] catalytic converters from new and used motorcycles between April 5, 2017 and October, 2022."[220] Defendants argue that UPHE has

---

[217] *See* UPHE Updated Spreadsheet, Row 7 (Bates Nos. 1620, 2567, 2571, 6140, and 8234).
[218] *Cf. supra* note 213.
[219] Utah Admin. Code R307-201-2 (1998).
[220] Pl.'s Mot. 28; Pl.'s Reply 3.

failed to prove that the parts it identifies were defeat parts, and it points to manufacturer representations about compliance.[221] Before addressing these arguments, the court must address two issues related to identifying the elements of this provision.

### i.    Elements of R307-201-2's Anti-Tampering Provision

First, UPHE argues that Defendants have the burden to prove the exception applies.[222] Defendants suggest that UPHE has the burden.[223] Generally, the burden of proving an exception to a statutory prohibition falls on the person claiming the benefit of that exception.[224] In other words, exceptions are generally treated as affirmative defenses, not as elements, to a prohibition. And there is nothing in the text or context of R307-201-2 that would warrant different treatment.

Second, Defendants briefly argue that the entirety of R307-201-2 applies only to owners or operators.[225] This argument fails. While the first sentence of the provision applies to "[a]ny person owning or operating any motor vehicle or motor vehicle engine," the second sentence contains no such limitation.[226] Instead, the second sentence simply states that "[n]o person shall remove or make inoperable . . . the system or device or any part thereof . . ."[227] Nothing about the second sentence is limited to owners or operators.

Therefore, appropriately construed, the elements of the second sentence of R307-201-2 are: (1) a person (2) within the State of Utah (3) removed or rendered inoperable an emissions

---

[221] Def.'s Mot. 19; *see also* Def.'s Opp'n 10–11.

[222] Pl.'s Mot. 29; Pl.'s Resp. 24.

[223] *See* Defs.' Reply 17 ("To prove each violation for removal, UPHE must prove Defendants (1) removed or made inoperable (2) within the State of Utah (3) an emission control device (4) without installing an equally or more effective emission control device.").

[224] *E.g.*, *United States. v. First City Nat'l Bank of Hous.*, 386 U.S. 361, 366 (1967); *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 91–92 (2008).

[225] *See* Defs.' Mot. 18–19 ("[T]he entire language in R307-201-2 must be read together, which means that dealers are not covered because they are not owners/operators and they do not register the vehicles.").

[226] Utah Admin. Code R307-201-2 (1998).

[227] *Id.*

control device or system (4) from a motor vehicle. There is no genuine issue of material fact on the first or second elements. And as discussed above, motorcycles are motor vehicles under the regulation. Accordingly, the court turns to whether there is a genuine issue of material fact on the third element and whether Defendants have proved the exception.

### ii.     Removed or Rendered Inoperable an Emissions Control Device

UPHE initially claims that Defendants have removed 440 catalytic converters from new and used motorcycles.[228] In its response, Defendants argue that "UPHE has failed to establish that when a part was sold, a corresponding part with a catalytic converter was removed."[229]

Defendants are correct that UPHE's spreadsheets and the invoices on which they are based do not show that any catalytic converters were removed. For instance, UPHE's spreadsheets identify a transaction wherein a "Black American Outlaw Dual Systems for Touring Models" part was installed on a motorcycle.[230] But there is no evidence in the record to show that when that part was installed, a catalytic converter was removed. And the same is true for nearly all the parts identified by UPHE in its spreadsheet. In response to Defendants' motion, UPHE presents EPA COCs.[231] But that evidence simply suggests that catalytic converters were installed on a number of the motorcycles listed in UPHE's spreadsheets; it does not suggest that when a particular part was installed, it necessarily meant the removal of a catalytic converter.

UPHE argues that installation of an aftermarket header pipe or muffler by physical necessity requires the removal of the original header pipe and muffler, which in turn necessarily

---

[228] Pl.'s Resp. 8–9; Updated UPHE Claims Spreadsheet, Summary Tables and Rows 1 through 7.
[229] Defs.' Resp. 10.
[230] *See* UPHE Claims Spreadsheet, Row 1, 1 (Bates No. 1137); Updated UPHE Claims Spreadsheet 6, Row 1 (Bates No. 1137); Defs.' Invoices, Bates No. 1137.
[231] *See* Copies of 2008–2022 Harley EPA COCs, ECF Nos. 109-1, 109-2, 109-3; Harley-Davidson Motorcycle OEM Catalytic Converters by Model and Year, ECF No. 107-5.

means that the original catalytic converter is removed.[232] But UPHE does not point to any evidence that proves both propositions for each of the motorcycles and aftermarket parts identified in its spreadsheets and in Defendants' invoices. UPHE does not devote any significant argument to whether an emissions control device or system was originally installed on each of the motorcycles at issue.[233] But in any event, even assuming that the record conclusively established that each motorcycle at issue was manufactured with an emissions control device, UPHE has not established that an emissions control device or system must have been removed when a particular aftermarket part was installed. For instance, UPHE points out that Mr. Udy testified that installing slip-on mufflers requires the removal of stock mufflers.[234] For that evidence to show the removal of an emissions control device, the court would need to assume that an emissions control device was located in the stock mufflers for each sale involving slip-on mufflers. But it cannot do so.

The only evidence presented by UPHE that links the installation of a particular part to the removal of a catalytic converter is Dr. St. Denis's expert report. Dr. St. Denis declares that he purchased a test motorcycle from Defendants on which was installed an exhaust system manufactured by Vance & Hines.[235] He declares that the stock exhaust system "consist[ed] of two header pipes, and two mufflers. A catalytic converter [was] installed in each muffler."[236] To install the aftermarket system, "the Dealership first removed the stock header pipes and stock

---

[232] Pl.'s Reply 7.
[233] At best, UPHE points to Dr. St. Denis's expert report, which considered only a handful of the models at issue, and the spreadsheet compiling EPA approvals for Harley-Davidson Motorcycles. *See* Pl.'s Resp. 16; *see also* St. Denis Report ¶¶ 54–55; St. Denis Decl. ¶ 3 n.1; Third St. Denis Decl. ¶ 4; Harley-Davidson Motorcycle OEM Catalytic Converters by Model and Year.
[234] *See* Pl.'s Reply 9 (quoting Udy Dep. 13:9–13:15).
[235] St. Denis Report ¶¶ 1, 21–23 (part no. 47624).
[236] *Id.* ¶ 21.

mufflers with catalytic converters."[237] The aftermarket system itself did not have catalytic

converters.[238] This sale is the subject of one of UPHE's claimed violations.[239] But because

UPHE does not point to this evidence in support of its argument on this claim in its motion, it

would be unfair to Defendants to grant summary judgment on this violation, as they were not

given an opportunity to respond.

But, as above, that does not mean that the court can grant Defendants summary judgment

on this element either. Defendants did not argue in their motion for summary judgment that

UPHE lacked evidence linking the installation of a particular part to the removal of a catalytic

converter.[240] Instead, Defendants focused entirely on whether the parts at issue were "defeat

parts,"[241] meaning parts that are not at least as effective as the original emission control device

installed on a given motorcycle. Defendants do argue that "UPHE has no evidence of the

configuration of the motorcycles upon which such parts were installed, which is necessary to be

able to assess if the parts could affect emissions."[242] This single, ambiguous sentence is

insufficient. Defendants' focus appears to again be on whether the resulting emissions were in

fact affected by the installation of a new emissions control device, not on whether an emissions

control device was removed or rendered inoperable. Defendants did not carry their burden in

---

[237] *Id.* ¶ 23.

[238] *See id.* ¶ 23.

[239] *See* UPHE Claims Spreadsheet, Row 1 at p. 19 (Bates No. 8652).

[240] *But see* Defs.' Reply 17 ("UPHE . . . has not established beyond bald assertion without foundation that parts containing catalytic converters were first removed. That the installation of a part necessitates the removal of a prior part does not necessarily mean that part was an [original] catalytic converter or that the prior part had a catalytic converter.").

[241] Def.'s Mot. 19.

[242] *Id.*

pointing out that UPHE lacked evidence on this element, which means UPHE was not obligated to come forward with evidence to survive summary judgment.

The court further observes that Mr. Timmons's responses to UPHE's interrogatories implicate this element, making summary judgment improper. In response to a question about whether Mr. Timmons was aware that the Dealerships "were removing [original] exhaust systems [which contain catalytic converters] during the applicable period," Mr. Timmons stated that he "knew the Dealerships sometimes removed [original] exhaust systems" but that "[t]here could be various reasons for doing so, including service or maintenance related reasons."[243]

Accordingly, neither UPHE nor Defendants have met their initial burden under Rule 56. Additionally, Mr. Timmons's responses suggest a genuine dispute of fact. Therefore, summary judgment is improper on this element.

### iii.    Installing an Equally Effective Device or System

Defendants argue that they are entitled to summary judgment because there is no evidence that the parts it installed were "defeat parts" and because the parts came with manufacturer compliance representations.[244] Because Defendants have the burden of proof on whether the exception contained in R307-201-2 applies, they must show that "no reasonable trier of fact could find other than for the moving party" before UPHE can be obliged to come forward with evidence of its own.[245] And Defendants have not produced evidence sufficient to carry that burden. Defendants have failed to provide evidence that the parts it installed actually met emissions standards, as the regulation requires. R307-201-2 is a strict liability regulation;

---

[243] Defs.' Response to Pl.'s Interrogatories to Def. Joseph L. Timmons, Jr., Second Set, at 8, ECF No. 94-13.
[244] Defs.' Mot. 19.
[245] *Leone*, 810 F.3d at 1153 (quoting *Calderone*, 799 F.2d at 259).

contrary to Defendants' arguments, whether a manufacturer provides a compliance representation for an aftermarket part is insufficient to determine Defendants' liability for removing a catalytic converter. The new part must in fact be "equally or more effective in reducing emissions from the vehicle to the atmosphere."[246] So a manufacturer representation could be evidence that a part is equally effective, but it is not itself determinative. A reasonable jury would not be compelled to decide in Defendants' favor based on this evidence alone.

In sum, neither side has carried its initial burden in demonstrating that it is entitled to summary judgment on the two anti-tampering claims based on R307-201-2. The court turns next to UPHE's CAA claims.

### C.  42 U.S.C. § 7522

UPHE's fourth and fifth claims are based on 42 U.S.C. § 7522(a)(3)(B), which provides that it shall be unlawful:

> [1] for any person to [2] manufacture or sell, or offer to sell, or install, [3] any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, [4] where a principal effect of the part or component is to bypass, defeat, or render inoperative [5] any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and [6] where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.[247]

Before reviewing the elements, the court first addresses two arguments from Defendants that seek to categorically foreclose liability on certain claimed violations.

---

[246] *Cf.* Utah Admin. Code R307-201-2 (1998).
[247] 42 U.S.C. § 7522(a)(3)(B).

### 1.  Reasonable Reliance

Defendants argue that UPHE's claims under Section 7522(a)(3)(B) fail as a matter of law because Defendants reasonably relied upon the representations of parts manufacturers.[248] In support of this assertion, Defendants point to websites that they suggest contain a representation that a given part is EPA compliant.[249] Plaintiffs do not apparently challenge the legal basis for this argument, but instead argue that there is a genuine dispute of material fact on whether Defendants actually reasonably relied on the representations they received from manufacturers.[250]

Defendants seem to argue that because federal regulations require that parts manufacturers ensure their parts are compliant, dealers can always rely on the representations of manufacturers.[251] Likewise, Defendants seem to argue that because they were not required to test motorcycle emissions, UPHE's claim fails as a matter of law.[252] Both arguments fail. Section 7522(a)(3)(B) applies to those who sell a defeat device as part of a motorcycle and who know or should know of the existence of a defeat device. In other words, the statute would plainly cover a situation in which a defendant sold a part that had a manufacturer's compliance representation, but where the defendant in fact knew or should have known that the part was nonetheless non-compliant. Indeed, in *Diesel Power Gear*, the Tenth Circuit rejected a similar argument related to as-is sales.[253] Thus, the existence of a manufacturer's representation does not, as a matter of law,

---

[248] Defs.' Mot. 22–23.
[249] *See* Defs.' Mot. 7–8; *see also* EPA Compliance Spreadsheet, ECF No. 82-11.
[250] Pl.'s Resp. 31.
[251] Defs.' Mot. 22.
[252] *Id.* at 23.
[253] *Diesel Power Gear*, 21 F.4th at 1254 ("There may be occasions in which an as-is seller could reasonably claim that it had no reason to know that the vehicle contained an illegal defeat device, and thus could escape liability under § 7522(a)(3)(B). But an ignorance defense is independent of whether the vehicle is sold with any warranties.").

defeat a claim under 42 U.S.C. § 7522(a)(3)(B). Even if it is true that Defendants have no legal duty to test emissions, that does not change the analysis.

Thus, while an aftermarket parts manufacturer's representation about compliance is relevant to the scienter element of Section 7522(a)(3)(B), it does not categorically foreclose liability. This is a question for the jury.

### 2. Direct Sales

Defendants also briefly argue that in each instance in which they sold parts directly to the consumer without installing the part, they cannot have known, as a matter of law, that the part was being used to defeat an emissions limitation.[254] This argument is unpersuasive. While that fact will be relevant for purposes of the scienter element, it does not categorically foreclose liability. Plainly, there are instances in which a dealer knew or should have known that a part is a defeat device, and whether the dealer sold the part directly to consumers or installed the part on behalf of the consumer would not change the analysis.

### 3. Evidence of CAA Violations

Defendants argue that there is no evidence that UPHE's claimed violations involve defeat parts, or that Defendants knew or should have known that such parts were defeat parts.[255] In its own motion, UPHE argues that Defendants sold and installed 440 aftermarket exhaust systems, sold and installed 155 software tuners, and sold 758 aftermarket exhaust systems over the counter, all of which are defeat devices under 42 U.S.C. § 7522(a)(3)(B) that Defendants knew

---

[254] Defs.' Mot. 23.
[255] *Id.* at 21.

or should have known were defeat devices.[256] In other words, only the fourth, fifth, and sixth elements are at issue in this case.

### i.  Principal Effect to Bypass, Defeat, or Render Inoperative

42 U.S.C. § 7522(a)(3)(B) prohibits the sale or installation of a motor vehicle part "where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with" EPA regulations.[257]

Defendants argue that UPHE lacks evidence that the aftermarket parts that they sold had such an effect.[258] UPHE argues that the parts at issue are defeat parts because none of them were certified as compliant by an executive order from the California Air Resources Board ("CARB EO").[259] And on reply, UPHE suggests that because Defendants only proffer links to websites "to counter UPHE's specific assertions of the number of catalysts removed by each asserted catalyst-removing part" in UPHE's motion, "Defendants concede these facts are undisputed consistent with Rule 56(c), thereby admitting UPHE's contention that the principal effect of the parts was to remove catalysts."[260]

The court begins with whether the absence of a CARB EO means that the parts sold and installed by Defendants were defeat parts. UPHE makes its argument without citation to legal authority and offers only a declaration from Dr. St. Denis.[261] Dr. St. Denis opines that "[a] certified aftermarket part with a CARB EO is accepted by EPA and can be sold lawfully in all 50

---

[256] Pl.'s Mot. 34–37.
[257] 42 U.S.C. § 7522(a)(3)(B).
[258] Defs.' Opp'n 20.
[259] Pl.'s Mot. 33–34, 36–37; Pl.'s Resp. 30–34.
[260] Pl.'s Reply 14.
[261] Pl.'s Mot. 33–35.

states consistent with the CARB EO. If the part has not been certified and does not have a CARB EO it lacks any official recognition as a legal part to be sold in any state."[262] Dr. St. Denis's declaration opines on a matter of law, not fact. Therefore, the court will examine UPHE's argument without regard to Dr. St. Denis's declaration.

As discussed above, the CAA generally prohibits states from adopting or enforcing emissions standards specific to new motor vehicles.[263] California, however, is the exception.[264] As such, California sets emission standards for motorcycles.[265] Likewise, it regulates the sale of aftermarket parts[266] and prohibits the sale of devices that alter the original design of an emissions control device or system.[267] However, California permits those prohibitions to be waived through a CARB EO.[268] And CARB provides a list of exempted aftermarket parts for highway motorcycles.[269]

For UPHE's argument to carry the day, CARB would necessarily have to impose an emissions standard no higher than that set by EPA *and* a given aftermarket parts manufacturer must have also sought to sell their parts in California. For motorcycles manufactured after 2010,

---

[262] 3rd St. Denis Decl. ¶ 8.
[263] *See* 42 U.S.C. § 7543(a).
[264] *See Diesel Power Gear*, 21 F.4th at 1236; 42 U.S.C. § 7543(b)(1).
[265] *See* Cal. Code Regs. tit. 13, § 1958.
[266] *See id.* §§ 2220–2222.
[267] Cal. Vehicle Code § 27156(c); *id.* § 38391.
[268] Cal. Code Regs. tit. 13, § 2222(h)(1)–(k)(1); *see, e.g.*, State of California Air Resources Board, Executive Order K-002 ("IT IS ORDERED AND RESOLVED: That the Steal Catalytic Exhaust System manufactured by BUB Enterprises Inc. . . . has been found not to reduce the effectiveness of any required vehicle pollution control system or to cause the vehicle emissions to exceed applicable emission standards, and is therefore exempt from the prohibitions of Sections 27156 and 3891 of the Vehicle Code . . . .").
[269] *See* California Air Resource Board, List of Exempted Aftermarket Critical Emission Control Parts for Highway Motorcycles, https://ww2.arb.ca.gov/sites/default/files/aftermarket/motorcycle1/exempthmc.pdf [https://perma.cc/9MLA-ZQEQ] (last updated June 21, 2024); *see also* Aftermarket Motorcycle Parts, California Air Resource Board, https://ww2.arb.ca.gov/aftermarket-motorcycle-parts [https://perma.cc/Z2LZ-A3HW] (last visited Mar. 21, 2024).

the federal and California standards are identical.[270] What is lacking, however, is evidence to suggest that the manufacturers of each of the parts identified in UPHE's claims spreadsheets sought to sell those parts in California. Without that evidence, there is nothing about the lack of a CARB EO that would demonstrate that a given part failed to meet an emission standard.

UPHE also points to a 2016 consent decree between the EPA and Harley-Davidson, which requires that Harley-Davidson itself instruct dealerships to deny certain warranty claims if a vehicle was tuned using a tuning product "not covered by a [CARB EO] or otherwise approved by EPA."[271] But UPHE has not shown that a consent decree to which Defendants were not party is material, nor has it shown why a provision limited to the denial of certain warranty claims should govern here.

Next, the court turns to whether Defendants made any evidentiary concession under Rule 56(e). Federal Rule of Civil Procedure 56(e) provides: "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court *may*: . . . (2) consider the fact undisputed for purposes of the motion; . . . or (4) issue any other appropriate order."[272] However, application of Rule 56(e)(2) is discretionary and UPHE has made no argument to suggest why the court should exercise its discretion in such a manner.[273] Therefore, the court declines to do so.

---

[270] *Compare* 40 C.F.R. § 86.410-2006 (setting an emission standard of 0.8 g/km for HC + NOx and 12 g/km for CO for class III motorcycles model year 2010 onward) *and id.* § 86.419-2006 (defining Class III motorcycles as those with an engine displacement of 280 cc and over) *with* Cal. Code Regs. tit. 13, § 1958 (setting the same emission standard for motorcycles with engine displacement of 280 cc and greater for model years 2008 onward).
[271] Consent Decree, *United States v. Harley-Davidson, Inc.*, No. 16-1687, ¶ 14 (D.D.C. Aug. 18, 2016).
[272] Fed. R. Civ. P. 56(e) (emphasis added).
[273] *Cf. Stella v. Anderson*, 844 F.App'x. 53, 58 (10th Cir. 2021).

Next, Dr. St. Denis's expert opinion does provide some evidence that certain parts are defeat parts.[274] However, a jury would not be compelled to find in UPHE's favor for each sale involving those specific parts, as the value of Dr. St. Denis's opinion will turn on credibility. Accordingly, the court finds that UPHE has failed to carry its initial burden under Rule 56.

Finally, the court turns to whether Defendants are entitled to summary judgment on this element. Defendants have carried their initial burden in pointing out that UPHE lacks evidence that all the parts it lists in its spreadsheets are defeat parts.[275] Thus, in order to resist summary judgment, UPHE must come forward with the kinds of evidence listed in Rule 56(c) to demonstrate that there will be a genuine issue for trial.[276] In response to Defendants' motion, UPHE argued that it "demonstrated in its Motion for Summary Judgment . . . that Defendants caused the sale and installation of hundreds of aftermarket exhaust systems without catalytic converters."[277] However, as discussed above, UPHE provided only limited evidence that the parts at issue were defeat parts.

Next, UPHE argues that the websites provided by Defendants for the purpose of establishing a manufacturer representation about emissions compliance essentially operate as an evidentiary admission.[278] In its own motion, Defendants suggest that "[o]f the 317 parts identified, 250 parts have a 49- or 50-state compliance manufacturer representation."[279] UPHE suggests that because websites covering 32 of the alleged violations suggest that the parts are not

---

[274] St. Denis Report ¶¶ 11, 13, 21, 23, 54.
[275] *See* Defs.' Mot. 21.
[276] *Celotex Corp.*, 477 U.S. at 324.
[277] Pl.'s Resp. 31.
[278] *Id.*; *id.* at 9–10.
[279] Defs.' Mot. 7.

legal for street use in any state,[280] Defendants have admitted that those parts are defeat parts.[281] While UPHE provides no authority to suggest that the court should treat these as evidentiary concessions, the court does find that these manufacturer representations create a dispute of material fact on this element. Next, UPHE suggests that "by providing empty, meaningless, inaccessible, or irrelevant weblinks" Defendants "concede they have no defense to selling and installing" parts that are the subject of another 385 alleged violations.[282] Again, UPHE cites no authority for the proposition that by proffering only irrelevant or inadmissible evidence— assuming that is true of the websites provided by Defendants—a party admits the fact they sought to dispute. Because it is UPHE's burden to prove this element, it would be illogical for the court to merely assume it away because Defendants failed to provide relevant evidence on their own motion for summary judgment.

Nevertheless, Defendants have admitted that Harley SLC "repeatedly sold and/or installed aftermarket 'full' and 'slip-on' exhaust parts that do not have catalytic converters."[283] While Defendants walk this back somewhat in argument,[284] there remains a genuine dispute of material fact whether parts sold or installed by Harley SLC lacked catalytic converters and were therefore defeat parts. In addition, Mr. Timmons admitted that he was aware that the Dealerships removed original exhaust systems, and that they "may have" "sold and installed aftermarket exhaust systems without catalytic converters that replaced [original] exhaust systems with

---

[280] *See* Updated UPHE Claims Spreadsheets, Row 2 at p. 1–2 (category A).
[281] Pl.'s Resp. 31; *id.* at 9.
[282] *Id.* at 31; *cf.* Updated UPHE Claims Spreadsheets, Row 2 at p. 2–20 (categories B & C).
[283] Compl. ¶ 102; *see* Answer ¶ 35, ECF No. 21 (admitting the allegation contained in paragraph 102 of the Complaint).
[284] *See* Defs.' Opp'n 25–26.

catalytic converters[.]"[285] Finally, Dr. St. Denis's declaration also suggests that at least some of the parts sold were defeat parts.[286]

Accordingly, there is a genuine dispute of material fact as to whether the parts identified by UPHE had the principal effect of bypassing, removing, or rendering inoperable the original emissions control system. While UPHE did not make a strong showing in response to Defendants' motion for summary judgment, there is sufficient evidence in the record from which a reasonable jury could find in UPHE's favor.

### ii.    Scienter

UPHE argues that Defendants knew or should have known that a specific part was a defeat part because Defendants could have performed simple visual inspections, because they could have checked that a part had a CARB EO, and because they have extensive experience.[287] Defendants argue that UPHE lacks evidence that Defendants knew or should have known that "a specific part, used in a specific application, could affect emissions."[288]

First, UPHE has not presented evidence that shows with sufficient certainty that Defendants had actual knowledge that a given part was a defeat part. Second, neither side has presented evidence sufficient for the court to find whether, as a matter of law, Defendants should have known that certain parts were defeat parts. There is some evidence in the record to suggest that it is relatively easy for an individual to tell if a motorcycle has aftermarket parts,[289] and that an aftermarket part is missing an emissions control device.[290] This evidence is sufficient to

---

[285] Defs.' Response to Pl.'s Interrogatories to Def. Joseph L. Timmons, Jr., Second Set, at 8, 9.
[286] *See supra* note 274 and accompanying text.
[287] Pl.'s Mot. 34–36.
[288] Defs.' Mot. 21.
[289] *See* Timmons Dep. 104:24–105:2.
[290] *See* 3rd St. Denis Decl. ¶ 2.

preclude summary judgment in favor of Defendants, as the ease with which Defendants could determine whether an aftermarket part contains an emissions control device is a factor in determining whether a dealer should have known that a given part was a defeat part. However, this limited evidence is not sufficient to compel a jury to find in UPHE's favor. A jury may also consider manufacturer representations, the presence or absence of a relevant CARB EO, whether Defendants actually performed the installation of a part, and their extensive experience in buying and selling such parts in weighing whether Defendants should have known that a given part was a defeat part. Therefore, because there are genuine disputes of fact on this element, summary judgment is inappropriate for either side.

To summarize, there are genuine issues of material fact preventing summary judgment for either side on the fourth, fifth, and sixth elements of the CAA's anti-tampering provision.

### III.   Responsible Corporate Officer Doctrine

UPHE alleged six claims against Mr. Timmons based on the responsible corporate officer doctrine.[291] The doctrine permits the extension of criminal liability for violation of public welfare statutes to corporate officers, even when the officer may not have known of the violation.[292] Defendants argue that the doctrine does not apply to Mr. Timmons under either the CAA or the NCA, and that in any event, the required elements have not been satisfied.[293] Because UPHE lacks standing to pursue its NCA claims, the court considers only whether the responsible corporate officer doctrine applies to Mr. Timmons under the CAA.[294]

---

[291] *See* Compl. ¶¶ 242–49, 286–93, 318–25, 364–71, 402–09, 426–33 (claims 3, 6, 9, 12, 15, and 18).

[292] *See, e.g.*, *United States v. Park*, 421 U.S. 658, 670 (1975).

[293] Defs.' Mot. 34–40.

[294] Neither party makes an argument regarding whether R307-201-2 applies to responsible corporate officers. *Cf.* Pl.'s Mot. 41 (suggesting, without analysis, that it does); Defs.' Mot. 31–38 (not addressing R307-201-2). Therefore, the court does not address the issue.

## A.  Civil Enforcement Actions

Defendants argue that the responsible corporate officer doctrine categorically does not extend to civil enforcement actions under the CAA.[295] In making this argument, Defendants suggest that the doctrine applies only if: (1) "Congress included the responsible corporate officer doctrine in the statute" or (2) "the definition of 'person' under the statute provides an avenue for the doctrine to be applied."[296]

In *United States v. Dotterweich*, which is often viewed as the foundational case for the doctrine, the Supreme Court observed that 21 U.S.C. § 333(a) "makes 'any person' who violates [21 U.S.C. § 331] guilty of a 'misdemeanor.' It specifically defines 'person' to include 'corporation.' *But the only way in which a corporation can act is through the individuals who act on its behalf*."[297] The court then permitted the extension of criminal liability to responsible corporate officers, even when they lacked knowledge of the corporation's offensive conduct.[298] Thus, the court rejected that even a narrow definition of "person" within the statute would exempt responsible corporate officers from criminal liability.

42 U.S.C. § 7604, which governs citizen suits under the CAA, reads: "[A]ny person may commence a civil action on his own behalf—(1) against any person . . . who is alleged to have violated . . . or to be in violation of . . . an emission standard or limitation under this chapter."[299] Further, "[t]he district courts shall have jurisdiction . . . to enforce such an emission standard or limitation, . . . and to apply any appropriate civil penalties[.]"[300] 42 U.S.C. § 7524 governs civil

---

[295] Defs.' Mot. 34–38.
[296] *Id.* at 34–35.
[297] 320 U.S. 277, 281 (1943) (emphasis added).
[298] *Id.* at 283–85.
[299] 42 U.S.C. § 7604(a)(1).
[300] *Id.* § 7604(a).

penalties for violations of 42 U.S.C. § 7522(a), and provides: "[A]ny person who violates section 7522(a)(3)(B) of this title shall be subject to a civil penalty of not more than $2,500."[301] And 42 U.S.C. § 7522(a)(3)(B) itself provides liability for "any person."[302] A single definition of "person" covers each of these provisions: "When used in this chapter—. . . (e) [t]he term 'person' includes an individual, *corporation*, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States *and any officer, agent, or employee thereof*."[303] The plain text of these provisions permits the extension of civil liability to corporate officers, as the phrase "any officer, agent, or employee" is distributed backwards to each of the specific entities preceding it, including corporations, through use of the word "thereof."

Defendants make two arguments to the contrary. First, they argue that "person" as defined in the CAA does not extend to responsible corporate officers.[304] Specifically, after quoting 42 U.S.C. § 7602(e), Defendants conclude: "There is no mention of officers or agents of a corporation[.]"[305] Beyond this conclusory statement, Defendants do not support their argument. As noted above, the text of the provision plainly includes corporate officers, agents, and employees.

Second, Defendants suggest that the express inclusion of responsible corporate officers in 42 U.S.C. § 7413(c)—which governs criminal penalties—negates any inference that Congress intended for the doctrine to operate as to civil penalties under 42 U.S.C. § 7413(d).[306] Indeed,

---

[301] *Id.* § 7524(a).
[302] *Id.* § 7522(a)(3)(B).
[303] *Id.* § 7602 (emphases added).
[304] Defs.' Mot. 35–38.
[305] *Id.* 35.
[306] *Id.*

Section 7413(c)(6) provides that "[f]or the purpose of this subsection, the term 'person' includes, in addition to the entities referred to in section 7602(e) of this title, any responsible corporate officer."[307] Defendants suggest that the omitted-case canon applies here.[308] But that canon applies only where there is a gap or omission in the relevant statute.[309] And here, there is no true gap or omission in Section 7602(e), since the plain text covers corporate officers. Indeed, adopting Defendants' reading would require it to adopt an unnatural reading of "person" as defined in 42 U.S.C. § 7602(e). That Congress expressly included responsible corporate officers with respect to criminal liability is unsurprising, given the heightened due process considerations particular to criminal cases.[310]

Finally, this court considers persuasive its earlier decision in *Utah Physicians for a Healthy Environment v. Diesel Power Gear*.[311] While that case reached the same result differently, Defendants do not effectively undermine the decision's analysis.

In sum, the CAA defines "persons" to include, among other things, officers of corporations. Accordingly, corporate officers can be held civilly liable under the CAA. Thus, the plain text resolves the issue, notwithstanding Congress's express reference to the responsible corporate officer doctrine in the CAA's criminal enforcement provision. In any event, even if there were textual ambiguity, the court is persuaded by its prior decision, and would follow it.

---

[307] 42 U.S.C. § 7413(c)(6).
[308] Defs.' Mot. 35–36 ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Russello v. United States*, 454 U.S. 16, 203 (1983) (alterations in original))).
[309] *See Russello*, 464 U.S. at 23; *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 93–98 (2012).
[310] *E.g.*, *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011) (describing the rule of lenity).
[311] 374 F.Supp.3d 1124, 1137 (D. Utah 2019).

### B.  Elements of the Doctrine

In order for the doctrine to apply, the following elements must be met: (1) an entity must have violated a public health statute[312]; (2) the officer must have held a position within the entity such that the officer had responsibility and authority to prevent or promptly correct the violation; and (3) the officer must have [knowingly] failed to prevent or promptly correct the violation.[313]

As described above, there is a genuine dispute of material fact whether the Dealerships violated 42 U.S.C. § 7522(a)(3)(B).

Next, there is no dispute that Mr. Timmons had responsibility and authority to prevent and promptly correct the alleged CAA violations.[314] Mr. Timmons is a member of both Harley-Davidson of Salt Lake City and Northern Utah Powersports.[315] Accordingly, the second element is met here.

Defendants make two arguments on the third element. First, Defendants argue that because 42 U.S.C. § 7522(a)(3)(B) incorporates a scienter element, Mr. Timmons cannot be held liable because there is no evidence that he "had knowledge of or participated in any of the acts forming the alleged violations."[316] UPHE argues that, to the contrary, there is no dispute that Mr. Timmons had actual and constructive knowledge of the relevant violations.[317]

Because Section 7522(a)(3)(B) limits liability to where "the person knows or should know" that a violation has occurred,[318] that scienter is likewise required for Mr. Timmons to be

---

[312] *See Dotterweich*, 320 U.S. at 280–81.
[313] *See Park*, 421 U.S. at 673–74.
[314] *See* Timmons Dep. 91:1–91:4; *compare* Pl.'s Mot. 10 *with* Defs.' Mot. 25–26.
[315] Timmons Decl. ¶ 2.
[316] Defs.' Mot. 39.
[317] Pl.'s Resp. 40.
[318] 42 U.S.C. § 7522(a)(3)(B).

held liable under the doctrine.[319] In his response to UPHE's interrogatories, Mr. Timmons stated

that he "was aware some non-Harley Davidson aftermarket exhaust systems were sold and

installed[.]"[320] Further, Mr. Timmons stated that he knew that the Dealerships may have been

selling and installing aftermarket exhaust systems without catalytic converters.[321] And Mr.

Timmons admitted to purchasing motorcycles with defeat parts already installed and re-selling

them at his Dealerships.[322] But because Mr. Timmons has not admitted to any specific violations

at issue, there remains a genuine issue of material fact on this element. In other words, Mr.

Timmons was generally aware of *some* of the alleged wrongdoing, but it is not clear of which

violations he was actually aware. Further, as Mr. Timmons' duties to the LLCs is not entirely

clear, there is a genuine dispute of material fact on whether Mr. Timmons should have known of

the alleged violations.

Second, Defendants argue that Mr. Timmons "took reasonable and responsible steps to

prevent sales of alleged defeat devices, going so far as to stop the sale of all non-Harley-

Davidson parts."[323] Even if there were no genuine dispute of material fact on this point,[324]

Defendants would not be entitled to judgment as a matter of law. The issue is whether Mr.

Timmons failed to prevent the violation in the first instance and whether any remedial measures

promptly corrected the violation. Whether the steps Mr. Timmons took were "reasonable" or

---

[319] *Cf. Park*, 421 U.S. at 672 (noting that strict liability as to corporate officers was appropriate under Food, Drug, and Cosmetic Act because "[t]he Act does not . . . make criminal liability turn on 'awareness of some wrongdoing' or 'conscious fraud.'").
[320] Defs.' Resp. to Pl.'s Interrogatories to Def. Joseph L. Timmons, Jr., Second Set, at 7.
[321] *Id.* at 9.
[322] Timmons Dep. 53:12–54:20, 81:13–82:12.
[323] Defs.' Reply 19–20; *see also* Defs.' Mot. 40.
[324] *Compare* Defs.' Mot. 5–6 *with* Pl.'s Resp. 7.

"responsible" does not foreclose potential liability as a matter of law. It is up to the jury to decide whether the efforts Mr. Timmons made were sufficiently rigorous and timely.

The court turns next to UPHE's motion for preliminary injunction.

## MOTION FOR PRELIMINARY INJUNCTION

### BACKGROUND

UPHE seeks a preliminary injunction to prevent Defendants from using or selling any motorcycle unless in compliance with the CAA and NCA, and from selling any motorcycle with a non-compliant aftermarket exhaust system installed.[325]

In support of its motion, UPHE offers evidence that on July 11, 2023, Dr. St. Denis inspected 18 used motorcycles offered for sale by Salt Lake Harley.[326] Dr. St. Denis found that ten of these motorcycles did not have a catalytic converter, and 14 lacked NCA-compliant exhaust systems.[327] Importantly, UPHE's motion does not seek to enjoin Defendants' sale of those motorcycles it suggests are in violation of the CAA and NCA[328]; rather, UPHE seeks to enjoin all wrongful sales and uses.

### STANDARD

Rule 65 of the Federal Rules of Civil Procedure authorizes courts to issue preliminary injunctions.[329] "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."[330] A party seeking a preliminary injunction must establish that four

---

[325] *See* [Proposed] Preliminary Injunction, ECF No. 49-9.
[326] St. Denis Decl. ¶ 3.
[327] *Id.*
[328] *See* Pl.'s Mot. for PI 3 (noting that nine of the 14 motorcycles alleged to be in violation had already been sold).
[329] Fed. R. Civ. P. 65(a).
[330] *Schrier v. Univ. of Colo.*, 427 F.3d 1253, (1258 (10th Cir. 2005); *accord Colorado v. U.S. EPA*, 989 F.3d 874, 883 (10th Cir. 2021).

factors weigh in its favor: (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "the injunction is in the public interest."[331]

There are three types of preliminary injunctions that require the movant to make a "strong showing" on both the likelihood of success factor and the balance of the equities factor.[332] These are: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."[333]

Defendants argue that UPHE has requested a disfavored preliminary injunction that warrants heightened scrutiny, since it has sought a mandatory preliminary injunction that would alter the status quo.[334] UPHE replies that it seeks only a prohibitory injunction.[335]

A mandatory preliminary injunction is an injunction "that requires the nonmoving party to take affirmative action . . . before a trial on the merits occurs."[336] Since UPHE seeks an injunction that would merely prohibit the selling of motorcycles that are either CAA or NCA non-compliant,[337] it is not seeking a mandatory injunction.

However, the court finds that UPHE is seeking a preliminary injunction that seeks to alter the status quo. "[T]he status quo is 'the last uncontested status between the parties which

---

[331] *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).
[332] *Colorado*, 989 F.3d at 884.
[333] *Id.* at 883–84.
[334] Def.'s Opp'n 6–7.
[335] Pl.'s Reply 2.
[336] *RoDa Drillling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).
[337] *See* [Proposed] Preliminary Injunction 2.

preceded the controversy."[338] In this case, the "last peaceable uncontested status"[339] between UPHE and Defendants was prior to UPHE sending its demand letter. Contrary to UPHE's argument that the determination of what is the status quo should take into account parties' legal rights under federal law,[340] the Tenth Circuit has clarified that "[t]he status quo is not defined by the parties existing *legal rights*; it is defined by the *reality* of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights."[341] In other words, under Tenth Circuit precedent, a preliminary injunction that orders a party to merely comply with federal law, where that party is alleged to have been violating such law, remains disfavored.

Therefore, the court applies the heightened preliminary injunction standard to UPHE's motion. UPHE must make a "strong showing" on both the likelihood of success on the merits factor and the balance of the equities factor.[342]

## DISCUSSION

Before the court turns to application of the preliminary injunction factors to the facts of this case, the court must address two preliminary issues: standing and claim waiver.

---

[338] *Schrier*, 427 F.3d at 1260.
[339] *Id.* (quoting 11A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2948 (2d ed. 1995)).
[340] Pl.'s Reply 2 ("Defendants should not be allowed to shield their noncompliance from injunctive relief by characterizing it as the 'status quo.' Ongoing violations of federal law are not deserving of such status.").
[341] *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1100 (10th Cir. 1991), *overruled on other grounds O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004); *accord Schrier*, 427 F.3d at 1260.
[342] *Colorado*, 989 F.3d at 884.

## I.        Standing

Before the court considers a motion for preliminary injunction, it must address standing

issues.[343] As discussed above, the court concludes that UPHE has standing to pursue air-related

claims when a vehicle has been driven or is likely to be driven in or around the Wasatch Front

airshed. UPHE lacks standing, however, to pursue air-related claims where the vehicle or part at

issue will not be operated in or around Salt Lake City. Likewise, UPHE lacks standing to pursue

any noise-related claims, since it has not shown that any of its members have been or are

imminently likely to be injured by a motorcycle Defendants have sold or on which they have

installed an aftermarket defeat part.

## II.    Claim Waiver

In their sur-reply, Defendants argue that because UPHE did not supplement its answer to

Defendants' contention interrogatory with the violations identified in their motion for

preliminary injunction, those alleged violations are not permitted in this case.[344] The court

rejected this argument above.[345] Accordingly, UPHE may proceed with the alleged violations

identified in its motion for preliminary injunction, notwithstanding that they are not identified in

UPHE's answer to Defendants' contention interrogatory.

## III.   Preliminary Injunction Factors

### A.  Likely Irreparable Harm

The Tenth Circuit holds that "irreparable injury [is] the 'single most important

prerequisite for the issuance of a preliminary injunction,' which must be met 'before the other

---

[343] *See, e.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013).
[344] Defs.' Sur-Reply to PI 2–4.
[345] *See supra* text accompanying notes 138–150.

requirements for the issuance of an injunction will be considered.'"[346] Therefore, the court

begins its analysis with this factor. Irreparable harm "must be certain, great, actual 'and not

theoretical.'"[347] It occurs if "the district court cannot remedy [the injury] following a final

determination on the merits."[348] Therefore, "simple economic loss usually does not, in and of

itself, constitute irreparable harm; such losses are compensable by monetary damages."[349]

Conversely, "courts recognize that '[e]nvironmental injury, by its nature, can seldom be

adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*,

irreparable."[350]

 On reply, UPHE asserts that the focus shifts from irreparable harm to the public interest

in cases involving environmental or public health statutes.[351] Several district courts in the Tenth

Circuit have indeed held that courts may rebalance the preliminary injunction factors in such

circumstances.[352] However, neither the Tenth Circuit nor the Supreme Court have adopted this

approach. Instead, the Tenth Circuit has cautioned against modifying the traditional test for

granting a preliminary injunction: "[A]ny modified test which relaxes one of the prongs for

---

[346] *Colorado*, 989 F.3d at 884.

[347] *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985))).

[348] *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quoting *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980)).

[349] *Id.*

[350] *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1050 (10th Cir. 2023) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)).

[351] Pl.'s Reply 8.

[352] *See Wilson v. Amoco Corp.*, 989 F.Supp. 1159, 1171 (D. Wyo. 1998) ("There is substantial authority that when a case is brought pursuant to an environmental or public health statute . . . the primary focus shifts from irreparable harm to concern for the general public interest."); *United States v. Power Eng'g Co.*, 10 F.Supp.2d 1145, 1149 (D. Colo. 1998) ("Normally, the most important equitable factor [when considering a preliminary injunction] is irreparable harm. When a case is brought pursuant to an environmental or public health statute, however, the primary focus shifts from irreparable harm to concern for the general public interest.").

preliminary relief and thus deviates from the standard test is impermissible."[353] Therefore, the court rejects the modification urged by UPHE.

Defendants suggest that because UPHE waited over a year after filing its Complaint to seek a preliminary injunction, it has undercut its argument of irreparable harm.[354] UPHE does not challenge this argument.[355] It is true that the Tenth Circuit has held that delay in seeking injunctive relief "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."[356] However, it has also clarified that "delay is but one factor in the irreparable harm analysis."[357] In *RoDa*, for instance, the Tenth Circuit held that delay did not alter the irreparable harm analysis when it "arose from [the plaintiff's] attempts to resolve the dispute," which included the hiring of investigators and holding several meetings to attempt to resolve the dispute.[358] Therefore, "[t]he question instead is whether the delay was reasonable, was not a decision by the party to 'sit on its rights,' and did not prejudice the opposing party."[359]

In this case, while it is plausible that UPHE's delay in seeking a preliminary injunction was caused, in part, by the need for evidence of Defendants' alleged violations, that alone is not conclusive. UPHE conducted its examination of Defendants' used motorcycles on July 11, 2023,

---

[353] *See Diné Citizens*, 839 F.3d 1282 (holding that a test which relaxed the likelihood of success on the merits factor when the other factors weighed in favor of relief could not be used following the Supreme Court's decision in *Winter*).
[354] Def.'s Opp'n 7.
[355] *Cf.* Pl.'s Reply 8–10 (arguing the irreparable harm factor without mentioning delay).
[356] *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984) (quoting *Le Sportsac, Inc. v. Dockside Rsch., Inc.*, 478 F.Supp. 602, 609 (S.D.N.Y. 1979)). *But see Benisek v. Lamone*, 585 U.S. 155, 158–59 (2018) (analyzing delay in seeking a preliminary injunction under the balance of the equities factor).
[357] *RoDa*, 552 F.3d at 1211.
[358] *Id.*
[359] *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016).

at which time it discovered the alleged violations.[360] UPHE did not seek a preliminary injunction

until September 28, 2023.[361] And as UPHE points out, Defendants have "presumably sold" nine

of the motorcycles UPHE initially observed as being out of compliance.[362] UPHE does not seek

to explain why it waited. Therefore, this delay somewhat undercuts any finding of an irreparable

injury, though it is not dispositive.

As discussed above, harms related to the environment are typically considered to be

irreparable.[363] The question then is whether UPHE has presented evidence that its members will

imminently be injured by air-related harms. It has. First, UPHE has shown that the absence of a

catalytic converter on a motorcycle will contribute to ozone and $PM_{2.5}$ pollution, both of which

are an issue along the Wasatch Front.[364] Next, UPHE presented evidence that its members are in

fact injured by elevated ozone and $PM_{2.5}$ levels.[365] Therefore, assuming a likelihood of success

on the merits, by showing that Defendants are offering for sale motorcycles that are likely to

contribute to ozone and $PM_{2.5}$ pollution, UPHE has shown likely imminent and irreparable harm

related to Defendants' selling of motorcycles that lack catalytic converters.

### B.   Substantial Likelihood of Success on the Merits

UPHE seeks a preliminary injunction based on 42 U.S.C. § 7522(a)(3)(B), which states

that it shall be unlawful:

> [1] for any person to [2] manufacture or sell, or offer to sell, or install, [3] any part
> or component intended for use with, or as part of, any motor vehicle or motor
> vehicle engine, [4] where a principal effect of the part or component is to bypass,
> defeat, or render inoperative [5] any device or element of design installed on or in

---

[360] *See* St. Denis Decl. ¶ 3.
[361] *See* Pl.'s Mot. for PI.
[362] St. Denis Decl. ¶ 5.
[363] *See Diné Citizens*, 59 F.4th at 1050.
[364] *See supra* notes 24–25 and accompanying text.
[365] *See supra* note 26 and accompanying text.

a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and [6] where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.[366]

There is no dispute that Defendants are "persons" or that motorcycles are "motor vehicles."[367] Likewise, because UPHE has shown that Defendants offer to sell and have sold used motorcycles on which aftermarket exhaust systems were installed, the second and third elements are plainly satisfied.[368] Accordingly, only the fourth, fifth, and sixth elements are at issue.[369]

On the fourth element, UPHE makes only a conclusory argument that the absence of a catalytic converter on a motorcycle with an aftermarket exhaust system necessarily means that the aftermarket exhaust system had the principal effect of removing an emissions control device.[370] Defendants suggest that Dr. St. Denis's inspection was incomplete, as several of the motorcycles he examined had catalytic converters installed "in the headpipes, not the mufflers."[371] On reply, Dr. St. Denis, however, explained that he examined "the interior space of all exhaust pipes installed on each motorcycle from the end of each pipe . . . to the engine head . . . including all piping upstream and downstream of the mufflers."[372] Based on Dr. St. Denis's examinations that revealed an absence of a catalytic converter on motorcycles with aftermarket exhaust systems installed, UPHE has demonstrated a likelihood of success on the merits for this element.

---

[366] 42 U.S.C. § 7522(a)(3)(B).
[367] *See* Pl.'s Mot. for PI 5.
[368] *See* St. Denis Decl. ¶¶ 3–5; *see also supra* text accompanying notes 134–136 (addressing the issue of pass-through sales).
[369] Defs.' Opp'n to PI 9–12 (arguing only that the fourth and fifth elements are not satisfied).
[370] Pl.'s Mot. for PI 5.
[371] Defs.' Opp'n to PI 10; *see also* Spratt Decl. ¶¶ 5–7 (declaring that four of the ten motorcycles at issue likely had the catalytic converter in the head pipe).
[372] 3rd St. Denis Decl. ¶ 3.

On the fifth element, Defendants argue that UPHE has not established that the motorcycles at issue were manufactured with catalytic converters.[373] Defendants assert, without citation to evidence or legal authority, that "older model motorcycles may not have catalytic converters."[374] UPHE responds that Dr. St. Denis confirmed that each of the motorcycles at issue had catalytic converters originally installed.[375] Dr. St. Denis provides only the links to EPA's and CARB's websites.[376] However, not all of the models identified by Dr. St. Denis appear in the cited documents—namely, the 2019 "FLDE Softail Deluxe."[377] Each of the remaining models, save for the 2007 "FLSTF Softail Fat Boy,"[378] were originally manufactured with catalytic converters.[379] Accordingly, UPHE has shown a likelihood of success on the merits with respect to this element for eight motorcycles.

Finally, on the sixth element, UPHE argues that Defendants knew or should have known that the aftermarket exhaust pipes at issue result in the removal of catalytic converters for two reasons. First, "[t]he existence and location of every catalytic converter originally installed in every Harley-Davidson motorcycle is shown in Defendants' parts and service manuals" and "[w]hether an aftermarket exhaust system includes a catalyst in a used motorcycle can be determined by a visual inspection."[380] Second, UPHE suggests that because Defendants operate

---

[373] Defs.' Opp'n to PI 10.

[374] Id.

[375] Pl.'s Reply to PI 5–6.

[376] St. Denis Decl. ¶ 3 n.1; Third St. Denis Decl. ¶ 4.

[377] See EPA, Certified Highway Motorcycle Test Results Report Data (Model Years: 2006 – Present), https://www.epa.gov/system/files/documents/2024-02/on-hwymc-2006-present.xlsx [https://perma.cc/J6M3-JC7B] (last updated May 2024).

[378] See id. (certificate number 7HDXC1.58AEC-004).

[379] See id. (certificate numbers: NHDXC1.87AEH-004; KHDXC1.87AEH-005-R02; JHDXC1.75AEE-008; JHDXC1.87AEH-012; HHDXC1.80AEC-001; GHDXCO1.2CEA-004-R01; EHDXC1.80AEC-007; BHDXC1.80AEC-03-R02).

[380] Pl.'s Mot. for PI 6.

motorcycle dealerships, and have experience in the area, they should have known that the parts at issue had the principal effect of removing catalytic converters.[381] Defendants suggest that they should have been able to rely on manufacturer representations that the parts were compliant.[382] UPHE replies that the evidence on which Defendants base their reliance argument lacks foundation and is hearsay, and that in any event, it is inherently unreasonable to rely upon a manufacturer representation when a simple visual inspection will confirm the presence of a catalytic converter.[383]

The evidence on this issue is insufficient to support UPHE's required "strong showing" of likelihood of success. The evidence is roughly equipoise. On the one hand, manufacturer compliance representations deserve some weight.[384] But on the other hand, Defendants' general experience in the field and that it is apparently relatively easy to determine whether a catalytic converter is present suggest that Defendants perhaps should have known that a given part was non-compliant, notwithstanding a manufacturer representation. Accordingly, the court finds that UPHE has not presented evidence of a sufficiently strong likelihood of success on this element. And because substantial likelihood of success on the merits is required for a preliminary injunction, the court need not reach the remaining factors.[385]

---

[381] *Id.* at 6–7.
[382] Defs.' Opp'n to PI 11–12; *see also* Spratt Decl. ¶ 6.
[383] Pl.'s Reply to PI 6.
[384] The court finds that Plaintiffs' hearsay objection is without merit, since the evidence is not being offered for the truth of the matter asserted. Likewise, the court finds that Plaintiffs' foundation objection is without merit.
[385] *See Diné Citizens*, 59 F.4th at 1281; *Aposhian v. Barr*, 958 F.3d 969, 989 (10th Cir. 2020).

A preliminary injunction is an "extraordinary remedy."[386] A party seeking one must make a "clear and unequivocal" showing that one should issue.[387] UPHE's motion falls short and must be denied.

## ORDER

For the forgoing reasons, the court GRANTS Plaintiff's motion to exclude expert testimony,[388] GRANTS IN PART Defendants' motion to exclude expert testimony,[389] GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment,[390] DENIES Plaintiff's motion for summary judgment,[391] and DENIES Plaintiff's motion for preliminary injunction.[392]

Signed July 1, 2024.

BY THE COURT

David Barlow
United States District Judge

---

[386] *Schrier*, 427 F.3d at 1258 (quoting *SCFC ILC*, 936 F.2d at 1098).
[387] *Id.* (quoting *SCFC ILC*, 936 F.2d at 1098); *Colorado*, 989 F.3d at 883.
[388] ECF No. 79.
[389] ECF No. 83.
[390] ECF No. 82.
[391] ECF No. 93.
[392] ECF No. 49.